**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **MICHAEL HAMM, JILL BROWN, AUSTIN RUSSELL, CHRISTIAN LAMMEY, NANCY JAMES, JILL WITTMAN, THOMAS MACONE,** individually and on behalf of themselves and all others similarly situated, | **Civil Action: 5:19-cv-488** Judge James S. Moody, Jr. Magistrate Judge Philip R. Lammens |
| Plaintiffs, | |
| v. | |
| **SHARP ELECTRONICS CORPORATION**, | |
| Defendant. | |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF THE PROPOSED
CLASS SETTLEMENT AND INCORPORATED MEMORANDUM OF LAW**

**GREG COLEMAN LAW**
Gregory F. Coleman*
Rachel Soffin (FBN 0018054)
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Phone: (865) 247-0080
Facsimile: (865) 522-0049
rachel@gregcolemanlaw.com
greg@gregcolemanlaw.com

**WHITFIELD BRYSON LLP**
Daniel K. Bryson*
Harper Segui*
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919-600-5000
Fax: 919-600-5035
dan@whitfieldbryson.com
harper@whitfieldbryson.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei*
Andrea Gold*
1828 L. Street, NW, Suite 1000
Washington, D.C 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

(* *pro hac vice*)

*Attorneys for the Plaintiffs and the proposed
Settlement Class*

Plaintiffs respectfully move, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of the proposed Settlement with Sharp Electronics Corporation ("Sharp") and affirmation of the certification of the Settlement Class defined in the Settlement Agreement.[1] This Settlement, reached after substantial expert investigation, active litigation, and lengthy and hard-fought negotiations in this case and four (4) other associated cases, resolves all of Plaintiffs' and Settlement Class Members' claims against Sharp in this action.

## I.    INTRODUCTION

Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Christian Lammey, Nancy James, Jill Wittman and Thomas Macone ("Plaintiffs"), individually and on behalf of all others similarly-situated, and Defendant Sharp Electronics Corporation ("Sharp" or "Defendant") have entered into a Class Action Settlement Agreement (the "Settlement," "Agreement," or "Settlement Agreement"), attached hereto as Exhibit 1, to resolve Plaintiffs' claims that Sharp's Microwave Drawers, including model numbers SMD2470AH, SMD2470AS, SMD3070AS, SMD2480CS, KB6524PS, and KB6525PS (collectively, "Microwaves"), have an alleged defect which may in certain instances cause arcing, which renders the Microwaves prone to premature failure. Sharp denies Plaintiffs' allegations, and the Parties engaged in significant hard-fought litigation and arm's length negotiations prior to reaching the Settlement.

Plaintiffs respectfully submit this Memorandum of Law in support of the unopposed motion for entry of an order that will: (1) grant Final Approval to the Settlement; (2) affirm the certification for settlement purposes of the proposed Settlement Class, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure; (3) appoint as Class Representatives the

---

[1] The complete Settlement Agreement, including all Exhibits, is attached hereto as Exhibit 1. Capitalized terms not defined herein shall have the same definitions and meanings as in the Settlement Agreement.

Plaintiffs previously appointed in the Court's Preliminary Approval Order (Plaintiffs Hamm, Brown, Russell, Lammey, James, Wittman and Macone); (4) appoint as Class Counsel the law firms and attorneys appointed previously in the Court's Preliminary Approval Order; (5) deny all timely objections, if any[2]; and (6) enter Final Judgment dismissing this Action.

The Court should grant Final Approval because the Settlement provides substantial relief for the Settlement Class, and the terms of the Settlement are well within the range of reasonableness and consistent with applicable case law. In light of the significant risks inherent in this Action, the Settlement is an excellent result for the Settlement Class. Indeed, as of December 20, 2020, as described below, 3,553 Settlement Class Members have submitted claims as part of the Settlement and there are *no* pending objections by any Settlement Class Member to final approval of the Settlement.

The Settlement satisfies all Eleventh Circuit criteria for final approval. The proposed Settlement is fair, reasonable, adequate, and in the best interests of the Settlement Class Members. It provides substantial and immediate benefits to Settlement Class Members, which collectively is valued at approximately $103,049,520 to $113,884,064. *See* Exhibit 2, Expert Report from Frank Bernatowicz, previously submitted to the Court at ECF No. 44, Ex. 2 (Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement) (hereinafter "Ex. 2, Bernatowicz Decl.").  As described in detail below, these benefits include:

- Extended Warranty: All Class Members shall receive an extension of the existing manufacturer's warranty for Documented Arcing Claims within any Class Microwave. The Extended Warranty shall extend the term of the existing manufacturer's warranty of one (1)

---

[2] One objection to the Settlement was filed on October 15, 2020, but was subsequently withdrawn on December 4, 2020.  *See* ECF Nos. 51 and 54.  No other objections were received.

year for parts and labor, and five (5) years for parts relating only to the magnetron tube, to an enhanced extended warranty of five (5) years for Documented Arcing Claims.

- <u>Treatment under Extended Warranty</u>:

  o <u>Replacement Microwave and Reimbursement of Labor and/or Costs</u>: The Extended Warranty includes the opportunity to receive a new replacement Microwave, which is comparable to the existing Class Microwave, in the event of a Documented Arcing Claim, along with reimbursement of any labor and/or service costs in connection with the Documented Arcing Claims of up to $150.00 per class member.

  o <u>Cash Option and Reimbursement of Labor and/or Costs</u>: In lieu of a replacement Microwave, consumers who have a Documented Arcing Claim during the extended five (5) year warranty period may select a $250 cash payment. Settlement Class Members who elect this cash payment remain entitled to reimbursement of any labor and/or service costs in connection with Documented Arcing Claims of up to $150.00 per Settlement Class Member.

  o <u>Voucher and Reimbursement of Labor and/or Costs</u>: In lieu of a replacement Microwave or Cash Payment, consumers who have a Documented Arcing Claim may select a $500 voucher for Sharp-branded merchandise. Settlement Class Members who elect this option remain entitled to reimbursement of any labor and/or costs in connection with Documented Arcing Claims of up to $150.00 per Settlement Class Member.

  o <u>Consequential Damages</u>: Settlement Class Members who elect either the cash payment or voucher option may also seek reimbursement for consequential damages of up to $200, for costs incurred to repair or cover the opening in a Settlement Class Member's kitchen cabinetry in which their Microwave was installed.

- In addition, any Settlement Class Member who can establish, with documented proof, that their Class Microwave experienced a Documented Arcing Claim instance within five (5) years of the date of purchase or installation of their Microwave, who did not previously receive a replacement Microwave, is entitled to replacement of their Microwave, or to the cash or voucher option, as described herein. Thus, Settlement Class Members who no longer possess their Microwave, or who possessed a Microwave for a period beyond the five (5) year extended warranty but experienced a Documented Arcing Claim within five (5) years of the date of purchase or installation of their Microwave, have an opportunity to participate in the Settlement.

Further, Sharp shall pay all Notice and Administration Costs directly to the Settlement Administrator as such costs are invoiced, and Sharp shall pay the Attorney Fee and Expense Award to Class Counsel.

Final approval of the fair and reasonable Settlement is in the best interest of Settlement Class Members. Not only does the Settlement provide for the meaningful and substantial relief outlined herein, but the Settlement delivers prompt and effective relief to thousands of consumers nationwide in a complex and lengthy litigation with significant risks and uncertainties.

## II.   BACKGROUND

### A.  Relevant Procedural Background.

On September 25, 2019, Plaintiff Hamm filed his Class Action Complaint alleging that the Microwaves contain a defect that causes arcing, which may make the Microwaves prone to premature failure (ECF. No. 1) ("Florida Action"). He alleged claims for breach of express and implied warranty, breach of contract, unjust enrichment, and violation of Florida's Unfair & Deceptive Trade Practices Act.

6

Related class actions were filed by the undersigned Class Counsel against Sharp in the United States District Court for the Northern District of California (*Brown, et al. v. Sharp Electronics Corporation,* No: 3:19-cv-00371-JD, N.D. Cal.) ("California Action") on January 22, 2019; the United States District Court for the Middle District of Georgia (*Lammey v. Sharp Electronics Corporation*, 3:19-cv-00048-CAR, M.D. Ga.) ("Georgia Action") on May 13, 2019; the United States District Court for the Southern District of Ohio (*James, et al. v. Sharp Electronics Corporation*, No. 2:19-cv-03246-SDM-EPD, S.D. Ohio) ("Ohio Action") on July 26, 2019; and the United States District Court for the District of Massachusetts (*Macone v. Sharp Electronics Corporation*, No. 1:19-cv-12021-WGY, D. Mass) ("Massachusetts Action") on September 25, 2019.

Prior to negotiating the Settlement in this Action, the Parties engaged in hard-fought litigation in the related actions. On March 27, 2019, in the related California Action, Sharp moved to dismiss Plaintiffs Brown and Russell's complaint and sought to stay the action pending resolution of the motion to dismiss. (California Action, ECF Nos. 25 and 27). On April 26, 2019, the plaintiffs in the California Action responded in opposition to Sharp's motions to dismiss and stay (*id.* at ECF Nos. 38 and 41), and Sharp filed its replies in support of its motions to dismiss and stay on May 28, 2019 (*id.* at ECF Nos. 42 and 43). On June 20, 2019, the court in the California Action heard oral argument from both Parties. On June 25, 2019, the court entered an Order confirming its ruling from the bench, which granted the motion to dismiss only as to the Plaintiffs' claim for unjust enrichment, and denied the remaining motion, and further denied Sharp's motion to stay. (*Id.* at ECF No. 46). Plaintiffs Brown and Russell subsequently filed a First Amended Complaint on August 22, 2019 (*id.* at ECF No. 55), which Sharp answered on September 19, 2019 (*id.* at ECF No. 56). In its Answer, Sharp included thirty-three (33)

affirmative defenses including, among others, lack of standing, expiration of statute of limitations, disclaimer or limitation of warranties, lack of privity, comparative fault, and failure to mitigate. (*Id.* at ECF No. 56, at 34-40). If the Parties had not negotiated the Settlement resolving the claims of all five cases, Sharp was likely to apply these and other defenses in its effort to defeat class certification and to move for summary judgment on all remaining claims.

In the California Action, the Parties spent considerable time developing a coordinated, joint discovery plan ("Joint Discovery Plan") to be applied across all five (5) actions.  Settlement Class Counsel and Sharp Counsel engaged in numerous meet and confer discussions, both via telephone and in writing, regarding the Joint Discovery Plan to be proposed to the court in the California Action per the court's request.  The comprehensive Joint Discovery Plan was intended to apply to all of the actions and outlined the Parties' agreement as to all of the significant aspects of discovery to be undertaken.  In July of 2019, the Joint Discovery Plan was submitted to the Court, and on August 2, 2019, the Parties appeared for a status conference regarding the remaining disputed issues in the Joint Discovery Plan.

On July 12, 2019, in the related Georgia Action, Sharp moved to dismiss Plaintiff Lammey's complaint (Georgia Action, ECF No. 28), and Plaintiff filed a First Amended Complaint on August 23, 2019 (*id.* at ECF No. 36).  Sharp filed another motion to dismiss on September 27, 2019 (*id.* at ECF No. 38), and Plaintiff Lammey responded in opposition to the motion to dismiss on November 19, 2019 (*id.* at ECF No. 42).

On October 14, 2019, in the related Ohio Action, Sharp moved to dismiss Plaintiffs James and Wittman's complaint (Ohio Action, ECF No. 29), and Plaintiffs' response was extended and ultimately stayed while the Parties worked toward resolution of all of the pending

actions (Ohio Action, ECF Nos. 37 and 42). The Parties attended several status conferences with the Ohio court by telephone.

While litigating these related actions, Sharp made known its intention to file similar motions to dismiss in the Florida Action and Massachusetts Action but did not do so given deadline extensions related, in part, to settlement negotiations. If the Parties had not negotiated this Settlement, Sharp undoubtedly would have fully litigated its motions to dismiss the Georgia and Ohio Actions, and would have moved to dismiss the Florida and Massachusetts Actions. Sharp also undoubtedly would have contested class certification and moved for summary judgment on any potentially remaining claims in each of the five (5) actions.

On July 17, 2020, for purposes of Settlement, Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Christian Lammey, Nancy James, Jill Wittman and Thomas Macone filed a Consolidated Amended Complaint in this Court (the "Action") (ECF No. 40). The Action involves the same alleged defect as in the Florida Action, Ohio Action, Massachusetts Action, Georgia Action, and California Action, and each includes multiple claims made on behalf of consumers in the states in which the complaints were filed.

On July 27, 2020, following settlement negotiations which took place over the course of approximately eleven (11) months, the Parties filed their Motion for Preliminary Approval of the Proposed Class Settlement (ECF No. 44), which this Court granted on August 5, 2020 (ECF No. 46).

### B. Class Counsel's Investigation

Prior to negotiating the Settlement, Class Counsel spent significant time communicating with Plaintiffs, investigating facts, researching the law, preparing well-pleaded complaints and amended complaints, engaging in informal discovery, working with an expert consultant, and

reviewing important documents and data. *See* Joint Declaration of Class Counsel. ("Ex. 3, Joint Decl."), attached as Exhibit 3, at ¶¶2, 11, 14-15.

Class Counsel spent many hours investigating the claims of several potential plaintiffs against Sharp. *Id.* Class Counsel performed hours of research on Sharp, its Microwaves, and consumer complaints. Additionally, numerous consumers were interviewed, and documents were collected to gather information about the Microwaves, the alleged defect, and Sharp's actions regarding the alleged defect and its knowledge of the same. *Id.* at ¶¶2, 11. Further, Class Counsel worked closely with a well-qualified engineering consultant who spent many hours investigating the Microwaves, including, *inter alia*, research of the product, specifications, industry standards, and alternative feasible designs. *Id.* The engineering consultant also performed significant testing on multiple Microwaves. The engineer provided ongoing assistance to Class Counsel during litigation, including formulation of discovery questions. *Id.*

The foregoing information was essential to Class Counsel's ability to understand the nature of Sharp's conduct and potential claims and remedies. ¶¶2, 11, 14-15. Class Counsel expended significant resources researching and developing the legal claims at issue. *Id.* Class Counsel is familiar with the claims as they have litigated and resolved cases with similar factual and legal issues. *Id.* at ¶¶10, 36. Class Counsel has experience in understanding the remedies and damages at issue, as well as what information is critical in determining class membership. *Id.*

Class Counsel entered the mediation fully informed of the merits of Settlement Class members' claims and negotiated the proposed Settlement while zealously advancing the position of Plaintiffs and Settlement Class members and being fully prepared to continue to litigate rather than accept a settlement that was not in the best interest of Plaintiffs and the Settlement Class. *Id.* at ¶¶2, 10-19, 36-37. U.S. Magistrate Judge Diane M. Welsh (Ret.) actively supervised and

participated in the settlement discussions to help the Parties reach an acceptable compromise. *Id.* at ¶¶13-16.

### C. Multiple Mediations and Subsequent Settlement Discussions

As shown herein, the Parties' settlement negotiations are the product of hard-fought, arm's-length negotiations, which took place over the course of approximately eleven (11) months, and included two (2) lengthy mediations, and numerous follow-up discussions, with the aid of U.S. Magistrate Judge Diane M. Welsh (Ret.). *Id.* at ¶¶10-19.

In August of 2019, the Parties commenced settlement discussions. To aid in those discussions, prior to mediation, the Parties requested and exchanged discovery pursuant to Rule 408 of the Federal Rules of Evidence. *Id.* at ¶14. On November 25, 2019, the Parties participated in a lengthy in-person mediation session with Judge Welsh at JAMS in New York, New York. *Id.* at ¶15. During mediation, the Parties exchanged additional discovery pursuant to Rule 408. *Id.* While the Parties were able to make substantial progress toward settlement, the Parties were unable to fully resolve this matter at the first mediation. *Id.*

On January 27, 2020, the Parties participated in a second in-person mediation session with the Judge Welsh (Ret.) at JAMS in New York, New York. The Parties were able to resolve additional issues regarding settlement but were unable to fully resolve this matter. *Id.* at ¶16.

Following the second mediation, the Parties continued their negotiations over the course of several telephonic discussions with the aid of Judge Welsh (Ret.). *Id.* at ¶17. Finally, on February 20, 2020, the Parties agreed to the final material terms of the Settlement, although they continued their discussions of the finer details of the Settlement through July 2020. *Id.* at ¶18-19.

### III.    MATERIAL TERMS OF THE SETTLEMENT AGREEMENT AND NOTICE PLAN

The Settlement's details are contained in the Agreement signed by the Parties, a copy of which is attached as Exhibit 1.  Below is a summary of the key terms of the Settlement.[3]

The Settlement Class is defined as follows:

All persons residing in the United States who, at any time during the Class Period, became the First Consumer Purchaser of a Class Microwave.

The Class Period shall be January 1, 2009 through August 5, 2020.

As defined in the Settlement Agreement, "Class Microwave" means any microwave oven drawer unit manufactured or sold by Sharp or any of its related entities and affiliates under the Sharp brand name, including, without limitation, the following model numbers, and any sub-models:  KB6524PS, KB6525PS, SMD2470AS, SMD3070AS, SMD2470AH, SMD2480CS, and SMD2489ES (and inclusive of sub-models, without limitation, KB6524PSY, KB6524PSYA, KB6524PSYB, KB6524PSYD, KB6525PSY, KB6525PSYD, SMD2470ASY, SMD2470ASYA, SMD2470ASYB, SMD2470ASYD, SMD3070ASY, SMD3070ASYA, SMD3070ASYB, SMD3070ASYD, SMD2470AHB, and SMD2470AHD).

As further defined in the Settlement Agreement, "First Consumer Purchaser" means either (1) the first person to purchase or receive a new Class Microwave for his/her own use or (2) the first person to own a residential real property after a new Class Microwave has been installed for the owner's use.

Excluded from the Settlement Class are: (a) officers, directors, and employees of Sharp or its parents, affiliates, or subsidiaries, (b) insurers of Class Members, (c) any entity purporting to be a subrogee of a Class Member, (d) any secondary owner of a Class Microwave including,

---

[3] To the extent of any inconsistency between the description of the Settlement herein and the terms of the Settlement Agreement, the express terms of the Settlement Agreement shall control.

without limitation, any purchaser of a used Class Microwave, purchaser of real property containing a used Class Microwave, or any other owner of a Class Microwave who was not the First Consumer Purchaser of a Class Microwave, (e) all third-party issuers or providers of extended warranties or service contracts, (f) persons who previously fully released their claims against Sharp, (g) any personnel of the Court overseeing the proposed settlement, and any immediate family member of such personnel, and (h) any personnel of the Settlement Administrator, and any immediate family member of such personnel, and (i) those persons who timely and validly exercise Opt-Out.

For purposes of final approval, the following summarizes the Agreement's terms. As shown below, and in the expert declaration of Frank Bernatowicz attached hereto as Exhibit 2, the value of settlement benefits to the Settlement Class is approximately $103,049,520.00 to $113,884,064.00. Sharp does not object to the Bernatowicz Declaration for purposes of the Settlement, provided however that nothing in the Bernatowicz Declaration shall be deemed an admission by Sharp nor shall be binding in this or any other litigation as against Sharp.

### A. Extended Warranty

The Settlement provides for a substantial extension of the warranty accompanying the Class Microwaves. Prior to the Settlement, each Class Microwave came with a warranty of one (1) year for parts and labor, and five (5) years for parts only relating to the magnetron tube in the Microwaves. Under the Settlement, the existing warranties are extended to a total of five (5) years for a Documented Arcing Claim. The warranty begins to run on the date of installation or 30 days after purchase, whichever is earlier. For those Settlement Class Members who do not have proof of the date of purchase or installation, proof of the date of manufacture from the serial

number plate is sufficient, with a presumption that the Class Microwave was installed 90 days after the date of manufacture. The Extended Warranty includes the following benefits:

**B. Treatment under Extended Warranty:**

1.    <u>Replacement Microwave</u>: The Extended Warranty includes the opportunity to receive a new replacement Microwave, which is comparable to the existing Class Microwave, in the event of a Documented Arcing Claim.[4] According to documentation from Sharp, along with Plaintiffs' expert's analysis of this documentation and his independent research of the cost of extended warranties for microwaves, the cost of a four (4) year warranty extension is approximately 17% of the sales price for all Microwave models. Sharp has distributed more than 500,000 Microwaves into the consumer marketplace. Using the formula of Quantity of Units x Price x 17%, as shown in the attached Exhibit 2 from Plaintiffs' expert economist, Frank Bernatowicz, the value of the Extended Warranty is approximately $97,292,580.00, and the value of the replacement Microwaves is up to $14,261,294.00. *See* Ex. 2, Bernatowicz Decl. at ¶¶23, 34.

2.    <u>Voucher and Cash Option</u>: Settlement Class Members whose Class Microwave experiences a Documented Arcing Claim during the Extended Warranty period may select, in lieu of a receiving a replacement Microwave, either (1) a $250 cash payment or (2) a $500 voucher for Sharp-branded merchandise. As shown in the attached Exhibit 2 from Mr. Bernatowicz, the value of the voucher option is approximately $6,583,500.00, and the value of the cash option is approximately $3,426,750.00. *See* Ex. 2, Bernatowicz Decl. at ¶¶23, 34.

---

[4] In certain instances, the Extended Warranty may extend up to six years from the date of installation, in the event the replacement is made during the fifth year of ownership because the Extended Warranty will have a one (1) year warranty term from the date of replacement for a Documented Arcing Claim or the remainder of the original five (5) year extended warranty, whichever is longer.

       3.     <u>Reimbursement of Labor and/or Service Costs:</u>

For consumers who elect any of the above options (replacement microwave, voucher or cash), the Extended Warranty also covers reimbursement for any labor or service costs in connection with a Documented Arcing Claim including, but not limited to, inspections to determine arcing related to the Class Microwaves, in an amount up to $150.00. As shown in the attached Exhibit 2 from Mr. Bernatowicz, the value of the reimbursement for labor and/or service costs is approximately $2,056,050.00. *See* Ex. 2, Bernatowicz Decl. at ¶¶28, 34. Claims for the voucher or cash option, and for reimbursement of labor or service costs in connection with a Documented Arcing Claim, are subject to verification by the Settlement Administrator.

       4.     <u>Reimbursement of Consequential Damages:</u>

Settlement Class Members who elect the cash or voucher option, and choose not to accept a replacement Microwave, may also seek reimbursement for consequential damages of up to $200 with documented proof.  These consequential damages are limited to the costs incurred to repair or cover the opening in a Settlement Class Member's kitchen cabinetry in which their Sharp Microwave was installed.

### C.  Class Release

In exchange for the benefits allowed under the Settlement Agreement, upon the Effective Date, Settlement Class Members who did not timely and validly opt out of the Settlement Class will release and discharge the Released Claims against the Released Persons. All of the Plaintiffs in the Consolidated Action have agreed to participate as Class Representatives in this matter, have agreed not to request exclusion from the Settlement Class, and have agreed to be bound by the release set forth in the Settlement Agreement at Paragraph 6.1.

### D. Class Representative Service Payments

As part of the Settlement, Sharp agreed to pay Service Payments, if awarded by the Court, of up to $1,500 to each of the Class Representatives in this Action in recognition of the time and effort they personally invested in this litigation and in exchange for the claims of Class Representatives in this Action being released. About a month after this Court's entry of the Order Granting Preliminary Approval (ECF No. 46), the Eleventh Circuit decided *Johnson v. NPAS Sols., LLC*, No. 18-12344, 2020 U.S. App. LEXIS 29682, at *17-28 (11th Cir. Sept. 17, 2020). In that case, the Eleventh Circuit found that service awards to class representatives were prohibited based upon Supreme Court cases from the 1800s. Following entry of the *Johnson* opinion, on October 22, 2020, the *Johnson* plaintiff/appellee filed a Petition for Panel Rehearing or Rehearing En Banc. Following that request, on November 5, 2020, the Eleventh Circuit granted multiple parties' petitions to file amicus briefs in support of the rehearing en banc and, on November 9, 2020, the Eleventh Circuit withheld issuance of the mandate in that case.

Because of the Eleventh Circuit's possible rehearing en banc in *Johnson*, on December 7, 2020, in an order granting final approval of a class action settlement in *Harvey v. Hammel Kaplan Co.*, LLC, No. 3:19-cv-640, 2020 U.S. Dist. LEXIS, at *9-10, 22 (M.D. Fla. Dec. 7, 2020), Judge Corrigan directed the defendant to deposit the agreed service awards of $1500.00 in the registry of the Court, to be held until the Eleventh Circuit's issuance of a mandate in *Johnson*. *Id.* at 10, citing *Metzler et al. v. Med. Mgmt. Int'l, Inc. et al.,* No. 8:19- CV-2289-T-33CPT, 2020 U.S. Dist. LEXIS 187478, at *7-8 (M.D. Fla. Oct. 9, 2020) (court granted final approval of class action settlement and retained jurisdiction for limited purpose of revisiting service awards if Eleventh Circuit reverses *Johnson*).

In light of the opinion in *Johnson,* Class Representatives are presently not moving for Court approval of the service payments.  However, similar to the rulings in *Harvey* and *Metzler*, Plaintiffs respectfully request that this Court retain jurisdiction for the limited purpose of revisiting the approval of service payments if the Eleventh Circuit holds a hearing en banc in *Johnson* and reverses its decision.  Plaintiffs do not seek an order directing Sharp to deposit the service payments into a Court registry, as they do not believe such an order is necessary. Sharp has agreed to pay the service payments in the event *Johnson* is reversed and this Court awards the service payments.  If the Court agrees to retain jurisdiction for this limited purpose, Plaintiffs will promptly petition the Court for an order approving the service payments to the Class Representatives.

### E.  Attorneys' Fees and Expenses

As detailed in Plaintiffs' Unopposed Motion for Attorneys' Fees and Expenses, filed on October 30, 2020 (ECF No. 53), Class Counsel has not been paid for their extensive efforts or reimbursed for litigation costs and expenses incurred. The Parties negotiated and agreed upon attorneys' fees and costs only after agreeing on all other material terms of the Settlement.  Sharp has agreed not to object, oppose, appeal or take a position to any fees and expenses request, up to and including the aggregate amount of three million dollars ($3,000,000.00), and has agreed to pay the fees and expenses, up to that amount, as may be awarded by the Court. Such award will serve to compensate for the time, risk and expense Plaintiffs' counsel incurred pursuing claims on behalf of Settlement Class Members. This represents approximately only 2.6% to 2.9% of the $103,049,520.00 to $113,884,064.00 value of the Settlement as estimated by Mr. Bernatowicz.

Sharp's payment of fees and costs to Class Counsel is entirely separate and apart from the benefits provided to the Settlement Class and will have no impact on the recovery received by

Settlement Class Members. Moreover, the effectiveness of the Settlement and the releases are not contingent on the Court's approval of the Fee and Expense Award or determined by the amount of the Fee and Expense Award approved by the Court.

### F.  Notice and Administration

#### 1.        Notice Plan

The Settlement Administrator is Rust Consulting ("Rust"), which oversaw the Notice Plan. Rust is one of the leading notice administration firms in the United States. As detailed in the Declaration of Tiffaney Janowicz, Senior Vice President at Rust Consulting, Inc. ("Rust"), attached hereto as Exhibit 4 ("Ex. 4, Janowicz Decl."), each facet of the Notice Plan was timely and properly accomplished. The Declaration of Tiffaney Janowicz attaches all relevant notice and administration documents as exhibits, which are incorporated herein.

The Notice Plan was completed in accordance with this Court's instructions in the Preliminary Approval Order. *See generally* Ex. 4, Janowicz Decl.; Ex. 3, Joint Decl. ¶32. The Notice Plan consisted of five primary parts: (1) a nationwide press release, (2) a Long Form version of the Class Notice containing more detail than the two other notices that has been available in English and Spanish on the Settlement Website (www.sharpmicrowavelitigation.com) and via U.S. mail upon request, (3) an email version of the Class Notice designed to reach those Settlement Class members for which Sharp maintains valid email addresses, (4) a postcard version of the Class Notice direct mailed to all Settlement Class members for whom Sharp did not provide an email address and those who were sent an email that was returned undeliverable, and (5) print and Internet ads.  *See generally* Ex. 4, Janowicz Decl.; Ex. 3, Joint Decl. ¶33.

On August 17, 2020, the Settlement Administrator received data files identifying potential Settlement Class members' names, last known addresses and email addresses, and ran the mailing addresses through the National Change of Address Database. *See* Ex. 4, Janowicz Decl. at ¶12. Thereafter, on September 18, 2020, 50,560 emails were sent to Settlement Class members for whom Sharp maintained email addresses. *Id*. ¶11, 14. Of the emails sent, 3,951 were returned as undeliverable or the email address was determined to be invalid. Of the 3,951 Settlement Class Members who did not receive the emailed Short Form Notice, a mailing address was available for 3,691, and those were denoted to receive a Short Form Notice by mail. The postcard version of the Short Form Notice was mailed to these Class Members on October 13, 2020. *Id*. ¶14.

On September 18, 2020, 10,964 postcards were sent to Settlement Class members that Sharp did not have email addresses for. *Id*. ¶13. As of December 20, 2020, 1,658 postcards were returned as undeliverable without forwarding addresses. A skip trace, using all available information, was performed on 1,450 of those undeliverable Short Form Notices. Of the 1,450 traces performed, 620 resulted in updated addresses. Short Form Notices in postcard form were then re-mailed to these 620 Settlement Class Members. *Id*. ¶15.

On September 18, 2020, and September 22, 2020, the Short Form Notice was also published in People magazine and Good Housekeeping magazine, respectively. The nationwide circulation for Good Housekeeping magazine is approximately 4,200,000 with a readership of 4,916,000. The nationwide circulation for People magazine is 3,400,000 with a readership of 9,250,000. *Id*. ¶18.

On September 21, 2020, the Settlement Administrator issued a national Press Release to further inform potential Settlement Class Members of the Settlement. The Press Release

generated 85 postings of the full text of the release, which resulted in a potential audience of 119,171,140. Ex. 4, Janowicz Decl. ¶19. The release received 1,851 views, 16 shares, and 575 web crawler hits. *Id*. A total of 47 journalists viewed the press release. *Id*. Information about the Settlement appeared in media outlets, such as MarketWatch, Yahoo! Finance, AP News, and Seeking Alpha. The press release included a message that highlighted the details of the Settlement, provided information for potential Class Members, and featured the toll-free telephone number and website address. *Id*.

From September 18, 2020, through October 9, 2020, digital ads were placed on several platforms. A total of 70,937,097 impressions and 49,504 clicks resulted from the placement of these ads on Google, Facebook, and Instagram. Ex. 4, Janowicz Decl. ¶19.

In addition, the Settlement Website, with a Long Form version of the Class Notice and other important filings relating to the Settlement, was established on September 17, 2020. *Id*. ¶21. The website allowed Settlement Class members to obtain detailed information about the Action and the Settlement. *Id*. As of December 20, 2020, the Settlement Website had 181,850 unique visitor sessions. *Id*. ¶22. The Long Form Notice has been viewed and/or downloaded a total of 1,795 times. The Claim Form has been viewed and/or downloaded a total of 2,017 times. *Id.*

On September 16, 2020, an automated toll-free telephone line established and maintained by the Settlement Administrator became operational. The telephone line is available 24 hours a day, seven days a week, for Settlement Class members to call to listen to answers to frequently asked questions and to request Long Form Notices be sent via mail. *Id*. ¶23. As of December 20, 2020, the toll-free number has handled 1,047 calls. *Id*.

The Notice Plan was effective as the Class Notice reached approximately 75% of the target audience consisting of homeowners with a total household income of $75,000 and over. *Id.* at ¶8.c.

### 2.      Settlement Administration

The Settlement Administrator has also distributed or made available Claim Forms to Settlement Class Members. Settlement Class Members may file a claim either through the regular mail or email ("paper claim") or online at the Settlement Website.  Paper claims are to be sent directly to Sharp via mail or email. As of December 20, 2020, the Settlement Administrator and/or Sharp have received a total of 3,553 total claims. Ex. 4, Janowicz Decl. at ¶28. All available Claimant contact and claim information, along with paper claims received by the Settlement Administrator and any documentation submitted by the Claimant to support the claim, is transferred by the Settlement Administrator to Sharp on a weekly basis for review and validation. This claim transfer process will be ongoing until such time that it is determined all potential Limited Extended Warranty periods have expired, and the claim filing deadline for any of those potentially-affected Settlement Class Members has passed.

### G.  Reaction to the Settlement by the Settlement Class

In accordance with the Notice Plan, Settlement Class members who wished to opt-out of the Settlement were required to do so by no later than November 17, 2020, and Settlement Class members who did not opt-out could object to the Settlement by no later than November 17, 2020. There have been just 6 timely requests for exclusion from the Settlement and no objections to the Settlement. Ex. 4, Janowicz Decl. ¶25; Ex. 3, Joint Decl. ¶42. The one objection that was timely received was later withdrawn by the objector, Steven Helfand, who stated that he is "now supportive of the Settlement and does not have any objection to its final approval."  ECF No. 54-

1. Mr. Helfand did not request, and has not received (nor will he receive), any compensation for the withdrawal of his objection.  *Id*.; *see also* Ex.3, Joint Decl. ¶¶43-54.

## IV.    THE STANDARDS OF RULE 23(A) AND RULE 23(B)(3) HAVE BEEN MET

The Court previously found that the requirements of Rule 23(a) and 23(b)(3) have been satisfied in this Action when conditionally certifying the Settlement Class in its Preliminary Approval Order. ECF No. 46 at 2-3. Plaintiffs respectfully submit that the Court should make the same determinations in granting Final Approval and certifying the Settlement Class.

## V.    THE LEGAL STANDARD FOR FINAL APPROVAL

Fed. R. Civ. P. 23(e) requires court approval before a class action can be dismissed via a settlement. "Although class action settlements require court approval, such approval is committed to the sound discretion of the district court." *In re U.S. Oil & Gas Litig.*, 967 F.2d. 489, 493 (11th Cir. 1992).  The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1054 (M.D. Fla. 1988) ("settlements are highly favored in the law"); *In re Sunbeam Sec. Litig.*, 176 F. Supp.2d 1323, 1329 (S.D. Fla. 2001) (citation omitted) (the Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements.").

The Eleventh Circuit instructs that courts determining whether to approve a settlement be guided by the "strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Estate of Dolby ex rel. Koenig v. Butler & Hosch, P.A.*, No. 8:03-cv-02246-SDMTGW, Report and Recommendation (M.D. Fla. Aug. 4, 2006) (ECF No. 111), adopted by Merryday, J.,

2006 WL 2474062 (M.D. Fla. Aug. 25, 2006). The policy favoring settlement is especially relevant in class actions and other complex matters where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See, e.g., Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) ("There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex.") (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *see also* 4 NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) (citing cases). With a settlement, class members are ensured a benefit as opposed to "the mere possibility of recovery at some indefinite time in the future." *In re Domestic Air Transport. Antitrust Litig.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993).

The Settlement here meets the standards of Rule 23(e) and applicable case law and Final Approval should therefore be granted.

### A. The Class Notice and Notice Plan Were Reasonably Calculated to Inform Settlement Class Members of Their Rights

The Court-approved Class Notice and Notice Plan satisfied due process requirements because they described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). The Class Notice, among other things, defined the Settlement Class, described the Class Release provided to Sharp under the Settlement, as well as the plan of distribution, and informed members of the Settlement Class of their right to opt-out or object, the procedures for doing so, and the time and place of the Final Approval Hearing. It also notified Settlement Class Members that a class judgment would bind them unless they opted-out and told them where they could get more information – for example, the Settlement Website where copies of the Settlement Agreement, as

well as other important documents, are posted. Further, the Notice described Class Counsel's intention to ask the Court to award them up to $3,000,000.00 for attorneys' fees, costs, and expenses and explained that any award of attorneys' fees and expense would be separate from and independent of the Court's determination of whether to approve the Settlement. *See* Ex. 4, Janowicz Decl. at Ex. B.

Settlement Class Members were thus provided with the best practicable notice that was "reasonably calculated, under . . . the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314-15 (1950)).  Indeed, according to the Settlement Administrator, the Notice Plan reached approximately 75% of the target audience consisting of homeowners with a total household income of $75,000 and over.  Ex. 4, Janowicz Decl.  ¶8.c. This reach exceeds the standard set out by the Federal Judicial Center, which states that a publication notice plan that reaches 70% of class members is one that reaches a "high percentage" and is within the "norm."  Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, "Managing Class Action Litigation: A Pocket Guide or Judges," at 27 (3d ed. 2010).

### B.  The Settlement Should be Approved as Fair, Adequate, and Reasonable

To determine whether to approve the Settlement, the Court should analyze whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett*, 737 F.2d at 986. Ultimately, "[a] settlement is fair, reasonable and adequate when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'" *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1344 (S.D. Fla. 2011) (citation omitted).  Importantly, settlements

24

are not evaluated on whether they provide "the best possible deal" or whether the result is equivalent to a "victory at trial." *In re Checking Account Overdraft Litig.*, No. 09-MD-02036, 2015 WL 12641970, at *8 (S.D. Fla. May 22, 2015) (quotations marks and citation omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the Plaintiffs' success on the merits;

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and the

substance and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986. As detailed below, each of these factors weighs in favor of Final Approval.

### 1.    The Settlement is the Product of Good-Faith, Informed, and Arms-Length Negotiations Between Competent Counsel

A class action settlement should be approved, so long as a district court finds that "the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton*, 559 F.2d at 1330; *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1318-19 (S.D. Fla. 2005) (approving class settlement where the "benefits conferred upon the Class are substantial, and are the result of informed, arms-length negotiations by experienced Class Counsel"). The policy favoring settlement is especially relevant in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit to the class. *See Turner v. Gen. Elec. Co.*, No. 2:05-

CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006) ("Settlement 'has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice.'") (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 538 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990)); *see also* 4 NEWBERG ON CLASS ACTIONS § 11.41.

This Settlement was reached in the absence of collusion using an experienced and highly regarded mediator, Judge Welsh. Judge Welsh actively supervised and participated in the settlement discussions to help the Parties reach a fair compromise. Ex. 3, Joint Decl. ¶10-19. Two in-person mediations plus subsequent intense negotiations resulted in the Parties agreeing on the material terms of a settlement. *Id*. "The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1247 (S.D. Fla. 2016) (citing *Adams v. Inter–Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007); *see also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of … a highly experienced mediator, lends further support to the absence of collusion."); *see also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1345, 1349 (no collusion where settlement reached by capable and experienced counsel with the assistance of a well-qualified, experienced mediator). Thus, this Court should give a presumption of fairness to this arms-length Settlement reached by experienced counsel: "where experienced counsel have negotiated a settlement at arm's-length, with the help of an experienced mediator, a strong initial presumption is created that the compromise is fair and reasonable." *In re BellSouth Corp. ERISA*

26

*Litig.*, No. 1:02-CV-2440-JOF, 2006 WL 8431178, at *4 (N.D. Ga. Dec. 5, 2006) (citing *United States v. Tex. Educ. Agency*, 679 F.2d 1104, 1108 (5th Cir. 1982)).

Here, the Settlement is the result of intensive negotiations between skilled attorneys with decades of experience in class action litigation and a solid grasp of the legal and factual issues of this Action. All of negotiations of the Settlement were arm's-length and lasted for an extensive period of time. Ex. 3, Joint Decl. ¶¶10-19.  Class Counsel, all of whom have significant experience in the litigation and settlement of nationwide class actions, zealously advocated for the Plaintiffs and putative class throughout the litigation including, *inter alia*, prevailing at the motion to dismiss stage, conducting crucial informal discovery, and planning for coordinated discovery between several complex cases. *Id*. ¶¶2-9.

Class Counsel conducted a thorough investigation and analysis of Plaintiffs' claims, including working with experts to analyze the alleged defect and calculate classwide damages. Moreover, Class Counsel's review of the informal discovery produced by Sharp assisted Class Counsel in analyzing the facts at issue and prepared them for well-informed settlement negotiations. Class Counsel was armed with sufficient core information to achieve an excellent Settlement for the Settlement Class.  *Id.* at ¶2, 11.

Furthermore, when determining settlement fairness, parties are required to balance the merits of the claims and defenses asserted against the attendant risks of continued litigation and delay. Although Plaintiffs believe that their claims are meritorious, and that they would prevail at trial, Sharp disagrees, denies any potential liability and, up to the point of settlement, indicated a willingness to litigate vigorously. Plaintiffs and Class Counsel are confident in their case but are also pragmatic in their awareness of Sharp's various defenses, and the risks inherent to complex litigation of this magnitude. Joint Decl. ¶¶27-31.

### 2.      Complexity, Expense, and Duration of Litigation.

"[I]n analyzing any settlement, 'the clear policy in favor of encouraging settlements must . . . be taken into account.'" *Ass'n for Disabled Ams.*, 211 F.R.D. at 467 (S.D. Fla. 2002) (citation omitted); *Lipuma v. Am. Express Co.* 406 F. Supp. 2d at (same); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (same).  Moreover, "[i]n evaluating a settlement's fairness, it should [not] be forgotten that compromise is the essence of a settlement.  The trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might [be] gained." *Ass'n for Disabled Ams.*, 211 F.R.D. at 467 (quoting *Cotton*, 559 F.2d at 1330 (internal quotations omitted)); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV, 2002 U.S. Dist. LEXIS 28975 at *4 (S.D. Fla. May 7, 2002) (same).  Instead, the Court should "consider[s] the vagaries of litigation and compare[s] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma*, 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)).  "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." *Behrens*, 118 F.R.D. at 543.  Put another way, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 674 (S.D. Fla. 2006) (citation omitted).

There is no doubt that this Action is complex, and that protracted litigation would be difficult, expensive, and time-consuming. Product defect class actions like this Action necessarily involve numerous obstacles—in addition to the hurdle of obtaining class certification—and usually take years to successfully prosecute.  During that entire time, of course, Plaintiffs and the class run the risk of no recovery whatsoever.

Had this Action not settled, Sharp would have vigorously contested class certification in the California Action and proceeded to summary judgment briefing. And, in other actions, Sharp would have continued to pursue dismissal at the outset. Even if such motions to dismiss were denied, Sharp would have similarly pursued summary judgment and opposed class certification in other actions as well. In light of the complexity, uncertainty, and the amount of potential damages at issue, the losing party would likely appeal any adverse judgment, further delaying any resolution. The Parties would therefore incur significant additional expenses if the Settlement is not approved, including the costs of further discovery, additional expert witness costs, filing and defending more pre-trial motions, including class certification briefing, and the enormous expenses involved in conducting a class action trial, requiring evidence and witnesses from across the country to be convened. The Settlement, by contrast, avoids the uncertainty of trial and lengthy appeals, and instead provides valuable relief to the Settlement Class Members now.

### 3.    The Stage of the Proceedings and the Amount of Discovery Completed

The Court considers the progress of litigation at the time of settlement to ensure that the parties "had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014) (*quoting Lipuma*, 406 F. Supp. 2d at 1324). While the Settlement was reached at a relatively early stage of the litigation, it was reached only after the Parties fully briefed motions to dismiss in the California and Georgia Actions, receipt of informal discovery from Sharp, retention of knowledgeable and qualified experts, and expert inspection of the subject Microwaves. Thus, the record was sufficiently developed to enable the Parties to make a reasoned and informed judgment regarding the Settlement. *See Cotton*, 559

F.2d at 1332 (5th Cir. 1977) (approving settlement over objection that not enough discovery was done, finding that plaintiff was adequately informed even though "very little formal discovery was conducted and that there is no voluminous record in the case."); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations."); *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted) ("'Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done.'"); *In re Mego Fin. Corp. Sec. Litig*. 213 F.3d 454, 459 (9th Cir. 2000) (quoting *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998)) ("in the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement."); *In re Jiffy Lube Sec. Litigation*, 927 F.2d 155 (4th Cir. 1991) (evidence obtained by plaintiffs through informal discovery yielded facts sufficient to inform plaintiff about the strength of its case); *Lachance v. Harrington*, 965 F. Supp. 630 (E.D. Pa. 1997) (evidence obtained through two depositions and preliminary document review sufficient to inform plaintiffs of strength of case); *Bowling v. Pfizer*, 143 F.R.D. 141, 161 (S.D. Ohio 1992) (approving settlement over objection that not enough discovery was done because plaintiff had sufficient information to assess case and noting "[w]e can imagine an inadequate settlement with much discovery done; similarly, we can envision an outstanding settlement with little discovery done.").

Settlement Class Counsel devoted substantial time and resources to investigating, litigating, and resolving the Action. The informal discovery conducted in this case was the product of extended negotiations between counsel and resulted in the production of key

documentation and data regarding the Microwaves by Sharp. Ex. 3, Joint Decl. at ¶¶14-15, 39. *Id*. Further, the Parties did not rush into a deal – rather, the Settlement was reached after two lengthy in-person mediations, and numerous conferences among adverse counsel. The hard-fought negotiations took several months and were conducted at arms-length with the aid of a neutral mediator with substantial experience mediating class actions. *See Preman v. Pollo Operations, Inc.*, 2018 U.S. Dist. LEXIS 79065, 2018 WL 3151673, at *10 (M.D. Fla. Apr. 12, 2018) (approving a preliminary settlement at "an early stage of the proceedings" that was a "result of intensive arms-length negotiations between experienced attorneys who are familiar with class action litigation."); *see also* Ex. 3, Joint Decl. at ¶¶10-19.

### 4.      The Probability of Plaintiffs' Success on the Merits

"The likelihood of success on the merits is weighed against the amount and form or relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. Where success at trial is uncertain, this factor weights in favor of approving the settlement. *Newman v. Sun Capital, Inc.*, No. 09-cv 445, 2012 WL 3715150, at *11 (M.D. Fla. Aug. 28, 2012).

Plaintiffs and Class Counsel are confident in the strength of their case but are also pragmatic in their awareness of Sharp's numerous defenses, and the risks inherent in trial and post-judgment appeal. For example, in the California Action, Sharp asserted defenses of, among others, lack of standing, expiration of statute of limitations, disclaimer or limitation of warranties, lack of privity, comparative fault, and failure to mitigate. (California Action, at ECF No. 56, at 34-40). Although Plaintiffs defeated Sharp's dismissal bid in the California Action, Plaintiffs were facing similar motions to dismiss in the other actions, not to mention battles at class certification and summary judgment. Under the circumstances, Class Counsel appropriately determined that the Settlement was appropriate. Ex. 3, Joint Decl. ¶¶27-31.

Put simply, Plaintiffs faced the risk of losing at class certification, summary judgment, at trial, or on appeal. Ex. 3, Joint Decl. at ¶¶27-31. Therefore, "because success at trial is not certain for Plaintiff[s], this factor weighs in favor of accepting the settlement." *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 U.S. Dist. LEXIS 189397, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013). Moreover, even if Plaintiffs prevailed at trial, any recovery could be delayed for years by an appeal. This Settlement provides substantial relief to Settlement Class Members without further delay. *Id.*; *Lipuma*, 406 F. Supp. 2d at 1322 (noting the likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement).

### 5.        Range of Possible Recovery

"The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief. In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Saccoccio,* 297 F.R.D. at 693 (S.D. Fla. 2014) (internal citation and quotation marks omitted). However, "[m]onetary relief is difficult to quantify." *Lipuma*, 406 F. Supp. 2d at 1322. Thus, in evaluating a class settlement, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id.* at 1323.

When evaluating "the terms of the compromise in relation to the likely benefits of a successful trial . . . the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330. "Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Id*. Courts have determined that settlements may be reasonable even where plaintiffs recover only part of their actual losses. *See Behrens*, 118 F.R.D. at 542 ("[T]he fact that a proposed settlement amounts to

32

only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."). "[T]he existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323.

The value of this Settlement is approximately $103,049,520.00 to $113,884,064.00 (*See generally* Ex. 2, Expert Report from Frank Bernatowicz), and the Settlement clearly meets the critical test of gauging its fairness and reasonableness because it provides significant, concrete relief to Settlement Class Members and directly remedies the injury alleged. The gravamen of Plaintiffs' Complaint is that Plaintiffs and Settlement Class Members purchased Microwaves which had a defect that caused certain Microwaves to arc and fail prematurely. Accordingly, the proposed Settlement provides relief to consumers for their unknowing purchase of an allegedly defective product. This relief includes a substantial extension of the Microwave warranty, which provides for replacement Microwaves for a Documented Arcing Claim for up to five years from the date of installation or 30 days after purchase, whichever is earlier. This Extended Warranty includes the opportunity to receive a new replacement Microwave in the event of a Documented Arcing Claim, along with reimbursement of any labor and/or costs in connection with a Documented Arcing Claim of up to $150.00 per Settlement Class Member. The value of the Extended Warranty is approximately $103,049,520.00 to $113,884,064.00, and the value of the replacement Microwaves is up to $14,261,294.00.  *See* Ex. 2, Bernatowicz Decl. at ¶¶23, 34.

In lieu of a replacement microwave, consumers who experience an arcing instance during the extended five (5) year warranty period may select, at their option, either (1) a $250 cash payment or (2) a $500 voucher for Sharp-branded merchandise.  The value of the voucher option

is approximately $6,853,500.00, and the value of the cash option is approximately $3,426,750.00. *See* Ex. 2, Bernatowicz Decl. at ¶¶23, 34.

Settlement Class Members who elect a replacement microwave under the Extended Warranty, or who elect the cash payment or voucher option, are all entitled to reimbursement of any labor and/or costs in connection with a Documented Arcing Claim of up to $150.00 per class member. The value of the reimbursement for labor and/or service costs is approximately $2,056,050.00. *See* Ex. 2, Bernatowicz Decl. at ¶28.

Further, Settlement Class Members who choose not to accept a replacement Microwave under the Extended Warranty may also seek reimbursement for consequential damages (i.e. the costs incurred to repair or cover the opening in a Settlement Class Member's kitchen cabinetry in which their original Microwave was installed) of up to $200 with documented proof.

In addition, any Settlement Class Member who can establish, with documented proof, that their Class Microwave experienced a Documented Arcing Claim within 5 years of the date of purchase of a Microwave, who did not previously receive a replacement Microwave, is entitled to replacement or cash or voucher per above.

Given the significant risks of prolonged litigation, the benefits of the Settlement are substantial. Settlement Class Members will be able to receive the remuneration described above by submitting a simple Claim Form, thereby directly addressing their claimed harm.

### 6.     Opinions of Class Counsel, the Class Representatives, and the Substance and Amount of Opposition to the Settlement.

Class Counsel—each a law firm that is nationwide leader in class-action litigation—have made a considered judgment based on adequate information gleaned from informal discovery, mediation, and based on their deep familiarity with the factual and legal issues in this case and the risks associated with continued litigation. *See Elkins v. Equitable Life Ins. of Iowa,* 1998 U.S.

Dist. LEXIS 1557 (M.D. Fla. Jan. 27, 1998) (giving consideration to the judgment of experienced counsel).  It is the opinion of the counsel who achieved the Settlement that, given the innumerable risks of extended litigation where a defendant has so much at stake, this Settlement is fair and reasonable to the members of the Settlement Class. Moreover, each of the Class Representatives strongly support the Settlement and have worked closely with Class Counsel, throughout the litigation, to advocate for the interests of the Settlement Class.  Ex. 3, Joint Decl. at ¶¶35-37.

Further, in determining whether a class action settlement is fair, reasonable, and adequate, the Court must consider the reaction of absent class members. *Bennett*, 737 F.2d at 986; *Hall v. Bank of Am., N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014). The fact that there is no opposition to this Settlement is also "strong circumstantial evidence favoring settlement." *See In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020-21 (finding that a settlement where "99.9% of class members have neither opted out nor filed objections . . . is strong circumstantial evidence in favor of the settlements"). Many Settlement Class Members have elected to participate in the settlement. Over 3,553 Settlement Class Members have submitted claim forms, and only 6 individuals elected to opt out, resulting in an exclusion rate of 0.2 %. Ex. 4, Janowicz Decl. ¶28. Such a low opt-out rate weighs in favor of final approval. *See, e.g., Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014); *Morgan*, 301 F. Supp. 3d at 1252 ("In a class of hundreds of thousands, the low number of opt-outs and objections reflects the Class' overall satisfaction with the Settlement."); *Lipuma*, 406 F. Supp. 2d at 1324 ("In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor."); *Burrow v. Forjas Taurus S.A.*, No. 16-21606-CIV, 2019 WL 4247284, at *10 (S.D. Fla. Sept. 6, 2019).

Accordingly, the Settlement Class Members' strong participation demonstrates overwhelming support for this Settlement.

By the November 17, 2020 objection deadline, only one purported Settlement Class Member had filed an objection. ECF No. 51. That objector, Mr. Helfand,[5] has since withdrawn his objection after he was deposed by Class Counsel.  ECF No. 54. After his deposition and communications with Class Counsel regarding the Settlement, Mr. Helfand withdrew his objection and voiced his support for final approval of the Settlement. *Id*. Mr. Helfand did not request and did not receive (nor will he ever receive) any compensation in exchange for withdrawing his objection.  *Id*.; *see also* Ex. 3, Joint Decl. at ¶¶43-45.

It is worth noting that, despite being under subpoena, Mr. Helfand was unable to produce any documentary evidence establishing that he is a Settlement Class Member, *i.e.* that he was a First Consumer Purchaser of a Class Microwave during the Class Period. Ex. 4, Joint Decl. at ¶43-45.  His first objection was that Class Counsel must have been improperly obligated by contractual agreement to apply for a service payments for the Plaintiffs despite such awards being disallowed by *Johnson v. NPAS Sols. LLC*, *supra*. EFC No. at 51 at 1.  Not only is there no such contractual agreement between Class Counsel and Plaintiffs, Mr. Helfand neglected to consider that the *Johnson* decision came down after the Parties entered into the Settlement Agreement and after Plaintiffs moved for preliminary approval. Ex. 4, Joint Decl. at ¶¶43-45. Class Counsel has since made clear both in this Motion and in their Motion for Attorneys' Fees and Expenses that, in light of *Johnson*, Plaintiffs are not presently moving for service payments. *See supra*, and *see* ECF No. 53 at 2.  Further, Mr. Helfand contended that the release is "over-

---

[5] Mr. Helfand has filed numerous objections to class action settlements in recent years.  *See Collins v. Quincy Bioscience*, no. 19-22864-CIV-Cooke/Goodman, LLC, 2020 U.S. Dist. LEXIS 218673 (S.D. Fla. Nov. 16, 2020) (providing a detailed discussion of Mr. Helfand).

broad" as it "could be construed to release claims for emotional distress and personal injury" (*id.*), yet the Release explicitly and specifically states that "[t]he Released Claims do not include any claims for personal injury." Ex. 1, at ¶6.1. In sum, Mr. Helfand's now-withdrawn objections were unfounded.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion for Final Approval of the Settlement, affirm its certification of the Settlement Class, and enter the proposed Final Approval Order.

Dated: December 24, 2020        Respectfully Submitted,

s/*Rachel Soffin*
Rachel Soffin, FL Bar No. 0018054
Gregory F. Coleman*
GREG COLEMAN LAW PC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: 865-247-0080
Fax: 865-522-0049
rachel@gregcolemanlaw.com
greg@gregcolemanlaw.com

Daniel K. Bryson*
Harper Segui*
WHITFIELD BRYSON LLP
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919-600-5000
Fax: 919-600-5035
dan@whitfieldbryson.com
harper@whitfieldbryson.com

Hassan A. Zavareei    *
Andrea Gold
TYCKO & ZAVAREEI LLP
1828 L St NW, Suite 1000
Washington, DC 20036

T: 202-973-0900
F: 202-973-0950
hzavareei@tzlegal.com
agold@tzlegal.com

(*pro hac vice*)

*Class Counsel*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 24, 2020, a copy of the foregoing document was filed electronically with the clerk of court via ECF which provided notice to all parties through their counsel of record.

GREG COLEMAN LAW PC

*/s/Rachel Soffin*
Rachel Soffin
FL Bar No. 0018084