# EXHIBIT 1

# SETTLEMENT AGREEMENT

# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **MICHAEL HAMM, JILL BROWN, AUSTIN RUSSELL, CHRISTIAN LAMMEY, NANCY JAMES, JILL WITTMAN, THOMAS MACONE,** individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>**SHARP ELECTRONICS CORPORATION**,<br><br>    Defendant. | **Civil Action: 5:19-cv-488**<br><br>Judge James S. Moody, Jr.<br><br>Magistrate Judge Philip R. Lammens |

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release ("Settlement Agreement") is made and entered into as of July 15, 2020, by and among: Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Christian Lammey, Nancy James, Jill Wittman, and Thomas Macone, each individually and as representatives of the proposed Settlement Class (collectively called "Plaintiffs" herein); and Defendant Sharp Electronics Corporation ("Sharp"), in consideration for and subject to the promises, terms and conditions herein.

Plaintiff Hamm filed a lawsuit styled *Hamm v. Sharp Electronics Corporation*, Case No. 5:19-cv-00488-JSM-PRL, in the United States District Court for the Middle District of Florida ("Florida Action"). That matter remains pending.

Plaintiffs Jill Brown and Austin Russell filed a lawsuit styled *Brown, et al. v. Sharp Electronics Corporation*, Case No. 3:19-cv-00371-JD, in the United States District Court for the Northern District of California ("California Action"). That matter remains pending.

Plaintiff Christian Lammey filed a lawsuit styled *Lammey v. Sharp Electronics Corporation,* 3:19-cv-00048-CAR, in the United States District Court for the Middle District of Georgia ("Georgia Action"). That matter remains pending.

Plaintiffs Nancy James and Jill Wittman filed a lawsuit styled *James, et al. v. Sharp Electronics Corporation*, Case No. 2:19-cv-03246-SDM-EPD, in the United States District Court for the Southern District of Ohio ("Ohio Action"). That matter remains pending.

Plaintiff Thomas Macone filed a lawsuit styled *Macone v. Sharp Electronics Corporation*, Case No. 1:19-cv-12021-WGY, in the United States District Court for the District of Massachusetts ("Massachusetts Action"). That matter remains pending.

Per the Parties' agreement, Plaintiffs will file a First Amended Consolidated Complaint in the Middle District of Florida, including Plaintiffs Hamm, Brown, Russell, Lammey, James, Wittman and Macone, which will include claims on behalf of these Plaintiffs (as class representatives) and a nationwide class (the "Nationwide Action"). Plaintiffs' proposed First Amended Consolidated Complaint is attached hereto as **Exhibit A**. The Complaint is being filed for the purpose of settlement only, and Sharp will not object to the jurisdiction of non-Florida resident Class Representatives or move to dismiss the First Amended Consolidated Complaint during the settlement approval process, but reserves all its rights including to challenge jurisdiction and move to dismiss if the settlement is not approved. Like the other filed Complaints, the First Amended Consolidated Complaint alleges that Sharp breached express and implied warranties, by manufacturing, distributing, marketing and selling Class Microwaves containing an alleged defect that caused, among other things, electrical arcing in the Class Microwaves. Sharp reserves all defenses and responsive rights, should the Court not approve the settlement. Plaintiffs will dismiss the California Action, Massachusetts Action, Ohio Action, and Georgia Action, without prejudice, and will seek Court approval of this Settlement Agreement in the Middle District of Florida.

This Settlement Agreement is subject to Court approval pursuant to Rule 23 of the Federal Rules of Civil Procedure. Unless otherwise defined, all capitalized words and terms used herein shall have the meanings ascribed to them in Section I of this Settlement Agreement, titled "Definitions."

The Settlement Agreement is intended to fully, finally and forever resolve, discharge and settle the Nationwide Action and all matters raised or that could have been raised in the California Action, Ohio Action, Massachusetts Action, and Georgia Action, subject to the terms and conditions set forth below and approval by the Court.

## RECITALS

**WHEREAS**, Plaintiff Hamm filed the Florida Action, and the other Plaintiffs filed the other actions, in federal courts in California, Georgia, Ohio, and Massachusetts (and subsequently a First Amended Consolidated Complaint in the Middle District of Florida on behalf of a Nationwide Class) alleging that, among other things, Sharp violated state consumer protection and state product liability laws, as well as breached express and implied warranties, by manufacturing, distributing, marketing and selling Class Microwaves containing an alleged defect that caused, among other things, electrical arcing in the Class Microwaves (the "Litigation");

**WHEREAS**, Sharp asserts that the Class Microwaves are safe, properly designed and manufactured, and receive high ratings from consumers, and vigorously disputes the allegations alleged by Plaintiffs in this Litigation;

**WHEREAS**, Sharp and Plaintiffs engaged in litigation, including briefing and argument of certain motions to dismiss, coordination of all actions, and commencement of discovery;

**WHEREAS**, beginning in November 2019, and continuing through February 2020, representatives for Sharp and Plaintiffs engaged in mediation with the Honorable Diane M. Welsh, U.S.M.J. (Ret.), including sessions at the JAMS New York Resolution Center, as well as further direct negotiations;

**WHEREAS**, as a result of that mediation and negotiations, the parties reached a tentative settlement, subject to final documentation, Class Notice, and Court approval;

**WHEREAS**, the parties have now memorialized their settlement by way of this Settlement Agreement ("Settlement"), and seek approval of the Settlement in this Court;

**WHEREAS**, before entering into this Settlement, Plaintiffs, by and through their counsel, conducted an examination, investigation, and evaluation of the relevant law and facts to assess the merits of Plaintiffs' claims and potential claims to determine the strength of liability, potential remedies, and all defenses thereto;

**WHEREAS**, Plaintiffs, as putative class representatives, believe that the claims settled herein have merit, but they and their counsel recognize and acknowledge the expense and length

of continued proceedings necessary to prosecute the claims through trial, appeal, and ancillary actions;

**WHEREAS**, Plaintiffs and Class Counsel have also taken into account the uncertain outcome and risk of any litigation, as well as the difficulties and delay inherent in such litigation, and they believe that the Settlement set forth in this Settlement Agreement confers substantial benefits upon the Class Members;

**WHEREAS**, Plaintiffs and Class Counsel are also mindful of the inherent challenges of proof and the strength of the defenses to the alleged claims, and, based upon their evaluation, they have determined that the Settlement herein provides a just, fair and favorable recovery for the Settlement Class and is in the best interests of the Class;

**WHEREAS**, based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiffs and Class Counsel, on behalf of Plaintiffs and the other members of the proposed Class, have agreed to settle the Litigation pursuant to the provisions of this Settlement Agreement, after considering, among other things: (i) the substantial benefits to the Class Members under the terms of this Settlement; (ii) the risks, costs, and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (iii) the desirability of consummating this Settlement promptly in order to provide effective relief to Class Members.

**WHEREAS**, Sharp vigorously disputes Plaintiffs' claims and contentions alleged in the Litigation, and denies any and all allegations of wrongdoing, fault, liability or damage of any kind to Plaintiffs and the putative Class, and believes that the Litigation has no merit;

**WHEREAS**, Sharp further denies that Plaintiffs' claims would be suitable for class action treatment outside of a class settlement context if this litigation were to proceed and Plaintiffs were to move for class certification;

**WHEREAS**, Sharp nevertheless desires to settle the Litigation upon the terms and conditions set forth in this Settlement Agreement in order to promote customer satisfaction as well as to eliminate the uncertainties, burden, expense, and delay of further protracted litigation;

**NOW, THEREFORE**, it is hereby **STIPULATED AND AGREED**, by and between the Parties, through their respective counsel, that: (a) the Litigation be fully and finally compromised, settled, and released upon final approval by the Court; and (b) upon such approval by the Court, a Final Order and Judgment be entered dismissing the Action with prejudice upon the following terms and conditions.

## I.   <u>DEFINITIONS</u>

As used in this Settlement Agreement, and in addition to the definitions set forth in the preamble and recitals above, capitalized terms shall have the following definitions and meanings or such definitions and meanings as are accorded to them elsewhere in this Settlement Agreement. Terms used in the singular shall be deemed to include the plural and vice versa.

1.1    "Action" means the civil action currently titled *Hamm v. Sharp Electronics Corporation*, Case No. 5:19-cv-00488-JSM-PRL, in the United States District Court for the Middle District of Florida, and includes Plaintiffs' First Amended Consolidated Complaint attached hereto as **Exhibit A.**

1.2    "CAFA Notice" refers to the notice requirements of 28 U.S.C. § 1715(b).

1.3    "Claim Form(s)" means the claim forms that will be made available to Class Members by the Settlement Administrator after the Preliminary Approval Date, which is attached hereto as **Exhibit B**.

1.4    "Claimant" means a Settlement Class Member who complies with the claims submission requirements herein, including the requirements of timely and complete submission.

1.5    "Class Counsel" means, collectively, Greg Coleman, Rachel Soffin, and Lisa White of Greg Coleman Law P.C., Dan Bryson and Harper Segui of Whitfield Bryson LLP, and Hassan Zavareei and Andrea Gold of Tycko & Zavareei LLP.

1.6    "Class Member(s)" means any member of the Settlement Class.

1.7    "Class Microwave" means any microwave oven drawer unit manufactured or sold by Sharp or any of its related entities and affiliates under the Sharp brand name, including, without limitation, the following model numbers, and any sub-models:  KB6524PS, KB6525PS, SMD2470AS, SMD3070AS, SMD2470AH, SMD2480CS, and SMD2489ES (and inclusive of sub-models, without limitation, KB6524PSY, KB6524PSYA, KB6524PSYB, KB6524PSYD, KB6525PSY, KB6525PSYD, SMD2470ASY, SMD2470ASYA, SMD2470ASYB, SMD2470ASYD, SMD3070ASY, SMD3070ASYA, SMD3070ASYB, SMD3070ASYD, SMD2470AHB, and SMD2470AHD).  This Settlement does not include any microwave oven drawer unit sold under any other brand name than Sharp.

1.8    "Class Notice" or "Notice" means the settlement notice to be mailed and/or emailed to the Class, substantially in the form attached as composite **Exhibit C** hereto.

1.9    "Class Period" means from January 1, 2009, through the Preliminary Approval Date.

1.10    "Court" means the United States District Court for the Middle District of Florida presiding over the Action.

1.11    "Documented Arcing Claim(s)" means claim(s) for electrical arcing occurring within the waveguide part, and that may extend to the magnetron, of a Class Microwave as evidenced by (i) dated photographic evidence or other similar evidence, or (ii) written information from a non-party licensed appliance service contractor, in either case establishing the existence of the electrical arcing and the date or approximate date such claim arose.

1.12    "Effective Date" means the first date when each and all of the following conditions have occurred:

a.    The Court has entered the Final Order and Judgment; and

b.    Either

(1)    no appeal has been taken from the Final Order and Judgment as of the date on which all deadlines to appeal therefrom have expired; or

(2)    an appeal or other review proceeding of the Final Order and Judgment having been commenced, the date by which such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions or rehearing or re-argument, petitions for rehearing *en banc*, petitions for writ of *certiorari*, remand, or otherwise, and such appeal or other review has been finally resolved in a manner that affirms the Final Order and Judgment in all material respects.

1.13    "Extended Warranty" means the extended warranty provided by Sharp to the Class Members as described more fully in Section III below.

1.14    "Fee Application" means the application of Class Counsel for the Fee and Expense Award.

1.15    "Fee and Expense Award" means such funds as may be approved and awarded by the Court to Class Counsel to compensate them for conferring the benefits upon the Class under this Settlement Agreement and for their professional time, fees, costs, advances, and expenses incurred in connection with the Litigation and the Settlement.

1.16    "Final Approval Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (a) entering the Final Order and Judgment; (b) determining whether the Settlement should be approved as fair, reasonable, and adequate; (c) ruling upon an application for Service Payments by the Plaintiffs; (d) ruling upon an application by Class Counsel for the Fee and Expense Award; and (e) entering any final order awarding the Fee and Expense Award and Service Payments. The Parties shall request that the Court schedule the Final Approval Hearing for a date that is in compliance with the provisions of 28 U.S.C. §1715(d).

1.17    "Final Order and Judgment" means the Court's order and judgment fully and finally approving the Settlement as contained in the Settlement Agreement and dismissing the Action with prejudice.

1.18    "First Consumer Purchaser" means either (1) the first person to purchase or receive a new Class Microwave for his/her own use or (2) the first person to own a residential real property after a new Class Microwave has been installed for the owner's use.

1.19    "Future Claim Deadline" applies to consumers whose five-year Extended Warranty expires after the date of the Final Approval Hearing. For such consumers, the Future Claim Deadline shall be two years after occurrence of the Documented Arcing Claim for which relief is being sought.  The Future Claim Deadline applicable to such consumers will be set forth in the Claim Form.

1.20    "Litigation" means the claims in the Nationwide Action alleged in the First Amended Consolidated Complaint filed in the Middle District of Florida.

1.21    "Notice and Administration Costs" means the reasonable fees, costs, and charges incurred, charged, or invoiced by the Settlement Administrator relating to the administration and notice of the Settlement, including but not limited to: (i) the costs and expenses that are associated with disseminating the Class Notice to the Settlement Class; and (ii) the costs and expenses of the distribution of the Settlement benefits to Claimants pursuant to terms and conditions herein.

1.22    "Notice Date" means the first date upon which the Class Notice is disseminated to the Settlement Class.

1.23    "Objection" means an objection that is timely filed with the Court by any Class Member who wishes to object to any provision of this Settlement Agreement.

1.24    "Opt-Out" refers to a timely request by a potential Class Member to be excluded from the Settlement Class as set forth in Section VII herein.

1.25    "Opt-Out and Objection Deadline" means the date that shall be sixty (60) days after dissemination of the Class Notice.

1.26    "Parties" means Plaintiffs and Sharp.

1.27    "Party" means any one of the "Parties."

1.28    "Person" means an individual, corporation, partnership, limited partnership, limited liability company or partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and their respective spouses, heirs, affiliates, attorneys, predecessors, successors, representatives, and/or assignees.

1.29    "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order.

1.30    "Prior Claim Deadline" applies to consumers whose five-year Extended Warranty expires prior to or on the date of the Final Approval Hearing. For such consumers, the Prior Claim Deadline shall be one hundred and twenty (120) days after the date of the Final Approval Hearing.  The Prior Claim Deadline applicable to such consumers will be set forth in the Claim Form.

1.31    "Released Claims" means the claims released under this Settlement Agreement as set forth in more detail in Section VI below.

1.32    "Released Parties" means Sharp, and any individual or entity involved in any way in the design, manufacture, advertising, marketing, distribution, sale, and/or service of any of the Class Microwaves (defined above), as well as all of these individuals' and entities' past, present, and future employees, officers, directors, shareholders, owners, partners, members, joint venturers, managers, representatives, adjusters, attorneys, agents, consultants, insurers, excess insurers, reinsurers, indemnitors, contractors, employers, affiliates, divisions, partnerships, independent contractors, servants, parents, subsidiaries, related entities, predecessors, successors, assignors, assignees, including but not limited to, successors or predecessors by merger, and any other person or entity who has, had, or could have legal responsibility relating to the Released Claims.

1.33    "Replacement Microwave" means a microwave oven drawer provided by Sharp to a Class Member in satisfaction of a claim made under the Extended Warranty.  The Replacement Microwave will be comparable to the Class Microwave subject to the Extended Warranty.

1.34    "Service Payment" means the payment to each Plaintiff, in an amount approved by the Court, in recognition of the obligations, time and effort the Plaintiffs expended in pursuing the Litigation and in fulfilling their obligations and responsibilities as class representatives.

1.35    "Settlement Administrator" means the qualified third-party agent agreed to by the Parties and approved and appointed by the Court in the Preliminary Approval Order to assist in administering the Settlement, including providing the Class Notice.

1.36    "Settlement Agreement" means this Settlement Agreement and Release and the settlement terms embodied herein, including all attached Exhibits (which are an integral part of this Settlement Agreement and Release and are incorporated in their entirety by reference), including all subsequent amendments agreed to in writing by the Parties and exhibits to such amendments.

1.37    "Settlement Class" means, for purposes of settlement only and subject to the Court's approval of the Settlement and the conditions of this Settlement Agreement, the agreement of the Parties to consent to the certification pursuant to Fed. R. Civ. P. 23(b)(3) of a class consisting of all persons residing in the United States who, at any time during the Class Period, became the First Consumer Purchaser of a Class Microwave; provided, however, that only one such person may be a member of the Settlement Class for each such Class Microwave; provided further that excluded from the Settlement Class are (a) officers, directors, and employees of Sharp or its parents, affiliates, or subsidiaries, (b) insurers of Class Members, (c) any entity purporting to be a subrogee of a Class Member, (d) any secondary owner of a Class Microwave including, without limitation, any purchaser of a used Class Microwave, purchaser of real property containing a used Class Microwave, or any other owner of a Class Microwave who was not the First Consumer Purchaser of a Class Microwave, (e) all third-party issuers or providers of extended warranties or service contracts, (f) persons who previously fully released their claims against Sharp, (g) any

8

personnel of the Court overseeing the proposed settlement, and any immediate family member of such personnel, and (h) any personnel of the Settlement Administrator, and any immediate family member of such personnel, and (i) those persons who timely and validly exercise Opt-Out.

1.38    "Sharp's Counsel" means Riker Danzig Scherer Hyland & Peretti LLP.

## II.    SETTLEMENT APPROVAL

2.1    As soon as is practicable following the signing of this Settlement Agreement, Class Counsel shall apply to the Court for entry of the First Amended Consolidated Complaint and Preliminary Approval Order – which Preliminary Approval Order shall be substantially in a form acceptable to the Parties – for the purposes of, among other things:

a.    Approving the Class Notice substantially in the form set forth at composite **Exhibit C**;

b.    Finding that the requirements for provisional certification of the Settlement Class have been satisfied, appointing Plaintiffs as the representatives of the Settlement Class and Class Counsel as counsel for the Settlement Class, and preliminarily approving the Settlement as being within the range of reasonableness such that the Class Notice should be provided pursuant to this Settlement Agreement;

c.    Scheduling the Final Approval Hearing on a date ordered by the Court, provided in the Preliminary Approval Order, and in compliance with applicable law, to determine whether the Settlement should be approved as fair, reasonable, and adequate, and to determine whether a Final Order and Judgment should be entered dismissing the Action with prejudice;

d.    Determining that the notice of the Settlement and of the Final Approval Hearing, as set forth in this Settlement Agreement, complies with all legal requirements, including but not limited to the Due Process Clause of the United States Constitution;

e.    Appointing the Settlement Administrator;

f.    Directing that Class Notice shall be given to the Settlement Class as provided in this Settlement Agreement;

g.    Providing that Class Members who have claims that arise prior to the date of the Final Approval Hearing (but their five-year Extended Warranty will expire on or before the date of the Final Approval Hearing) will have until the Prior Claim Deadline to submit Claim Forms;

h.    Providing that Class Members who have an Extended Warranty that expires after the date of the Final Approval Hearing will have two years following the date of the arcing instance to make a claim;

i.    Providing that any objections by any Class Member to the certification of the Settlement Class and the proposed Settlement contained in this Settlement Agreement, the Fee

Application, the Service Payment Application, and/or the entry of the Final Order and Judgment shall be heard and any papers submitted in support of said objections shall be considered by the Court at or prior to the Final Approval Hearing;

j.    Establishing dates by which the Parties shall file and serve all papers in support of the application for final approval of the Settlement and in response to any valid and timely objections;

k.    Providing that all Class Members will be bound by the Final Order and Judgment dismissing the Action with prejudice, unless such Class Members timely file valid written requests for exclusion or Opt-Out;

l.    Providing that Class Members wishing to Opt-Out will have until the date specified in the Class Notice and the Preliminary Approval Order to submit a valid written request to the Settlement Administrator for Opt-Out to the Settlement Administrator, and requiring that the Settlement Administrator provide Sharp and Class Counsel with copies of all Opt-Out requests;

m.    Directing the Parties, pursuant to the terms and conditions of this Settlement Agreement, to take all necessary and appropriate steps to prepare to implement the Settlement; and

n.    Pending the Final Order and Judgment, staying all proceedings in the Action, including, but not limited to Sharp's time to answer and otherwise move with respect to the First Amended Consolidated Complaint, other than proceedings necessary to carry out or enforce the terms and conditions of this Settlement Agreement and the Preliminary Approval Order.

2.2    Following the entry of the Preliminary Approval Order, Class Notice shall be disseminated in the manner directed and approved by the Court.

2.3    At the Final Approval Hearing, the Parties shall seek to obtain from the Court a Final Order and Judgment, which shall, among other things:

a.    Find that the Court has personal jurisdiction over all Class Members, the Court has subject matter jurisdiction over the claims asserted in the Action, and that venue is proper;

b.    Finally approve this Settlement Agreement and the Settlement pursuant to Rule 23 of the Federal Rules of Civil Procedure;

c.    Certify the Settlement Class for purposes of this Settlement only;

d.    Find that the Class Notice complied with all laws, including, but not limited to, Federal Rule of Civil Procedure 23 and the Due Process Clause of the United States Constitution;

e.    Incorporate the Release set forth in this Settlement Agreement and make the Release effective as of the date of the Final Order and Judgment;

f.    Authorize the Parties to implement the terms of the Settlement;

g.      Dismiss the Action with prejudice; and

h.      Retain jurisdiction relating to the administration, consummation, validity, enforcement, and interpretation of this Settlement Agreement, the Final Order and Judgment and any final order approving the Fees and Expense Award.

2.4      The Parties shall cooperate with each other in good faith to carry out the purpose of and effectuate this Settlement Agreement, and they shall take any and all actions and execute and deliver any and all additional documents reasonably necessary or appropriate to carry out the terms of this Settlement Agreement and the transactions contemplated hereby.

## III.    SETTLEMENT CONSIDERATION, CLAIMS, AND CLAIM REQUIREMENTS AND LIMITATIONS

3.1      In consideration for the releases contained in this Settlement Agreement, and without admitting liability for any of the alleged acts or omissions in the Litigation, and in the interest of minimizing the costs inherent in any litigation, Sharp agrees to provide benefits to the Class Members as follows:

3.1.1    Extended Warranty.  All Class Members shall receive an extension of the existing manufacturer's warranty for Documented Arcing Claims within any Class Microwave, subject to the following terms:

(a)  Term of Extended Warranty.  The Extended Warranty shall extend the term of the existing manufacturer's warranty for Documented Arcing Claims that arise on or before a date that is five (5) years from the earlier of (i) the date of installation of the Class Microwave, or (ii) thirty (30) days after the date of purchase of the Class Microwave, with documented proof of the date of purchase or installation of the Class Microwave to be provided by a Class Member upon submission of any claim in compliance with Sharp's warranty claim process under the Extended Warranty (the "Extended Warranty Term").  In lieu of documented proof of the date of purchase or installation of the Class Microwave, a Class Member may submit a photograph of the serial number plate inside the Class Microwave, which provides information regarding the date of manufacture of the Class Microwave, and such Class Member is entitled to a presumption that the Class Microwave was installed ninety (90) days after the such date of manufacture. With respect to any replacement microwave that has been delivered to a Class Member by Sharp, either prior to this Settlement or through this Settlement, such replacement microwave shall have an Extended Warranty, pursuant to this Settlement, for a term of (1) year from the date of replacement installation for arcing instances, or the remainder of the original five (5) year Extended Warranty period for arcing instances, whichever is longer.

(b)  Treatment under Extended Warranty.  Class Members properly submitting a Documented Arcing Claim pursuant to the Extended Warranty Term applicable to their

Class Microwave shall be entitled to select one (1) of the following options ("Extended Warranty Treatment"):

1) a new replacement Sharp microwave oven drawer, which is comparable to the existing Class Microwave, to be delivered and installed by Sharp, free of charge, in the location of the existing Class Microwave, provided that the existing Class Microwave shall be returned to Sharp at Sharp's expense; or

2) a $250 cash payment in lieu of a new replacement microwave; or

3) a $500 electronic voucher for the purchase of Sharp-branded merchandise available for purchase through shop.sharpusa.com or, alternatively, available for purchase through other sales channels that offer Sharp-branded merchandise for sale, as to be further arranged prior to final approval of the Settlement, which voucher shall expire two (2) years from the date of issuance.

Notwithstanding the foregoing benefits of Section 3.1.1(b), any Class Member that has already received a replacement microwave or refund from Sharp in connection with a prior Documented Arcing Claim shall not be entitled to further Extended Warranty Treatment under this Section 3.1.1(b) (i.e. shall not be entitled to a further replacement microwave, cash payment, or a voucher in connection with that prior Documented Arcing Claim) or reimbursement for any prorated exchange charges, including shipping charges, in connection with that prior Documented Arcing Claim. However, such Class Members may be entitled to other recovery under this Settlement, including pursuant to Section 3.1.2 (Reimbursement of Labor Costs Paid) in connection with that prior Documented Arcing Claim, subject to the terms of this Settlement Agreement. Should such Class Members experience a Documented Arcing Claim in connection with their replacement microwave, they may be eligible for recovery under this Settlement in connection with that Documented Arcing Claim as outlined herein.

(c) Prior Claims.  Any Class Member with a Documented Arcing Claim that occurred within the Extended Warranty Term of their Class Microwave is entitled to Extended Warranty Treatment above, subject to the Claims Bar described in Section 3.1.5. and the Prior Claim Deadline (i.e. for Class Members whose five-year Extended Warranty expired prior to or on the date of the Final Approval Hearing).

(d) Future Claims.  For any Class Members whose five-year Extended Warranty will expire after the date of the Final Approval Hearing, such Class Members may submit a Documented Arcing Claim pursuant to the Extended Warranty Term applicable to their Class Microwave.  Any Class Member with an Extended Warranty that expires after the date of the Final Approval Hearing, and who is seeking relief for a Documented Arcing Claim, must make a claim within the Future Claim Deadline. As discussed in Section 3.1.1(b), any replacement microwave provided to a Class Member shall have an Extended Warranty, pursuant to this Settlement, for a term of (1) year from the date of replacement installation for arcing instances, or the remainder of the original five (5) year Extended Warranty period for arcing instances, whichever period is longer.

12

3.1.2  <u>Reimbursement of Labor Costs Paid</u>.  Any Class Member with a Documented Arcing
Claim that occurred within the Extended Warranty Term for their Class Microwave
may be reimbursed for labor and/or service costs for services calls related to the
Documented Arcing Claim or for inspections to determine arcing ("Labor
Reimbursement Claim").  Any such Labor Reimbursement Claim reimbursement(s)
shall be capped at $150 per Class Member.  Class Members must provide
documentation of the labor and/or service costs, including the date(s) of the charges,
the services provided, and the amount paid, in order to receive reimbursement for a
Labor Reimbursement Claim.  This benefit is subject to the Claims Bar described in
Section 3.1.5, and either the Prior Claim Deadline or the Future Claim Deadline
applicable to the Class Microwave

3.1.3  <u>Reimbursement of Cabinet Covering</u>.  Any Class Member (i) with a Documented
Arcing Claim that occurred within the Extended Warranty Term for their Class
Microwave, <u>and</u> (ii) who has chosen not to accept a replacement Sharp microwave for
that Documented Arcing Claim may seek reimbursement for up to $200 of costs
incurred to repair or cover the opening in a Class Member's kitchen cabinetry in which
their Class Microwave was installed ("Cabinet Covering Claim").  Class Members
must provide documentation of the costs related to the Cabinet Covering Claim,
including the date(s) of the charges assessed, the services and/or materials provided,
and the amount paid, in order to receive reimbursement for a Cabinet Covering Claim.
This benefit is subject to the Claims Bar described in Section 3.1.5, and either the Prior
Claim Deadline or the Future Claim Deadline applicable to the Class Microwave.

3.1.4  <u>Inspection</u>.  Sharp reserves the right to inspect any Class Microwave, including at the
location of the Class Microwave, to assess the validity of a Documented Arcing Claim,
and to challenge the approval of such claim based upon evidence or lack of evidence
of arcing in the Class Microwave.  If any Class Member seeks to challenge Sharp's
determination of a claim, the Class Member may pursue such challenge in accordance
with the provisions of Sections 5.8 and 5.9 below.

3.1.5  <u>Claims Bar</u>.  As described in Section 3.1.1(c), in order to promote prompt
administration and finality for the Settlement, a Claim Form for any <u>prior</u> Documented
Arcing Claims that occurred within the Extended Warranty (i.e. five years from the
date of purchase or installation as described in Section 3.1.1(a), where the Extended
Warranty has either already expired or will expire prior to the date of the Final
Approval Hearing) must be submitted to Sharp on or before the Prior Claim Deadline
or otherwise shall be forever barred.

By way of illustration, if a Class Member establishes a date of installation for a Class
Microwave of January 1, 2015, and a Documented Arcing Claim arising on January 1,
2019, (i.e. within the Extended Warranty Term for the Class Member's Class
Microwave, with the expiration of that Extended Warranty Term occurring on or before
the date of the Final Approval Hearing), the Class Member is entitled to select Extended

Warranty Treatment subject to the terms above, provided the Class Member submits a valid Claim Form by the Prior Claim Deadline, or will be forever barred.

Any Class Member with an Extended Warranty that will expire after the date of the Final Approval Hearing, and who is seeking relief for a Documented Arcing Claim, must submit a valid claim to Sharp on or before the Future Claim Deadline, or their claim will be forever barred.

3.1.6   <u>Notice and Administration Costs</u>:   Sharp shall pay any and all Notice and Administration Costs directly to the Settlement Administrator as such costs and expenses are invoiced.  The Settlement Administrator shall also provide a copy of all invoices and charges to Class Counsel.

3.2   <u>Fees and Expenses Award</u>:  Sharp shall pay the Fee and Expenses Award and all Service Payments awarded by the Court pursuant to the terms and conditions of Section 9.4 herein.

3.3   <u>Notice and Claim Form</u>. The Settlement Administrator will notify and advise Class Members of the right to make a claim for such benefits by disseminating to the Settlement Class the Notice and making the Claim Form available promptly following Preliminary Approval Date. Copies of the Claim Form and Notice are attached hereto as **Exhibits B** and **C**, respectively.

3.4   <u>Payment of Claims</u>.  Sharp shall make available sufficient funds to pay all valid Class Member claims.

3.5   <u>Claims Administration</u>.  Sharp will manage and oversee the administration of all claims, with the assistance of the Settlement Administrator.

## IV.   <u>NOTICE OF THE SETTLEMENT</u>

4.1   Concurrently with the filing of the Preliminary Approval motion referred to in Section 2.1, the Parties shall also submit for the Court's approval forms of notice of the certification of the Settlement Class, proposed Settlement Agreement, and Final Approval Hearing, substantially in the form of **Exhibit C** (the "Class Notice" or "Notice") and a Notice Plan and, within 45 days thereafter, upon order of the Court, the Settlement Administrator shall disseminate the Notice to the Class in the manner so ordered.

4.2   The Notice Plan will direct to Class Members the best notice that is practicable under the circumstances, satisfying the requirements of the Federal Rules of Civil Procedure and any other applicable statute, law, or rule, including but not limited to, the Due Process Clause of the United States Constitution, and Fed. R. Civ. P. 23(c)(2)(B).  The Notice Plan shall consist of the following: (i) a press release shall be published pursuant to the Notice Plan, (ii) the Long Form version of the Class Notice shall be distributed to those Settlement Class Members by (a) making it available in English and  Spanish for Class Members who request it and (b) posting it online on the Settlement Website, (iii) the Class Notice shall be emailed to the last known valid email address of Class Members that can reasonably be identified by Sharp and a direct mail postcard shall be

mailed to all Class Members for whom Sharp no longer has valid e-mail addresses but for whom it has direct mail addresses and (iv) print and Internet ads.

4.3    Following the Court's preliminary approval of this Settlement Agreement and the Court's appointment of the proposed Settlement Administrator, the Settlement Administrator shall disseminate the Class Notice as provided for herein and in the Declaration of the Settlement Administrator, attached hereto as **Exhibit D**, as specified in the Preliminary Approval Order and in this Settlement Agreement, and in order to comply with all applicable laws, including, but not limited to, the Due Process Clause of the United States Constitution.

4.4    Immediately upon entry of the Preliminary Approval Order, Sharp shall provide to the Settlement Administrator reasonably available mailing addresses and email addresses, along with model and serial number information, contained in Sharp's warranty and service databases in computer readable format and will cooperate with the Settlement Administrator in transmitting this information in the manner that is most efficient for the Settlement Administrator.  Sharp will cooperate in making its warranty registration and service data and other relevant information from its databases available to the Settlement Administrator to facilitate identification of potential Settlement Class Members.

4.5    The Settlement Administrator shall send or cause to be sent, by first class or priority United States Mail, the Class Notice in postcard form to every Settlement Class Member whose name and address can reasonably be identified in Sharp's records or databases and for whom Sharp does not have a valid email address. The Settlement Administrator will obtain mailing address updates utilizing the National Change of Address database.  The Settlement Administrator will use any updated addresses obtained.  The Settlement Administrator will forward any Class Notices that are returned by the United States Postal Service with a forwarding address. The Settlement Administrator shall perform reasonable address traces for all postcards that are returned as undeliverable.  By way of example, a "reasonable" tracing procedure would be to run addresses of returned postcards through the Lexis/Nexis or similar database that can be utilized for such purpose.  No later than 60 days before the Final Approval Hearing, the Settlement Administrator shall complete the re-mailing of postcard notice to those Settlement Class members whose new addresses were identified as of that time through address traces.

4.6    The Settlement Administrator will send an electronic copy of the Class Notice to all Class Members for whom an email address is reasonably available, even if a postal mailing address is known.  The Settlement Administrator shall take commercially reasonable steps to complete and/or update email addresses for Class Members prior to disseminating the email Notices.  The Settlement Administrator shall send postcard notice to all Settlement Class members whose emails were returned as undeliverable and complete such notice pursuant no later than 60 days before the Final Approval Hearing.

4.7    Toll Free Telephone Number:  Prior to the dissemination of the Class Notice, the Settlement Administrator also shall establish a toll-free telephone number, through which Class Members may obtain information about the Litigation, obtain answers to frequently asked

questions, and request a mailed copy of the Class Notice and Claim Form, pursuant to the terms and conditions of this Settlement Agreement.

4.8    The Settlement Administrator also shall develop and manage a website no later than forty-five (45) days after the entry of the Order preliminarily approving the Settlement Agreement. The Settlement Administrator will use the Settlement Website as a means for Settlement Class members to obtain notice of and information about the Settlement, through and including hyperlinked access to this Agreement, the Long Form Notice, the order preliminarily approving this Settlement, and such other documents as Class Counsel agrees to post or that the Court orders posted on the website. The Settlement Website shall also include a means for Settlement Class members to submit Claim Forms online. The URL of the Settlement Website shall be www.SharpMicrowaveLitigation.com, or such other URL as Class Counsel and Sharp agree upon in writing. The Settlement Website shall remain active for five years following the Effective Date.

4.9    The Settlement Administrator shall also establish a mailing address to allow Settlement Class Members the opportunity to request Class Notice, Claim Forms, or additional information by mail, until the expiration of the Prior Claim Deadline or Future Claim Deadline, including any cure periods.

4.10    The Class Notice: The Class Notice (or "Notice") – in postcard, email, long-form, and publication forms – shall be substantially similar to the documents attached to this Settlement Agreement as **Exhibit C** and shall cover the following:

a.    General Terms: The Class Notice shall contain a plain and concise description of the nature of the Action and the proposed Settlement, including information on the definition of the Settlement Class, how the proposed Settlement would provide relief to Class Members, what claims are released under the proposed Settlement, how Settlement Class Members may submit Claim Forms, and other relevant information.

b.    Opt-Out Rights: The Class Notice shall inform Class Members that they have the right to opt out of the Settlement. The Class Notice shall provide the deadlines and procedures for exercising this right.

c.    Objection to Settlement: The Class Notice shall inform Class Members of their right to object to the proposed Settlement and appear at the Final Approval Hearing. The Class Notice shall provide the deadlines and procedures for exercising these rights.

d.    Fees and Expenses: The Class Notice shall inform Class Members of the total estimated Notice and Administration Costs and the maximum amounts to be sought by Class Counsel in the Fee Application and shall also explain that the fees and expenses awarded to Class Counsel (if any) and Service Payments to Plaintiffs (if any), are in addition to Settlement benefits and consideration being made available to Class Members. Nothing in this provision is intended to prevent Sharp from communicating with Class Members in the normal course of Sharp's business.

4.11    The Parties agree that any communications or publications by Class Counsel regarding the issues addressed in this Settlement Agreement will be consistent with the terms of this Settlement Agreement, the Class Notice, the Preliminary Approval Order, and the Final Order and Judgment. To the extent that Class Counsel communicate with any press or media concerning this Settlement Agreement, Class Counsel will give Sharp 48 hours advance notice and reasonable opportunity to review such communications in advance.

## V.    SETTLEMENT ADMINISTRATION

5.1    The Parties agree to recommend that the Court appoint Rust Consulting as Settlement Administrator to: (a) implement and distribute the Class Notice by electronic mail and U.S. Mail as provided herein; (b) distribute or make available the Claim Forms to Class Members after the Preliminary Approval Date as provided herein; (c) establish and maintain the Settlement Website; and (d) to provide reasonable and necessary ancillary settlement administration services.

5.2    Because the names of Class Members and other personal information about them will be provided to the Settlement Administrator for purposes of sending Class Notice and processing opt out requests, the Settlement Administrator will ensure that any information provided to it by Settlement Class Members will be secure and used solely for the purpose of effecting this Settlement and will execute any appropriate agreement needed to ensure confidentiality.

5.3    The Settlement Administrator shall administer the Settlement in the most cost-effective and timely manner, subject to the terms and conditions of this Settlement Agreement. Without limiting any of its other obligations as stated herein, the Settlement Administrator shall be responsible for printing and mailing and/or emailing the Class Notice, establishing and maintaining the Settlement Website, and providing all other related support, reporting, and administration as further stated in this Settlement Agreement. Class Counsel and Sharp's Counsel may direct the Settlement Administrator to assist with various additional administrative tasks in implementing the Settlement as Class Counsel and Sharp's Counsel shall deem appropriate by mutual agreement.

5.4    In fulfilling its responsibilities in providing Class Notice, the Settlement Administrator shall be responsible for, without limitation, consulting on and designing the notice to the Settlement Class. In particular, the Settlement Administrator shall be responsible for: (a) printing and mailing and/or emailing the Class Notice as provided herein; (b) printing and mailing the Claim Forms as provided herein; (c) responding to requests from Class Counsel and/or Sharp's Counsel; (d) establishing a toll-free voice response unit with message and interactive voice response (IVR) capabilities to which Class Members may refer for information about the Action and the Settlement; (e) receiving and maintaining any Class Member correspondence regarding requests for exclusion to the Settlement; (f) forwarding inquiries from Class Members to Class Counsel for a response, if warranted; (g) establishing a post office box for the receipt of Claim Forms, exclusion requests, and any correspondence; and (h) establishing and maintaining the Settlement Website as detailed herein; and (i) collecting, preserving, and making completed Claim Forms received from Settlement Class members (whether via the Settlement Website or otherwise) available to Sharp on a weekly basis.

5.5     The Settlement Administrator also shall be responsible for providing the required CAFA Notice to the appropriate Federal official and appropriate State officials within ten (10) days of the filing of this Settlement Agreement with the Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715.  Any and all cost or expense related to, either directly or indirectly, this compliance with CAFA, shall be paid by Sharp.

5.6     The Settlement Administrator shall administer the Settlement in accordance with the terms of this Settlement Agreement and, without limiting the foregoing, shall:

      a.     Treat any and all documents, communications, and other information and materials received in connection with the administration of the Settlement as confidential and shall not disclose any or all such documents, communications, or other information to any person or entity except as provided for in this Settlement Agreement or by court order;

      b.     Receive requests for exclusion or opt out requests from Class Members and provide to Class Counsel and Sharp's Counsel a copy thereof on a weekly basis.  If the Settlement Administrator receives any requests for exclusion or opt out request after the deadline for the submission of such requests, the Settlement Administrator shall promptly provide Class Counsel and Sharp's Counsel with copies thereof;

      c.     Receive and maintain all correspondence from any Class Member regarding the Settlement; and

      d.     Provide a summary report on a monthly basis to Class Counsel and Sharp's Counsel on number of calls and any other pertinent information agreed to by Class Counsel and Sharp's Counsel.

5.7     In coordination with Rust, Sharp shall be responsible for receiving completed Claim Forms, reviewing them for eligibility, and paying eligible Claims with funds to be provided by Sharp.  Sharp shall review Claim Forms according to the review protocols agreed to by the Parties and set forth in this Settlement Agreement. For those subject to the Prior Claim Deadline (i.e. consumers whose five-year Extended Warranty expired prior to or on the date of the Final Approval Hearing) Sharp shall distribute the Settlement benefits to Settlement Class Members and pay funds to Settlement Class Members in the amounts set forth in timely and valid Claim Forms within sixty (60) days of the (a) Prior Claim Deadline (as applicable to consumers whose five-year Warranty expired prior to or on the date of the Final Approval Hearing) or within sixty (60) days of (b) the Effective Date, whichever is later.  For those subject to the Future Claim Deadline (i.e. consumers whose five-year Extended Warranty has not expired prior to or on the date of the Final Approval Hearing), Sharp shall distribute the Settlement benefits to Settlement Class Members and pay funds to Settlement Class Members in the amounts set forth in timely and valid Claim Forms within a reasonable time consistent with Sharp's warranty claim process.Sharp shall use the Claim Form, attached hereto as **Exhibit B**, to administer the claims of all Settlement Class Members.

5.8     Sharp shall establish a toll-free voice response unit with message and interactive voice response (IVR) capabilities to which Settlement Class Members may refer for information about the submission of Claim Forms.  Sharp shall also establish a dedicated Sharp-based email address to be used for, *inter alia*, the receipt of Claim Forms and supporting documentation from Settlement Class Members.  Information about this dedicated email address shall be provided to Settlement Class Members in the Class Notice, on the Claim Form, and on the automated toll-free telephone lines established by the Settlement Administrator and Sharp.

5.9     Class Members must follow and abide by the instructions set forth in the Claim Form.  Claim Forms that do not meet the requirements set forth in the Claim Form instructions shall be rejected.  Where a good faith basis exists, Sharp may reject a Settlement Class Member's Claim Form for good cause and, among any other valid reason, the following: (i) failure to fully complete and/or sign the Claim Form; (ii) illegible Claim Form; (iii) the person submitting the Claim Form is not a Class Member; (iv) the Claim Form is fraudulent; (v) the Claim Form is duplicative; (vi) failure to submit a Claim Form by the Prior Claim Deadline or Future Claim Deadline, as applicable; and/or (vii) the Claim Form otherwise does not meet the requirements of this Settlement Agreement.

5.10    Sharp shall determine whether a Claim Form meets the requirements set forth in this Settlement Agreement.  Each Claim Form shall be submitted to and reviewed by Sharp, who shall determine (in accordance with this Settlement Agreement) the extent, if any, to which the claim shall be allowed.

5.11    Sharp shall have (a) thirty (30) days from the receipt of the Claim Form or (b) thirty (30) days after the Effective Date, whichever is later, to exercise the right of rejection.  Sharp shall notify the Settlement Class Member using the contact information provided in the Claim Form of the rejection.  Class Counsel and Sharp's Counsel shall be provided with copies of all such notifications to Settlement Class Members.  If any Class Member whose Claim Form has been rejected, in whole or in part, desires to contest such rejection, the Settlement Class Member must, within thirty (30) business days from receipt of the rejection, transmit to Sharp by U.S. Mail or electronic mail a notice and statement of reasons indicating the grounds for contesting the rejection, along with any supporting documentation, and requesting further review, in consultation with Class Counsel and Sharp's Counsel, of the denial of the Claim Form.  Sharp shall provide Class Counsel with the Settlement Class Member's notice and statement of reasons for contesting the rejection and all supporting documentation received by Sharp from the Settlement Class Member.  If Class Counsel and Sharp's Counsel cannot agree on a resolution of the Settlement Class Member's notice contesting the rejection, the disputed Claim Form shall be presented to the Court, and/or a referee appointed by the Court to make recommendations to the Court, for summary and non-appealable resolution.

5.12    Sharp shall also provide quarterly summary reports to Class Counsel regarding its administration of Settlement Class Member claims.  Such quarterly reports shall be submitted to Class Counsel via email and shall include, at a minimum, the following information: (a) the number of Claim Forms received by Sharp (either directly or via the Settlement Administrator), (b) the number of Claim Forms approved by Sharp as valid, (c) the number of Claim Forms rejected by

Sharp as invalid and the reasons for such rejection, and (d) the amount paid to each Settlement Class
Member in connection with an approved Claim Form.

5.13    No person shall have any claim against Sharp, Sharp's Counsel, Plaintiffs, Class
Counsel, the Settlement Class, and/or the Settlement Administrator based on any eligibility
determinations, distributions, or awards made in accordance with this Settlement Agreement.  This
provision does not affect or limit in any way the right of review by the Court or referee of any
disputed Claim Forms as provided in this Settlement Agreement.

5.14    Claim Forms submitted via U.S. Mail or electronically to the Settlement
Administrator shall be deemed to have been submitted when it is actually received by the
Settlement Administrator, or by the USPS postmark date or date stamp on the electronic
submission, whichever is earlier.

5.15    Claim Forms submitted via U.S. Mail or electronically to Sharp shall be deemed to
have been submitted when it is actually received by Sharp, or by the USPS postmark date or date
stamp on the electronic submission, whichever is earlier.

5.16    Class Counsel and Sharp's Counsel shall have the right to inspect the Claim Forms
and supporting documentation received by the Settlement Administrator or Sharp at any time upon
reasonable notice.

5.17    Any Class Member who, in accordance with the terms and conditions of this
Settlement Agreement, does not seek exclusion from the Settlement Class will be bound together
with all Class Members by all of the terms of this Settlement Agreement, including the terms of
the Final Order and Judgment to be entered in the Action and the releases provided for herein, and
will be barred from bringing any action in any forum (state or federal) against any of the Released
Parties concerning the claims released in this Settlement Agreement.

5.18    Not later than fourteen (14) days before the date of the Final Approval Hearing the
Settlement Administrator shall file with the Court an affidavit containing a list of those persons
who have opted out or excluded themselves from the Settlement.

5.19    If the Settlement is not approved or for any reason the Effective Date does not
occur, any Claim Forms submitted in connection with Prior Claims shall be deemed void and
disregarded, no payments or distributions of any kind shall be made pursuant to this Settlement
Agreement, except for the costs and expenses of the Settlement Administrator, which shall be paid
by Sharp, and for which Plaintiffs and/or Class Counsel are not responsible. In the event the
Settlement Administrator fails to perform its duties, and/or makes a material or fraudulent
misrepresentation to, or conceals requested material information from Class Counsel, Sharp,
and/or Sharp's Counsel, then the party to whom the misrepresentation is made shall, in addition to
any other appropriate relief, have the right to demand that the Settlement Administrator
immediately be replaced. No party shall unreasonably withhold consent to remove the Settlement
Administrator. The Parties will attempt to resolve any disputes regarding the retention or dismissal
of the Settlement Administrator in good faith, and, if they are unable to do so, will refer the matter
to the Court for resolution.

5.20    Reasonable costs for the administration of the settlement (including notice to the class and administration of the claims process described herein) shall be paid by Sharp. Sharp shall have the right to approve in advance a budget for notice and administrative expenses of the Settlement Administrator, which shall be subject to Court approval.

## VI.    RELEASE AND DISMISSAL WITH PREJUDICE

6.1    As of the entry of the Final Order and Judgment, Plaintiffs and the Class Members hereby release Sharp and the Released Parties from any and all claims, demands, actions, causes of actions, individual actions, class actions, damages (including without limitation compensatory, consequential, exemplary, treble, and punitive damages), obligations, liabilities, appeals, reimbursements, penalties, costs, expenses, attorneys' fees, liens, interest, injunctive or equitable claims and/or administrative claims, whether known or unknown, filed or unfiled, asserted or unasserted, regardless of the legal theories involved (and whether based in common law, statute or otherwise), that relate in any way to any Class Microwaves, and Plaintiffs and Class Members expressly waive and relinquish all such claims or causes of action to the fullest extent permitted by law ("Released Claims"). Plaintiffs and the Settlement Class Members recognize that even if they later discover facts in addition to or different from those which they now know or believe to be true, they nevertheless agree that, upon entry of the Final Order and Judgment, Plaintiffs and the Class Members fully, finally and forever settle and release any and all of the Released Claims. The Parties acknowledge that the foregoing release was bargained for and is an essential and material element of this Settlement Agreement. The Released Claims do not include any claims for personal injury.

6.2    In connection with the foregoing release, Plaintiffs and the Class Members expressly, knowingly, and voluntarily waive the provisions of Section 1542 of the California Civil Code (as well as any statute or legal provision in the relevant states similar to California Civil Code Section 1542), which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Plaintiffs and the Class Members expressly waive and relinquish any and all rights and benefits which they may have under, or which may be conferred upon them by, the provisions of Section 1542 of the California Civil Code, or any other law of any state or territory which is similar, comparable, or equivalent to Section 1542, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Released Claims. In connection with such waiver and relinquishment, Plaintiffs and the Class Members acknowledge that they are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the Released Claims, but that it is their intention to fully, finally and forever settle and release all of the Released Claims known or unknown,

suspected or unsuspected, which they have against the Released Parties, in exchange for the consideration provided under this Settlement. In furtherance of such intention, the release herein given by the Plaintiffs and the Class Members to the Released Parties shall be and remain in effect as a full and complete general release of the Released Claims notwithstanding the discovery or existence of any such additional different claims or facts.

6.3     The foregoing release does not affect the rights of Class Members who timely and properly Opt-Out.  Such Class Members do not release their claims and will not obtain any of the benefits of the Settlement.

6.4     Within five (5) days of the issuance of the Effective Date, the Nationwide Action shall be dismissed with prejudice, and Plaintiffs and Class Members, other than those who timely and properly submitted for Opt-Out, shall be permanently barred and enjoined from initiating, asserting, or prosecuting any Released Claim against Sharp or any of the other Released Parties. Plaintiffs and Class Members and their counsel hereto agree to do all things necessary, along with the execution of any additional documents, to cause claims alleged in any other actions against Sharp involving the Class Microwaves to be dismissed with prejudice, if not already dismissed with prejudice prior to the Effective Date, including any other class action lawsuit which has been filed or may be filed involving some or all of the Class Microwaves.

Plaintiffs and Class Members and their counsel hereto agree to cease all advertisements and solicitations for claims involving the Class Microwaves, and to remove any such advertisements or solicitations presently appearing in any print or online publications, including without limitation the classaction.org website.

6.5     Notwithstanding the dismissal of the Action pursuant to this Section VI, the Court shall retain jurisdiction over the Parties to the Settlement Agreement with respect to the future performance and enforcement of the terms of the Settlement Agreement including, but not limited to, whether any claim being asserted in any Court or forum is released by the terms of the Settlement Agreement.

## VII.    REQUEST FOR EXCLUSION BY CLASS MEMBERS

7.1     Any Class Member may make a request to be excluded from the Settlement Class, and from participation in the settlement consideration provided by this Settlement Agreement, by mailing or delivering such request in writing ("Request for Exclusion") to the Settlement Administrator at the address set forth in the Class Notice prior to the Opt-Out and Objection Deadline.

7.2     Any Request for Exclusion must be actually delivered not later than the Opt-Out and Objection Deadline.  The Request for Exclusion shall (1) state the Class Member's printed full name, current address and phone number, as well as email address, if any; (2) specifically state the Class Member's desire to be excluded from the Settlement Class; (3) provide the serial number and date of manufacture for the Class Member's Microwave, as well as the date that the Class Member's Microwave was purchased, if known; and (4) be signed personally by the Class Member, with the date of the Class Member's signature also provided.  Failure to comply with

these requirements or to timely submit the Request for Exclusion will result in the Class Member being bound by the terms of this Settlement Agreement.

7.3    Any Class Member who submits a timely Request for Exclusion may not file an Objection and waives any rights or benefits under this Settlement Agreement.

## VIII.    **OBJECTIONS BY CLASS MEMBERS**

8.1    As will be set forth in the Class Notice, any Class Member who wishes to object to any provision of this Settlement Agreement must file an Objection with the Court no later than the Opt-Out and Objection Deadline.  An objection may only be filed by a Class Member.

8.2    To state a valid Objection, a Class Member must include the following information in the Objection: (1) the objector's full name, current address, current telephone number and email address, if any; (2) documentation, such as documents showing the serial number, date of manufacture, and date of purchase for the Class Member's Microwave, sufficient to establish membership in the Settlement Class; (3) a written statement of all grounds for the Objection; (4) a list of all persons who will be called to testify at the Final Approval Hearing in support of the Objection; (5) the objector's signature and the signature of the objector's duly authorized attorney or other duly authorized representation (if any) along with documentation setting forth such representation; and (6) copies of any documents supporting the Objection.

8.3    The Class Member must personally sign the Objection; an attorney's signature is not sufficient. Subject to the approval of the Court, any Class Member filing an Objection may appear, in person or by counsel, at the Final Approval Hearing.  However, to be eligible for appearance at the hearing, such Class Member must file with the Court and serve upon all counsel designated in the Class Notice, a Notice of Intention to Appear by the Opt-Out and Objection Deadline.  The Notice of Intention to Appear must include the case name, case number, the Class Member's printed name, address, email address, telephone number and signature.  The Class Member also must include copies of any papers, exhibits, or other evidence that the Class Member or counsel will present to the Court.  Any Class Member who does not provide a Notice of Intention to Appear in complete accordance with these specifications, subject to approval by the Court, waives any objections to the Settlement Agreement and may be barred from speaking or otherwise presenting any views at the hearing on the Final Order and Judgment.

8.4    In the event that a Class Member objects through an attorney hired at his, her or its own expense, the attorney must file a notice of appearance with the Court by the Opt-Out and Objection Deadline and serve a copy of the notice and the Objection containing the information detailed above on Class Counsel and Sharp's Counsel by the Opt-Out and Objection Deadline.

8.5    Any Class Member who fails to file and serve timely a written Objection containing all of the information listed above in the previous paragraphs, including notice of his/her intent to appear at the Final Approval Hearing, shall not be permitted to object to the Settlement and shall be foreclosed from seeking any review of the settlement or the terms of the Settlement Agreement by any means, including but not limited to an appeal.

8.6    Written notice of an Objection in appropriate form must be filed with: Clerk of Court, United States District Court for the Middle District of Florida, Tampa Division, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida 33602.

## IX.    SERVICE PAYMENTS AND ATTORNEYS' FEES AND EXPENSES

9.1    In recognition of the time and effort the Plaintiffs expended in pursuing the Litigation and in fulfilling their obligations and responsibilities as class representatives, and in recognition of the benefits conferred on all Class Members by the Settlement, Class Counsel may ask the Court for the award and payment of Service Payments, in an amount not to exceed One Thousand Five Hundred Dollars ($1,500) for each Plaintiff.

9.2    The Service Payments as awarded by the Court, if any, shall be paid by Sharp by way of physical check or wire transfer to "Greg Coleman Law PC Client Trust Account" within fifteen (15) business days after the Effective Date, subject to Sharp's prior receipt of a completed IRS Form W-9 form duly executed on behalf of Greg Coleman Law PC and, if applicable, wire instructions.

9.3    Plaintiffs acknowledge and understand that they may receive no Service Payments, and their agreement to the Settlement is not conditioned on the possibility of receiving Service Payments. If the Court does not grant a Service Payment to a Plaintiff, that Plaintiff is entitled only to the amounts they claim as Class Members.

9.4    Class Counsel will make a Fee Application for an award of reasonable attorney's Fees and Expenses incurred in Litigation.  Class Counsel will not seek any other attorney's fees, costs and expenses for any work they have performed or will perform in connection with this Settlement Agreement and will not seek or accept Fees and Expenses exceeding $3,000,000 in the aggregate. Sharp will not object, oppose, appeal, or take a position to any fee and expenses request up to and including the aggregate amount of Three Million Dollars ($3,000,000).

9.5    Pursuant to Fed. R. Civ. P. Rule 23(h), the Court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

(2) A class member, or a party from whom payment is sought, may object to the motion.

(3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

(4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

The Court's award of any attorney's fees and expenses to Class Counsel shall be separate from and independent of the Court's determination of whether to approve the Settlement. If the Court declines to approve the Settlement, no award of attorney's fees and expenses shall be awarded or paid to Class Counsel. It is not a condition of this Settlement or Agreement that the Court award any particular amount of Attorney's Fees and Expenses up to a maximum of three million dollars ($3,000,000).

9.6    The Fee and Expense Award shall be paid by Sharp by way of physical check or wire transfer to "Greg Coleman Law PC" within fifteen (15) business days of the entry of the Fee and Expense Award, subject to Sharp's prior receipt of a completed IRS Form W-9 form duly executed on behalf of Greg Coleman Law PC and, if applicable, wire instructions.

9.7    Sharp shall have no responsibility for and no liability with respect to the allocation of the attorney's fees, costs and expenses among Class Counsel or any other counsel purporting to represent Plaintiffs.

## X.    MODIFICATION OR TERMINATION OF THE SETTLEMENT

10.1    In addition to the circumstances outlined above that entitle the Parties to terminate this Settlement Agreement, either Party shall have the right to terminate this Settlement Agreement in the event that the Court or any appellate court, rejects, denies approval, or modifies the Settlement Agreement or any portion of the Settlement Agreement in a way that is material. For purposes of this provision, "material" shall mean any modifications to the definitions of the Settlement Class, Class Members, or Released Claims, any modifications to the Settlement that relieve or alter the rights of the Plaintiffs or Sharp, and/or any modifications to the terms of the settlement consideration or releases set forth in Section III of this Settlement Agreement.

10.2    In addition to the circumstances outlined above that entitle the Parties to terminate this Settlement Agreement, either Party shall have the right to terminate this Settlement Agreement in the event that any governmental or regulatory agency should successfully challenge any of the terms of the Settlement Agreement such that any material provisions of this Settlement Agreement are deemed invalid.

10.3    Sharp shall have the right to withdraw from the Settlement if the number of Settlement Class Members who attempt to exclude themselves from the Settlement Class equals or exceeds two percent (2%) of the total putative class members. If Sharp chooses, pursuant to its sole and absolute discretion, to exercise this right, Sharp must do so within ten (10) days of receipt of the Settlement Administrator's Opt-Out list as provided in Section V, by providing written notice to Class Counsel.

10.4    If any Party elects to terminate this Settlement Agreement under any provision herein, that Party shall provide the other Party with notice of the termination no later than ten (10) days after the event or action that gives rise to the termination.

10.5    In the event that: (i) the Settlement is not approved, is overturned, or is modified in a material way by the Court or on appeal, (ii) the Judgment does not become Final, or (iii) this

Settlement Agreement is terminated, canceled, or fails to become effective for any reason, then: (a) the Settlement shall be without force and effect upon the rights of the Parties hereto, and none of its terms shall be effective or enforceable, with the exception of this Paragraph, which shall remain effective and enforceable; (b) the Parties shall be deemed to have reverted *nunc pro tunc* to their respective status as of the date of the first mediation described herein; (c) all orders entered in connection with the Settlement, including the certification of the Settlement Class shall be vacated without prejudice to any Party's position on the issue of class certification or any other issue, in this Action or any other action, and the Parties shall be restored to their litigation positions existing on the date of execution of this Settlement Agreement; (d) the Parties shall proceed in all respects as if the Settlement Agreement and related documentation and orders had not been executed, and without prejudice in any way from the negotiation or fact of the Settlement or the terms of the Settlement Agreement; and (e) Sharp may assert any and all defenses, challenges, motions, responses, or any other answer to the First Amended Consolidated Complaint or any other complaint, including, but not limited to, any challenge to jurisdiction. This Settlement Agreement, the Settlement, and orders sought or entered as a result of an obligation herein, the fact of their existence, any of their terms, any press release or other statement or report by the Parties or by others concerning the Settlement Agreement, the Settlement, their existence, or their terms, any negotiations, proceedings, acts performed, or documents executed pursuant to or in furtherance of the Settlement Agreement or the Settlement shall not be offered, received, or construed as evidence of a presumption, concession, or an admission of liability, of the certifiability of a litigation class, or of any misrepresentation or omission in any statement or written document approved or made, or otherwise used by any Person for any purpose whatsoever, in any trial of this Action or any other action or proceedings, except to enforce the provisions of this section 10.5

10.6    Notwithstanding any provision herein, in the event this Settlement Agreement is not approved by the Court, or the Settlement set forth herein is declared null and void, or in the event that the Effective Date does not occur, Class Members, Plaintiffs, and Class Counsel shall not in any way be responsible or liable for any costs of notice and associated with this Settlement or this Settlement Agreement, except that each Party shall bear its own attorney's fees and costs and Sharp's future payment obligations pursuant to this Settlement Agreement shall cease.

10.7    The terms and provisions of this Settlement may be amended, modified, or expanded by written agreement of the Parties and approval of the Court; provided, however that, after entry of the Final Order and Judgment, the Parties may by written agreement effect such amendments, modifications, or expansions of this Settlement and its implementing documents (including all exhibits hereto) without further notice to the Settlement Class or approval by the Court if such changes are consistent with the Court's Final Order and Judgment and do not materially alter, reduce or limit the rights of the Class Members under this Settlement Agreement.

## XI.    <u>MISCELLANEOUS PROVISIONS</u>

11.1    This Settlement Agreement is not to be used in evidence (except in connection with obtaining approval of this Settlement Agreement and enforcing its terms) and shall not at any time be construed or deemed to be an admission or concession by Sharp with respect to any alleged wrongdoing, fault, or omission of any kind whatsoever, regardless of whether or not this

Settlement Agreement results in entry of a Final Order and Judgment as contemplated herein. Neither this Settlement Agreement nor any certification of a class pursuant to it shall constitute, in this or any other proceeding, an admission by Sharp, or evidence or a finding of any kind, that any requirement for class certification is satisfied with respect to the Action, or any other litigation, except for the limited purpose of settlement pursuant to this Settlement Agreement.

11.2    The headings of the sections and paragraphs of this Settlement Agreement are included for convenience only and shall not be deemed to constitute part of this Settlement Agreement or to affect its construction.

11.3    This Settlement Agreement may not be modified or amended except in writing and signed by all of the Parties.  This Settlement may not be discharged except by performance in accordance with its terms or by a writing signed by the Parties.

11.4    This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Electronic, .pdf, faxed or scanned signatures shall be treated as originals.

11.5    Except as otherwise provided in this Settlement Agreement, each Party bears his, her, or its own attorney's fees, costs and expenses of the Action and in connection with this Settlement Agreement.

11.6    The Parties to this Settlement Agreement reserve the right, by agreement and subject to the Court's approval, to grant any reasonable extensions of time that might be necessary to carry out any of the provisions of this Settlement Agreement, as well as to correct any inadvertent, non-substantive mistakes or typographical errors contained in the Settlement Agreement or the Exhibits.

11.7    The administration, consummation, and enforcement of the settlement embodied in this Settlement Agreement shall be under the authority of the Court. The Court shall retain jurisdiction to protect, preserve, and implement the Settlement Agreement, including but not limited to, the release contained herein. The Court expressly retains jurisdiction to enter such further orders as may be necessary or appropriate in administering and implementing the terms and provisions of this Settlement Agreement. The Parties do not intend by this provision to give the Court authority to change any term or condition of this Settlement Agreement over the objection of any Party.

11.8    The determination of the terms of, and the drafting of, this Settlement Agreement has been by mutual agreement after negotiation, with consideration by and participation of all Parties and their counsel.  Since this Settlement Agreement was drafted with the participation of all Parties and their counsel, the presumption that ambiguities shall be construed against the drafter does not apply.  The Parties were represented by competent and effective counsel throughout the course of settlement negotiations and in the drafting and execution of this Settlement Agreement, and there was no disparity in bargaining power among the Parties to this Settlement Agreement.

11.9    All of the Parties warrant and represent that they are agreeing to the terms of this Settlement Agreement based upon the legal advice of their respective attorneys, that they have been afforded the opportunity to discuss the contents of this Settlement Agreement with their attorneys and that the terms and conditions of this document are fully understood and voluntarily accepted.

11.10    This Settlement Agreement constitutes the entire, fully integrated agreement among the Parties and cancels and supersedes all prior written and unwritten agreements and understandings pertaining to the settlement of the Action.

11.11    The Settlement Agreement shall be governed by and interpreted according to the laws of the State of New Jersey, notwithstanding its conflict of law provisions.

11.12    This Settlement will be binding upon and will inure to the benefit of the Parties and their respective heirs, trustees, executors, administrators, successors and assigns.

11.13    If any disputes arise regarding the implementation or interpretation of this Settlement Agreement, the parties agree to use reasonable efforts to resolve the dispute, including consultation with the Mediator, Hon. Diane M. Welsh, U.S.M.J. (Ret.) of JAMS; and if no agreement can be reached, the dispute will be submitted to the Court, which will retain continuing jurisdiction to resolve such disputes. The Parties do not intend by this provision to give the Court authority to change any term or condition of this Settlement Agreement over the objection of a Party. Any disagreement and/or action to enforce this Settlement Agreement shall be commenced and maintained only in the Court in which this Action is pending. The Court has jurisdiction over the Parties to this Settlement Agreement and the Settlement Class.

11.14    All time periods set forth herein shall be computed in calendar days unless otherwise expressly provided.  In computing any period of time prescribed or allowed by this Settlement Agreement, the day of the act, or default, from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday or Sunday or a legal holiday, in which event the period shall run until the end of the next day that is not one of the aforementioned days.

11.15    Any failure by any of the Parties to insist upon the strict performance by any of the other Parties of any of the provisions of this Settlement Agreement shall not be deemed a waiver of any provision of this Settlement Agreement, and such Party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions herein.

11.16    Class Counsel represent and warrant that they have the authority, on behalf of Plaintiffs, to execute, deliver, and perform this Settlement Agreement and to consummate all of the transactions contemplated hereby. This Settlement Agreement has been duly and validly executed and delivered by Class Counsel and Plaintiffs and constitutes their legal, valid, and binding obligation.

11.17   Sharp, through its undersigned attorneys, represents and warrants that it has the authority to execute, deliver, and perform this Settlement Agreement and to consummate the transactions contemplated hereby. This Settlement Agreement has been duly and validly executed and delivered by Sharp and constitutes its legal, valid, and binding obligation.

11.18   Sharp represents and warrants that the individual(s) executing this Settlement Agreement on its behalf are authorized to enter into this Settlement Agreement on behalf of Sharp.

11.19   The signatories to this Settlement hereby represent that they are fully authorized to enter into this Settlement on behalf of themselves or their respective principals.

11.20   All notices to the Parties or counsel required by this Settlement Agreement shall be made in writing and communicated by electronic and regular mail to the following addresses (unless one of the Parties subsequently designates one or more other designees):

| **For Plaintiffs and Class Counsel:** | **For Sharp:** |
|---|---|
| Gregory F. Coleman, Esq.<br>Rachel Soffin, Esq.<br>Greg Coleman Law<br>800 S. Gay Street, Suite 1100<br>Knoxville TN 37929<br>greg@gregcolemanlaw.com<br>rachel@gregcolemanlaw.com | Brian E. O'Donnell, Esq.<br>Curtis M. Plaza, Esq.<br>Jeffrey M. Beyer, Esq.<br>Riker Danzig Scherer Hyland &<br> Perretti LLP<br>One Speedwell Avenue<br>P.O. Box 1981<br>Morristown, NJ 07962-1981<br>bodonnell@riker.com<br>cplaza@riker.com<br>jbeyer@riker.com |
| Daniel K. Bryson, Esq.<br>Harper T. Segui, Esq.<br>Whitfield Bryson LLP<br>900 W. Morgan St.<br>Raleigh, NC 27603<br>dan@whitfieldbryson.com<br>harper@whitfieldbryson.com | |
| Andrea R. Gold, Esq.<br>Hassan A. Zavareei, Esq.<br>Tycko & Zavareei LLP<br>1828 L Street, NW - Suite 1000<br>Washington, DC 20036<br>agold@tzlegal.com<br>hzavareei@tzlegal.com | |

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____          _____
                                          Jill Brown, Plaintiff

Dated: _____          _____
                                          Austin Russell, Plaintiff

Dated: _____          _____
                                          Christian Lammey, Plaintiff

Dated: _____          _____
                                          Nancy James, Plaintiff

Dated: _____          _____
                                          Jill Wittman, Plaintiff

Dated: _____          _____
                                          Thomas Macone, Plaintiff

Dated: _____07/20/2020_____               _____*Michael A. Hamm*_____
                                          Michael Hamm, Plaintiff

Dated: _____          _____
                                          Andrea Gold, Esq., Plaintiffs' Counsel

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this

Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____    _____
                                   Jill Brown, Plaintiff

Dated: _____    _____
                                   Austin Russell, Plaintiff

Dated: July 17, 2020               _____
                                   Christian Lammey, Plaintiff

Dated: _____    _____
                                   Nancy James, Plaintiff

Dated: _____    _____
                                   Jill Wittman, Plaintiff

Dated: _____    _____
                                   Thomas Macone, Plaintiff

Dated: _____    _____
                                   Michael Hamm, Plaintiff

Dated: _____    _____
                                   Andrea Gold, Esq., Plaintiffs' Counsel

30

**Signature:** *Nancy James*
Nancy James (Jul 21, 2020 11:26 EDT)

**Email:** nacjames@outlook.com

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this

Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____          _____
                                                          Jill Brown, Plaintiff

Dated: _____          _____
                                                          Austin Russell, Plaintiff

Dated: _____          _____
                                                          Christian Lammey, Plaintiff

Dated: _____          Nancy James
                                                          _____
                                                          Nancy James, Plaintiff

Dated: _____          _____
                                                          Jill Wittman, Plaintiff

Dated: _____          _____
                                                          Thomas Macone, Plaintiff

Dated: _____          _____
                                                          Michael Hamm, Plaintiff

Dated: _____          _____
                                                          Andrea Gold, Esq., Plaintiffs' Counsel

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____       _____
                                      Jill Brown, Plaintiff

Dated: **7/18/2020**                  _____
                                      Austin Russell, Plaintiff

Dated: _____       _____
                                      Christian Lammey, Plaintiff

Dated: _____       _____
                                      Nancy James, Plaintiff

Dated: _____       _____
                                      Jill Wittman, Plaintiff

Dated: _____       _____
                                      Thomas Macone, Plaintiff

Dated: _____       _____
                                      Michael Hamm, Plaintiff

Dated: _____       _____
                                      Andrea Gold, Esq., Plaintiffs' Counsel

**Signature:** *Jill Wittman*
Jill Wittman (Jul 17, 2020 17:59 EDT)

**Email:** wittmanjp@gmail.com

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this

Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____         _____
                                    Jill Brown, Plaintiff

Dated: _____         _____
                                    Austin Russell, Plaintiff

Dated: _____         _____
                                    Christian Lammey, Plaintiff

Dated: _____         _____
                                    Nancy James, Plaintiff

Dated: _____         # Jill Wittman
                                    _____
                                    Jill Wittman, Plaintiff

Dated: _____         _____
                                    Thomas Macone, Plaintiff

Dated: _____         _____
                                    Michael Hamm, Plaintiff

Dated: _____         _____
                                    Andrea Gold, Esq., Plaintiffs' Counsel

**Signature:** _Thomas J Macone_
thomas j macone (Jul 22, 2020 13:43 EDT)

**Email:** tommacone@gmail.com

 

 

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this

Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____    _____
                                                  Jill Brown, Plaintiff

Dated: _____    _____
                                                  Austin Russell, Plaintiff

Dated: _____    _____
                                                  Christian Lammey, Plaintiff

Dated: _____    _____
                                                  Nancy James, Plaintiff

Dated: _____    _____
                                                  Jill Wittman, Plaintiff

                                                tom

Dated: _____    _____
                                                  Thomas Macone, Plaintiff

Dated: _____    _____
                                                  Michael Hamm, Plaintiff

Dated: _____    _____
                                                  Andrea Gold, Esq., Plaintiffs' Counsel

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this

Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____    _Jill Bornor-Brown_
                                     Jill Bornor-Brown (Jul 24, 2020 10:58 PDT)
                                     _____
                                     Jill Brown, Plaintiff

Dated: _____    _____
                                     Austin Russell, Plaintiff

Dated: _____    _____
                                     Christian Lammey, Plaintiff

Dated: _____    _____
                                     Nancy James, Plaintiff

Dated: _____    _____
                                     Jill Wittman, Plaintiff

Dated: _____    _____
                                     Thomas Macone, Plaintiff

Dated: _____    _____
                                     Michael Hamm, Plaintiff

Dated: _____    _____
                                     Andrea Gold, Esq., Plaintiffs' Counsel

Dated: _____          _____

                                    Daniel K. Bryson, Esq., Plaintiff's
                                    Counsel

Dated: _____7. 23-20_____          _____

                                    Gregory F. Coleman, Esq., Plaintiffs'
                                    Counsel

Dated: _____          _____

                                    Kevin A. Fox, Esq., General Counsel
                                    Defendant Sharp Electronics Corporation

Dated: _____          _____

                                    Brian E. O'Donnell, Esq., Counsel to
                                    Defendant Sharp Electronics Corporation

**IN WITNESS WHEREOF**, the Parties and their representatives have executed this Settlement Agreement as of the dates(s) indicated on the lines below.

Dated: _____    _____
                                    Jill Brown, Plaintiff

Dated: _____    _____
                                    Austin Russell, Plaintiff

Dated: _____    _____
                                    Christian Lammey, Plaintiff

Dated: _____    _____
                                    Nancy James, Plaintiff

Dated: _____    _____
                                    Jill Wittman, Plaintiff

Dated: _____    _____
                                    Thomas Macone, Plaintiff

Dated: _____    _____
                                    Michael Hamm, Plaintiff

Dated:    7-23-20                   _____
                                    Andrea Gold, Esq., Plaintiffs' Counsel

30

Dated: _____July 23, 2020_____    _____*Daniel K. Bryson*_____
                                        Daniel K. Bryson, Esq., Plaintiff's
                                        Counsel



Dated: _____    _____
                                        Gregory F. Coleman, Esq., Plaintiffs'
                                        Counsel



Dated: _____    _____
                                        Kevin A. Fox, Esq., General Counsel
                                        Defendant Sharp Electronics Corporation



Dated: _____    _____
                                        Brian E. O'Donnell, Esq., Counsel to
                                        Defendant Sharp Electronics Corporation

# EXHIBIT A

# Consolidated Amended Complaint

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **MICHAEL HAMM, JILL BROWN, AUSTIN RUSSELL, NANCY JAMES, JILL WITTMAN, CHRISTIAN LAMMEY, THOMAS MACONE,** individually and on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>**SHARP ELECTRONICS CORPORATION**,<br><br>    Defendant. | Case No.: 5:19-cv-00488-JSM-PRL<br><br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**(For the Purpose of Settlement)** |

## FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Nancy James, Jill Wittman, Christan Lammey, and Thomas Macone ("Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, bring this First Amended Consolidated Class Action Complaint against Sharp Electronics Corporation ("Defendant" or "Sharp") and in support allege, upon information and belief and based on the investigation to date of counsel, as follows:

## NATURE OF ACTION

1.    Sharp is one of the largest technology companies in the world. It designs, manufactures and sells a variety of technological products, including kitchen appliances such as microwaves.

2.    Sharp's kitchen appliance portfolio includes multiple different types of microwaves, including microwave drawers (the "Microwaves" or the "Products"), which are the subject of this action. On its website, Sharp boasts that it "has been innovating microwave cooking for decades and holds 11 patents on the Microwave Drawer platform alone. Engineered for consistency and

1

built with the finest quality materials, great cooks trust the Microwave Drawer to deliver great results every time."[1] Over the course of several decades, Sharp has gained the trust of consumers, who reasonably believe that Sharp products are made with quality materials, and that the Sharp products can be used safely, as intended.

3.  Microwave drawers, as described by Sharp, "offer[] flexible placement options so you can focus on the design elements you prefer by maximizing sight-lines and enabling more design versatility than typical built-in, over-the-range or countertop microwaves."[2]

4.  Sharp's microwave drawers are intended by Sharp to be installed within cabinets, under countertops, or adjacent to wall ovens.[3]

5.  Sharp has offered six models for its microwave drawers, and currently offers five of those six: SMD2470AH, SMD2470AS, SMD3070AS, SMD2480CS, KB6524PS, and KB6525PS (collectively, the "Microwaves"). The Microwaves, and the defect in the Microwaves alleged herein, are substantially similar and each model is the subject of this class action lawsuit.

6.  Each Microwave is similarly defectively designed and/or manufactured.

7.  The Microwaves all contain a defect, described in detail *infra*, that makes them unsuitable for their intended use.  More specifically, the  Microwaves are defectively designed and/or manufactured such that, under normal and intended use, the electromagnetic waves generated by the magnetron tube are unable to properly move through the waveguide into the cooking cavity, resulting in buzzing, smoking, overheating, and eventual destruction of the magnetron, leading to

---

[1] http://www.sharpusa.com/ForHome/HomeAppliances/Microwaves/MicrowaveDrawer.aspx (last accessed Mar. 12, 2019).

[2] http://www.sharpusa.com/ForHome/HomeAppliances/Microwaves/MicrowaveDrawerDark.aspx (last accessed Mar. 12, 2019).

[3] http://files.sharpusa.com/Downloads/ForHome/HomeAppliances/MicrowaveOvens/BuildersGuides/2017-Builders%20Guide_3-20-17.pdf (last accessed Mar. 12, 2019).

scorching of the waveguide (the "Defect").

8.    Accordingly, the Microwaves are not fit for household use.

9.    The Defect exists at (and prior to) the point of sale, as the Microwaves are defectively designed and/or manufactured. The damage to the Microwaves, resulting from the Defect, is  not a result of misuse of any kind, such as overcooking or prolonged heating by the owner. It can take less than 30 seconds for the magnetron tube to overheat, scorch the back panel of the Microwaves, produce smoke, and fail altogether.

10.    At all relevant times, Sharp knew or should have known about the Defect but nevertheless marketed, advertised, and sold the Microwaves without warning consumers that the Microwaves are likely to overheat and could result in buzzing, overheating of the magnetron, scorching of the waveguide, smoking, and ultimate failure.    Despite this knowledge, Sharp failed to disclose and actively concealed the Defect from Class Members and the public, and continued to markete, advertise, distribute and sell the Microwaves to consumers.

11.    Sharp has failed to provide an adequate fix for the Defect.

12.    As a direct and proximate result of Sharp's concealment of the Defect, its failure to warn customers about the Defect before their purchase of the Microwaves, its inability or refusal to replace the defective Microwaves, and its failure to remedy the Defect, Plaintiffs and other similarly situated customers ("Class" or "Class Members") purchased and used Sharp's defective Microwaves when they otherwise would not have made such purchases or would not have paid as much for the defective Microwaves.

13.    Plaintiffs' and putative Class Members' Microwaves have failed (or are likely to fail) as a result of the Defect when Plaintiffs and Class Members use the Products as intended, resulting in smoke damage to the Microwaves and other property, including smoke damage to

cabinetry, kitchen islands and peninsulas, and other interior parts of their homes, and the loss of meals prepared in the Microwaves.

14.     Plaintiffs and all putative Class Members' Microwaves contain the same Defect at the point of sale, pose substantially the same risk to Plaintiffs, Class Members, consumers, and the public. Sharp's Microwaves cannot be used properly for their intended purpose of preparing meals at home.

15.     The price of the Microwaves is between approximately $1,000.00 and $1,700.00.

16.     This action is brought to remedy Sharp's conduct in connection with the design, manufacture, marketing, advertising, selling, warranting and servicing of the Microwaves.

## PARTIES

17.     Plaintiff Hamm is a resident and citizen of Clermont, Lake County, Florida.

18.     Plaintiff Brown is a resident and citizen of Oakland, Alameda County, California.

19.     Plaintiff Russell is a resident and citizen of Fresno, Fresno County, California.

20.     Plaintiff Wittman owns a home in Cincinnati, Hamilton County, Ohio, where the Microwave is installed.

21.     Plaintiff James is a resident and citizen of Columbus, Franklin County, Ohio.

22.     Plaintiff Lammey is a resident and citizen of Monroe, Walton County, Georgia.

23.     Plaintiff Macone is a resident and citizen of Stoneham, Middlesex County, Massachusetts.

24.     Defendant Sharp Electronics Corporation is a New York corporation with its principal place of business located in Montvale, New Jersey.

25.     Sharp distributes and markets, and directs the marketing of the Microwaves in Florida, and throughout the United States.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d) because: (1) there are one hundred or more (named or unnamed) class members, (2) there

is an aggregate amount in controversy exceeding $5,000,000.00, exclusive of interest and costs,

and (3) there is minimal diversity because Plaintiff Hamm and Defendant are citizens of different

States. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

§ 1367.

27.     This Court may exercise personal jurisdiction over Defendant because Defendant

does substantial business in this State and within this District, receives substantial compensation

and profits from the marketing, distribution, and sales of products in this District, and has engaged

in the unlawful practices described in this Complaint in this District.

28.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

29.     Upon information and belief, as this document is being filed for the purpose of

settlement, Defendant does not oppose jurisdiction with regard to the Plaintiffs who are not Florida

residents.

## COMMON FACTUAL ALLEGATIONS

30.     Microwave ovens have been ubiquitous in American kitchens for several decades.

Consumers have become accustomed to the simplicity and quick cooking that microwave ovens

provide, and rely upon manufacturers, including Sharp, to ensure their safe and efficient use.

31.     Sharp is a household name, and one in which consumers have relied upon for the

safety and quality of microwave ovens for more than 40 years. Sharp introduced the first microwave

oven with a turntable in the 1960s, and in the late 1970s, Sharp introduced low-cost microwave ovens for residential use.[4]

32.    Upon information and belief, Sharp was the first to design, patent, and manufacture microwave drawers. In fact, Sharp owns the trademark for the term "Microwave Drawer."[5]

33.    Sharp is engaged in the business of designing, manufacturing, warranting, marketing, advertising, distributing, and selling the Microwaves. Each of the Microwaves is branded with the "Sharp" logo or, upon information and belief, can be readily identified as being a Sharp designed, manufactured, and distributed product.

34.    The Microwaves are used, and are intended by Sharp to be used, for safe food preparation.

35.    Each Microwave contains a magnetron, which is powered by a high voltage transformer, generating the electromagnetic energy waves ("electromagnetic energy" or "waves") in the Microwaves. The magnetron is a vacuum tube device that generates the energy needed to heat food within the microwave. In other words, when a consumer cooks food in a microwave oven, the magnetron takes electricity from the power outlet and converts it into high-powered radio waves that are transmitted down a waveguide.

36.    The waveguide directs the radio waves generated by the magnetron from one end of the waveguide to the other end and into the cooking cavity. The waves enter the cooking cavity and are directed and distributed throughout the cooking cavity by a mode stirrer. The intended purpose of the mode stirrer is to ensure the waves are distributed throughout the cooking cavity so that the

---

[4]http://www.sharpusa.com/AboutSharp/CompanyProfile/SharpAndTechnologyHistory.aspx (last accessed Mar. 12, 2019)

[5]http://www.sharpusa.com/ForHome/HomeAppliances/Microwaves/MicrowaveDrawer.aspx (last accessed Mar. 12, 2019).

food is evenly cooked. A mode stirrer is utilized in microwaves that do not have a carousel to move the waves throughout the food.

37.    Each of the Sharp-branded Microwaves contains a Defect that prevents the waves from properly moving through the waveguide into the cooking cavity. More specifically, the electromagnetic energy that originates from the magnetron tube becomes obstructed or disturbed while moving through the waveguide due to improper dimensions and configurations of the Microwave's internal components. This obstruction or disturbance prevents a substantial portion of the energy from being properly guided into the cooking cavity.

38.    The obstruction or disturbance in the electromagnetic energy's movement down the waveguide causes the energy that is not transmitted to the cooking cavity to arc and otherwise concentrate near the magnetron, burning the waveguide and causing the magnetron tube to overheat. As a result of the overheating, the magnetron tube anode terminal (the top of the magnetron tube) melts and the waveguide is scorched.

39.    Expert investigation has revealed evidence of a localized hot spot on the waveguide, which was observed several inches from the magnetron during normal operation.

40.    The hot spot is consistent with a faulty design by Sharp, in which the magnetron, the waveguide, and its load (the food) are not properly matched to one another in size and/or ratio, resulting in premature failure of the magnetron tube.

41.    Customers' experience and technicians' reports, including burn patterns in the Microwaves, are consistent with premature failure of the magnetron and an increased Voltage Standing Wave Ratio ("VSWR").

42.    Waveguide problems, such as localized energy disturbances, are consistent with an increased VSWR. The manufacturer's data sheets for magnetron tubes indicate that an increase in the VSWR reduces magnetron life.

43.    Further, the Microwaves are designed and marketed as having 950-1000 watts heating capacity; however, due to the obstruction or disturbance in the transmission of the energy to the cooking cavity, the Microwaves operate at a maximum of only 750 watts.

44.    While microwave drawers have only been on the market for approximately 20 years, successful alternative designs for the manufacture of microwaves that utilize magnetron/waveguide/mode stirrer technology have existed since the 1970s, including but not limited to those utilized in microwaves manufactured and sold by Amana.

45.    Sharp expressly and impliedly warranted, via user manuals, advertisements, pamphlets, brochures, circulars, samples, and/or models, that the Microwaves are fit for the ordinary purpose for which such goods are sold.

46.    Sharp expressly warrants in its user manuals that the Microwaves are free from defects in workmanship and materials.

47.    Sharp's Warranty further provides:

One (1) year parts and labor including in-home service. The warranty period continues for an additional four (4) years, for a total of five (5) years, with respect to the magnetron tube in the Product for parts only; labor and service are not provided free of charge for this additional period.

48.    However, the Warranty fails of its essential purpose for the following reasons:

(a)    Sharp consistently fails to investigate whether there is a failure of the magnetron implicating the five (5) year warranty, and instead denies warranty claims as being outside of the one (1) year warranty;

(b)    and

    (c)    Sharp often attempts to force consumers into purchasing an extended Warranty or prorated replacement Microwave when the defect manifests outside the one (1) year Warranty, without regard to whether the magnetron has failed within the five (5) year Warranty

49.    Sharp also warrants that the Microwave "when shipped in its original container, will be free from defective workmanship and materials, and agrees that it will, at its option, either repair the defect or replace the defective Product or part thereof with a new or remanufactured equivalent at no charge to the purchaser for parts or labor for the period(s) set forth…"The Microwaves were not free from defects in workmanship and materials at they time they were "shipped," in breach of Sharp's express  warranty.  As described herein, Sharp breached this warranty at the time it shipped the Microwaves (and at the point of sale to consumers) because, the Microwaves were defective when they came off of the assembly line. Thus, at the time the defective Microwaves were shipped and sold to consumers, Sharp was in violation of the express warranty.

50.    Further, because its repairs are simply a band-aid that do not resolve the Defect, it is unable to fulfill its warranty obligations at  the point of purchase, or anytime thereafter, and the warranty is therefore breached immediately upon purchase.

51.    In addition, the Warranty is unconscionable in its time limitations, disclaimer of warranties, and limitation of remedies.  The Warranty is further unconscionable given Sharp's knowledge of the Defect, the existence of the Defect at the point of sale, Sharp's failure to disclose the Defect at the time of sale and during warranty communications, and resulting premature failure of the Microwaves..

52.    The Defect renders the Microwaves unfit for the ordinary purpose for which they are used, which is to heat food at up to 950-1000 watts.

53.    Had Plaintiffs, Class Members, and the consuming public known that the Microwaves were defective, they would not have purchased the Microwaves.

54.     In sum, Sharp has concealed the existence and nature of the Defect from Class Members, despite its knowledge of the existence and pervasiveness of the Defect, and certainly well before Plaintiffs and Class members purchased the Microwaves and during warranty communications.  Specifically, Sharp has:

    a.     Failed to disclose the Defect to consumers, at or after the time of purchase, including when consumers make warranty claims or otherwise complain to Sharp about the Defect;

    b.     Actively concealed the Defect from Consumers, at or after the time of purchase, including when consumers make warranty claims, or otherwise complain  Sharp about the Defect;

    c.     Failed to disclose, and concealed the Defect from consumers, including that the Microwaves were not fit for their intended purpose;

    d.     Failed to disclose and concealed the Defect from consumers when consumers complaining about the Defect purchased extended warranties;

    e.     Failed to disclose and concealed the Defect from consumers when it improperly denied valid warranty claims;

55.     As a direct, proximate, and foreseeable result of the defect, Plaintiffs and Class Members suffered damages, including but not limited to: (a) the difference in value of the Microwaves as purchased and the Microwaves received; (b) loss of use of the Microwaves; (c) property damage; (c) actual damage; and (d) consequential damage.

## PLAINTIFFS' FACTS

### Facts Specific to Plaintiff  Michael Hamm

56.     Plaintiff and his wife purchased a home in 2015 and performed a total kitchen remodel. On October 22, 2015, Plaintiff purchased a Sharp-branded Microwave Oven Drawer, Model Number SMD2470AS from Southwest Steal Appliance Warehouse in Orlando, Florida for $1,190.00.   Shortly thereafter, Plaintiff had the Microwave installed in custom cabinetry built specifically for installation of the Microwave.

57.     Plaintiff purchased the Microwave after performing research and viewing models of the Microwaves.  Specifically, Plaintiff purchased based, in part, on Sharp's representations that the Microwaves were of high quality. Plaintiff's purchase was also based on the unique drawer feature that would be installed in custom cabinetry and free up counterspace.

58.     Based on brand name and the price of the Microwave, Plaintiff believed the warranty would be longer than just one year and expected Sharp would repair or replaced the Microwave if it failed.

59.     From the time of installation until the incident described below, Plaintiff used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner.

60.     On or around May of 2019, Plaintiff was heating popcorn when the Microwave made an odd noise and began to emit an electrical smelling smoke, consistent with the Defect. Plaintiff stopped using his Microwave after this incident.  Also, as the strong electrical smoke had filled the cooking cavity and contaminated his food, Plaintiff was forced to dispose of the popcorn.

61.     Shortly thereafter, Plaintiff notified Sharp of the problem. He was given a case number, and a Sharp authorized technician was sent to inspect the Microwave.  Plaintiff was required to pay a $95.00 fee for the technician's visit. Upon inspection, the technician stated that

the "Magtube has burned through microwave cavity" and the Microwave was unrepairable.

62.    Despite the fact that the magnetron tube had failed within its five-year Warranty, Sharp denied Plaintiff's warranty claim as being outside the one-year Warranty.

63.    As Plaintiff's cabinetry was custom built for the Microwave drawer, Plaintiff had no choice but to purchase a new Microwave of the same model for approximately the same amount. As Plaintiff feared the new Microwave might also fail after the one-year Warranty, he purchased an extended five-year warranty for approximately $100.00.  Upone information and belief, the replacement Microwave is defective.

64.    Despite the premature failure of the magnetron tube prior to the expiration of its five year warranty, Sharp informed Plaintiff that because the Microwave was outside of the one (1) year warranty, no repair or replacement would be offered. This was a breach of the express warranty.

65.    Further, as Sharp had exclusive knowledge of the Defect, which existed at the point of sale, Sharp was in violation of the express warranty at the time Plaintiff purchased the Microwave.

66.    Because  Sharp concealed the Defect from him before his purchase as well as after the Microwave was installed in his home and being used, Plaintiff did not suspect (and had no reason to suspect) that there was anything wrong with his Microwave until the the aforementioned incident  in or around May of 2019.

67.    Since May of 2019, Plaintiff has not used his Microwave as it smells like it is burning when turned on.  Consequently, because Sharp has improperly denied warranty coverage for his defective Microwave, Plaintiff incurred the additional cost of the new Microwave and the extended Warranty.

68.    Plaintiff's Microwave did not operate safely for its life expectancy. Had Plaintiff

known of the Defect, he would have either not purchased the Microwave, or would have paid

substantially less than he did for the Microwave. Therefore, he did not receive the benefit of his

bargain.

### Facts Specific to Plaintiff Jill Brown

69.    In or around December 2017, Plaintiff Jill Brown purchased a Sharp-branded

Microwave Oven Drawer, Model Number SMD2470AS, for her home.

70.    Shortly after her purchase, also in December 2017, the Microwave was  installed in

Plaintiff's kitchen, and she began to use it  as it was intended to be used. From the time of purchase

until the incident described below, Plaintiff used the Microwave as intended, cleaning it

appropriately, and maintaining it in a reasonable manner as an owner of an appliance.

71.    On or about December 2018, the Microwave began to make loud crackling sounds

and was smoking from both sides when it was used. Since the Microwave is installed as a drawer,

Plaintiff and her family were unsure whether the cabinetry is burned or smoke damaged around the

Microwave.

72.    Given the failure of the Microwave, Plaintiff Brown and her family did not use the

Microwave again.

73.    After the incident in December 2018 occurred, Plaintiff performed research online

and discovered more than thirty (30) other consumers reporting the same or similar incidences.

74.    Plaintiff reported the incident to Sharp, and inquired as to the widespread nature of

the problem with the Microwaves.  The Sharp representative failed to acknowledge that other

consumers were reporting the same issues, and indicated that the company would look into

Plaintiff's claim.

75.    Because  Sharp concealed the defect from her before her purchase as well as after

the Microwave was installed in her home and being used, Plaintiff did not suspect (and had no reason to suspect) that there was anything wrong with her Microwave until the defect manifested.

76.    On December 10, 2018,  Sharp offered Plaintiff a replacement Microwave of the same model or an "upgraded" model.  As Christmas was approaching and a working microwave was needed, Plaintiff agreed to have her failed Microwave replaced.  Sharp sent a technician to Plaintiff's home and replaced the failed Microwave with an "upgraded" model of the Microwave. Despite Plaintiff Brown's specific request to keep the defective Microwave and her protests, Sharp confiscated the failed Microwave during the replacement. To-date, Plaintiff Brown is unable to determine the current whereabouts of her original Microwave.

77.    The replacement Microwave is a Model No. SMD2480CS. Upon information and belief, the replacement Microwave is also defective and will likely fail in the foreseeable future.

78.    Plaintiff Brown's original Microwave did not operate safely for its life expectancy. Had she known of the defect, she would have either not purchased the Microwave or would have paid less than she did. Therefore, she did not receive the benefit of her bargain.

*Facts Specific to Plaintiff Austin Russell*

79.    In or around February 2016, Plaintiff Russell and his wife were renovating their kitchen, and purchased a Sharp-branded Microwave Oven Drawer, Model Number SMD2470AS. Plaintiff paid more than $1,000.00 for the purchase of the Microwave.

80.    Plaintiff reviewed and relied on Sharp's advertising and marketing materials regarding the Microwave when selecting and purchasing the Microwave.

81.    Plaintiff purchased the Microwave based on the belief that Sharp is a superior manufacturer, and because the design was such that would fit well with the premium kitchen renovation being completed.

82.     Plaintiff expected that the Microwave to come with a warranty that would be honored by Sharp based upon the belief that the Microwave was a high-end appliance and that Sharp was a superior manufacturer of such products.

83.     Plaintiff also believed that the Microwave would last at least ten (10) to fifteen (15) years given the cost of the Microwave.

84.     Due to the fact that the Microwave was purchased as part of a kitchen renovation, it was not installed until about 6-8 months after purchase.  After installation, the couple began to use the Microwave as it was intended to be used.  From the time of purchase until the incident described below,  Plaintiff and his family members used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner as an owner of an appliance.

85.     On January 13, 2019, Plaintiff was microwaving barbeque beans in a microwavable container.  Approximately 35 seconds into cooking, the Microwave began emitting a loud buzzing sound that was followed by white electrical smoke billowing from the Microwave.  Although Plaintiff Russell was able to stop the Microwave, the smoke continued to spew from the Microwave for another three (3) to five (5) minutes afterwards. Due to the installation of the Microwave as a drawer, he was unable to determine whether the cabinetry suffered fire or smoke damage.

86.     After this incident, Plaintiff Russell performed Internet research about the problems he experienced with the Microwave, and found that there were numerous other consumers reporting the same problems.  Consequently, he contacted Sharp to report the incident.  Sharp informed him that because the Microwave's one-year warranty had expired, it would only refer him to a local retailer where he could pay to have the Microwave repaired.

87.     Given the failure of the Microwave, the Plaintiff has not used and will not use the Microwave again.

88.     Because  Sharp concealed the defect from him, Plaintiff did not suspect (and had no reason to suspect) that there was anything wrong with his Microwave until the defect manifested in his own Microwave.

89.     Plaintiff Russell's Microwave did not operate safely for anywhere near its life expectancy. Had he known of the defect, he would have either not purchased the Microwave or would have paid less than he did. therefore, he did not receive the benefit of his bargain.

*Facts Specific to Plaintiff Jill Wittman*

90.     In August 2015, Plaintiff's contractor purchased and installed a Sharp-branded Microwave Oven Drawer, Model Number KB6524PS, during a kitchen renovation. A new KB6524PS retails for $1,054.99 on Sharp's website.[6]

91.     After the Microwave was installed, Wittman used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner as an owner of an appliance.

92.     Immediately after installation, Wittman began to notice an occasional, odd buzzing sound emanating from the Microwave during normal use.  After contacting Sharp, a technician was unable to replicate the noise during the service call and did not perform repairs.

93.     Beginning on November 27, 2017, the Microwave made the odd buzzing sound and smoke began pouring out of the Microwave under the island countertop.

94.     Plaintiff called Sharp to report the incident with the Microwave.  Sharp took possession of the Microwave and sent a replacement Microwave.  Sharp charged Wittman for the replacement Microwave as it was outside the warranty period.

95.     The replacement Microwave contained the same defect which resulted in the same

---

[6] http://www.sharpusa.com/ForHome/HomeAppliances/Microwaves/Models/KB6524PS.aspx

buzzing noise followed by billowing smoke from the Microwave.  Again, Plaintiff called Sharp, who took the second Microwave and replaced it with a third Sharp-branded Microwave drawer.  A Sharp representative told Whittman that a design issue had been fixed.

96.     This process repeated over and over a total of *six* times.[7]  Wittman is currently on her sixth replacement Microwave and it still makes the same buzzing sound.  Wittman's kitchen island has been damaged due to the repeated installations and uninstallations of the six Microwaves.

97.     Because Sharp concealed the defect from her before her purchase as well as after the Microwave was installed in her home and being used, Wittman did not suspect (and had no reason to suspect) that there was anything wrong with his Microwave until the defect manifested in or around November 27, 2018.  These incidents continued with the replacement Microwaves – the last occurring on July 28, 2018.

***Facts Specific to Plaintiff Nancy James***

98.     In early 2015, Plaintiff James' contractor purchased and installed a Sharp-branded Microwave Oven Drawer, Model Number SMD2470AS in Plaintiff's new kitchen.

99.     A new SMD2470AS retails for $1,334.99 on Sharp's website.[8]

100.    From the time the microwave was installed until the incident described below, James used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner as an owner of an appliance.

101.    During use, James would occasionally hear odd screeching sounds coming from the Microwave.

---

[7]Plaintiff can specifically recall the following dates for these incidents:  November 27, 2017; February 10, 2018; June 30, 2018; and July 28, 2018.

[8]https://www.sharpusa.com/ForHome/HomeAppliances/Microwaves/Models/SMD2470AS.aspx (last accessed May 16, 2019).

102.    On September 21, 2018, James was using the Microwave normally when it began
making screeching sounds again.  However, the Microwave also began making popping sounds
accompanied by billowing smoke and a lingering burning electrical smell.  James turned off the
Microwave.

103.    James contacted Sharp's customer service department who referred her to three
companies that service Sharp appliances.  The Sharp customer service representative emphasized
that James should not use the microwave until it was serviced.  Sharp did not offer any resolution
or remedy to fix the Microwave.  A technician examined the Microwave at James' house and stated
that the Microwave could not be repaired and must be replaced.

104.    Because Sharp concealed the defect from her before her purchase as well as after the
Microwave was installed in her home and being used, James did not suspect (and had no reason to
suspect) that there was anything wrong with her Microwave until the defect manifested in or around
September 21, 2018.  James has been unable to use the Microwave since that time.

105.    James' Microwave did not operate safely for its life expectancy. Had James known
of the defect, she would have either not purchased the Microwave, or would have paid less than she
did for the Microwave. Therefore, she did not receive the benefit of her bargain.

***Facts Specific to Plaintiff Christian Lammey***

106.    In or around May of 2017, Plaintiff paid $849.00 for a Sharp-branded Microwave
Oven Drawer, Model Number KB6524PS, for his home.

107.    Plaintiff is a contractor and had installed several Sharp Microwave drawers in homes
he had constructed, and had an older model Microwave drawer that had successfully operated for
seven or more years.  He purchased the other models and the Microwave at issue, after performing
research and viewing models of the Microwaves.  Specifically, Plaintiff purchase the Microwave

based on the fit within the cabinetry, but also based on Sharp's representations that the Microwaves were of high quality and operated at a wattage better than a standard microwave.

108.     Based on brand name and the price of the Microwave, Plaintiff believed the warranty would be longer than just one year and expected Sharp would repair or replaced the Microwave if it failed.

109.     Shortly thereafter, the Microwave was delivered and installed in Plaintiff's kitchen, and he began to use the Microwave.  From the time of installation until the incident described below, Plaintiff used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner.

110.     On or around August 3, 2018, Plaintiff was heating popcorn utilizing the popcorn setting when the Microwave made a buzzing sound and began to emit a burning or smoking smell, consistent with the Defect. Plaintiff stopped using the Microwave.  As strong electrical smoke had filled the cooking cavity and contaminated his food, Plaintiff was forced to discard it.

111.     Shortly thereafter, Plaintiff notified Sharp of the problem. However, without investigation of the cause of the problem and without regard to whether the magnetron had failed or been damaged (and was thus subject to the five (5) year warranty applicabe to the Microwave's magnetron tube)  Sharp informed Plaintiff that the Microwave was outside of the one (1) year warranty and no repair or replacement would be offered. This was a breach of the express warranty.

112.     Further, as Sharp had exclusive knowledge of the Defect, which existed at the point of sale, Sharp was in violation of the express warranty at the time Plaintiff purchased the Microwave.

113.     Because  Sharp concealed the Defect from him before his purchase as well as after the Microwave was installed in his home and being used, Plaintiff did not suspect (and had no

reason to suspect) that there was anything wrong with his Microwave until the the aforementioned incident in or around August of 2018.

114.     Since August of 2018, Plaintiff has not used his Microwave. And, because Sharp has improperly denied warranty coverage for his defective Microwave, Plaintiff cannot safely use his Microwave without incurring out-of-pocket costs to repair the Microwave – a repair that should have been covered by the Microwave warranty. Accordingly, he has been utilizing alternative means of heating his food, and has not had the benefit of the nearly $1,000.00 Microwave he purchased.

115.     Plaintiff's Microwave did not operate safely for its life expectancy. Had Plaintiff known of the Defect, he would have either not purchased the Microwave, or would have paid less than he did for the Microwave. Therefore, he did not receive the benefit of his bargain.

116.     On January 31, 2019, counsel for Plaintiff put Defendant on statutory notice of Plaintiff's claims.

### Facts Specific to Plaintiff Thomas Macone

117.     As part of a kitchen upgrade, in or around October or November of 2017, Plaintiff paid over $900 for a Sharp-branded 1000 Watt Microwave Oven Drawer, Model Number KB6524PSY, for his home.

118.     Plaintiff the Microwave, after viewing models of the Microwaves. Specifically, Plaintiff purchased the Microwave based on the drawer feature, but also based on Sharp's reputable name and representations that the Microwaves were of high quality.

119.     Based on brand name and the price of the Microwave, Plaintiff believed the warranty would be longer than just one year and expected Sharp would repair or replace the Microwave if it failed.

120.     The Microwave was installed in Plaintiff's kitchen in December of 2017, and he and

his wife began to use the Microwave.  From the time of installation until the incident described below, Plaintiff used the Microwave as intended, cleaning it appropriately, and maintaining it in a reasonable manner.

121.    On or around February of 2019, Plaintiff's wife was heating butter in a bowl when the Microwave made a buzzing sound and began to emit a burning or smoking smell, consistent with the Defect. Plaintiff's wife stopped using the Microwave, and Plaintiff accessed the outlet and unplugged it.  As strong electrical smoke had filled the cooking cavity and contaminated his food, Plaintiff was forced to discard it. Plaintiff had only used the Microwave approximately twenty-five times, at most, before it failed.

122.    Shortly thereafter, Plaintiff notified Sharp of the problem. In accordance with Sharp's instructions, Plaintiff arranged for Boston Appliance Product Care to inspect the Microwave.  On February 26, 2019, Boston Appliance Product Care inspected the Microwave, charging a $89.00 inspection fee that was paid by Plaintiff.

123.    However, without investigation of the cause of the problem and without regard to whether the magnetron had failed or been damaged (and was thus subject to the five (5) year warranty applicable to the Microwave's magnetron tube) Sharp informed Plaintiff that the Microwave was outside of the one (1) year warranty and that a replacement would be offered at a cost of $325.00. This was a breach of the express warranty.

124.    During Plaintiff's warranty communications with Sharp, he asked whether there was a widespread defect or problem with the Microwaves.  In response, the Sharp representative denied that there was.  In reliance on those communications and given that only another microwave drawer would fit into the custom cabinetry, Plaintiff accepted the replacement and paid the $325.00.

125.    Shortly thereafter, Sharp provided Plaintiff with a "new model KB6524PSY." Upon

information and belief, the replacement is also defective.

126.    Further, as Sharp had exclusive knowledge of the Defect, which existed at the point of sale, Sharp was in violation of the express warranty at the time Plaintiff purchased the Microwave.

127.    Because  Sharp concealed the Defect from him before his purchase as well as after the Microwave was installed in his home and being used, Plaintiff did not suspect (and had no reason to suspect) that there was anything wrong with his Microwave until the aforementioned incident in or around in February of 2019.

128.    Plaintiff's Microwave did not operate safely for its life expectancy. Had Plaintiff known of the Defect, he would have either not purchased the Microwave, or would have paid less than he did for the Microwave. Therefore, he did not receive the benefit of his bargain.

## SHARP'S ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE DEFECT

129.    Sharp knew or should have known when it sold the Microwaves to the public, and during warranty communications, that the Microwaves suffered from the Defect, and that the Defect caused the Microwaves to function improperly during their expected useful life..

130.    Sharp's knowledge of these facts is established through consumer complaints, including several years of public Internet posts complaining that the Microwaves failed during normal use, and warranty claims.  The number of complaints, and consistency of their descriptions, either alerted or should have alerted Sharp of the Defect affecting the Microwaves.  Indeed, upon information and belief, Sharp has a designated complaint center for complaints specifically related to the Defect.

131.    Sharp's actual knowledge of the Defect is further evidenced by its responses to consumer complaints submitted to https://www.saferproducts.gov, cited *infra*, wherein Sharp continues to attempt to discredit reports of the Defect in the Microwaves.

132.    Sharp's response to numerous customer complaints demonstrate that not only is Sharp aware of the Defect, it attempts to actively conceal the Defect from consumers.

133.    Customer complaints available online regarding the Microwaves date back to at least 2015. For example, in March of 2015, one consumer reported a problem with Model KB6524PS:[9]

> We were using the microwave to make popcorn. The bag had been the microwave maybe 30 seconds and a horrible noise come from the microwave -- a little smoke starts to come out. Thought it was the popcorn -- but bag was completely flat with no burn marks. Took the popcorn out and turned on the microwave with nothing in it -- terrible noise again and smoke came pouring out from under the control panel....stop microwave after only a few seconds...grabbed fire extinguisher. If I had not been in the room there would have been a fire.

134.    Another consumer reported having the same problem with the same model in August of 2016:[10]

> I want Sharp to acknowledge and provide support for all consumers claiming any sparks, melting or smoke with these microwaves- apparently this is frequent and needs to be addressed in order to prevent death or harm to children and adults. I would also like a full reimbursement to re-purchase a microwave that is not a fire-hazard for my family, a new replacement of the existing microwave, or a different microwave that will not pose any safety risks to my children and will fit in the kitchen cabinet built specifically for this model. Sharp needs to be held accountable and stand up for their name and products. They should not wait for a fatality or lawsuit to stop them from concealing consumers complaints of a safety hazard in their homes and knowingly misguiding consumers.

135.    Another consumer reported the same problem in July of 2017:[11]

---

[9] https://www.saferproducts.gov/ViewIncident/1470348 (last accessed June 26, 2019).

[10] https://www.saferproducts.gov/ViewIncident/1581834 (last accessed Dec. 27, 2018).

[11] https://www.saferproducts.gov/ViewIncident/1664034 (last accessed Dec. 27, 2018).

Sharp Microwave oven model KB6524PS caused much smoke during normal use. The unit is 3 years old and I had called Sharp within 4 months of purchasing to report loud humming that would happen randomly. I was advised that this happens from time to time and that it was normal and not a warrantable condition.

The noise has been becoming more frequent and recently the noise is present with smoke now that fills my kitchen. I called the help line and they said that this happens from time to time and that it is not something to worry about.

136.    In May of 2016, another consumer noted:[12]

We own two Sharp Microwave Drawers - model smd2470AS. Both were manufactured in September 2015, installed in a new home in January 2016 and not used until we moved in in March 2016. Each unit is on its own independent electrical circuit, with no other appliances on either circuit.

On Saturday, May 7th around noon, while cooking a sausage, one of the units (serial number 128968) had an electrical "event" - significant smoke pouring out of the unit accompanied by loud cracking electrical noise. The circuit breaker did not trip. I called Sharp immediately and reported this event (Sharp case number [REDACTED]). As it was a Saturday, the[y] asked that I call back on Monday.

On Sunday, May 8th, while i was using the other unit (serial number 128862) to cook a potato, it also had an identical electrical "event" - significant smoke pouring out of the unit accompanied by loud cracking electrical noise. Again, the circuit breaker did not trip. On Monday, May 9th I called Sharp and added this information (Sharp case number [REDACTED]).

I told the Sharp personnel that had I not been in the kitchen there could have been a major, house-threatening electrical fire. I offered to have them remove the units to analyze what is happening. The Sharp "Safety Department" seems not to be interested in this.

137.    Sharp's response to numerous customer complaints demonstrate that not only is

Sharp aware of the Defect, it attempts to actively conceal the Defect from consumers.

---

[12] https://www.saferproducts.gov/ViewIncident/1571856 (last accessed Dec. 27, 2018).

138.    Similarly, numerous Amazon reviewers reported the same problems. In fact, 33% of the reviewers gave the SMD2470AS just one (1) star, in part due to the premature failure flowing from the Defect.  For example, on an Amazon page selling the Microwave one consumer noted:[13]

> Why is Amazon still selling this Microwave on their website with the significant problems reported? All you need to do is look at the feedback with a rating of 1 and you can see there is a manufacturing defect. This Microwave is just 6 months installed and it melted down like Chernobyl.....sounded more like a garbage disposal then a microwave. Smoke started pouring out of the unit and got so hot I can't believe it didn't start a fire.... Very concerned based on what others have noted that replacing this unit under warranty still results in same issues and this problem has not been addressed by Sharp. I have to imag[in]e it won't be long before someone decides to start a Class Action lawsuit, or there is a major recall.

139.    By July of 2016, if not earlier, consumers were reporting failures with Microwaves:[14]

> ROUND ONE: We've had this microwave for 2 months. Today it started smoking, and not the food, but the actual microwave. It smelled electrical. I'm awaiting word from Sharp on how to handle. Not too happy.
>
> After a service call (the first repair company was a no-show, so add yet another week to get a second company out) this was unfixable and a replacement unit was approved and shipped. After going 4 weeks without a microwave, we were excited to have it working again.
>
> ROUND TWO: TWO DAYS AFTER DELIVERY (right around Labor Day 2016) the SAME THING HAPPENED. Smoke in the house after reheating some coffee. They sent another technician, it was unfixable, and a THIRD unit was approved and delivered.
>
> ROUND 3: February 24th 2017: This time the microwave has simply stopped heating anything. Customer Service was called and a technician has been scheduled for 3/1. The technician was anther no-show. Another technician has been scheduled, add yet another week.

---

[13] https://www.amazon.com/Sharp-SMD2470AS-Microwave-24-Inch-Stainless/dp/B00U6YFOZ6?th=1 (last accessed Dec. 27, 2018).
[14] https://www.amazon.com/Sharp-SMD2470AS-Microwave-24-Inch-Stainless/product-reviews/B00U6YFOZ6/ref=cm_cr_dp_d_hist_1?ie=UTF8&filterByStar=one_star&reviewerType=all_reviews#reviews-filter-bar (last accessed June 26, 2019).

IN SUMMARY - SAVE YOURSELF AND DO NOT BUY THIS
MICROWAVE!

140.    By August 2016, if not earlier, consumers were reporting that Sharp technicians

were acknowledging the company's awareness of the problems with the Microwaves:[15]

> DO NOT BUY THIS PRODUCT - A DEFECTIVE UNIT -GOOGLE THIS
> MODEL AND YOU WILL ALSO SEE MULTIPLE COMPLAINTS.
> I BOUGHT THIS UNIT AND USED IT ONLY A WEEK BEFORE IT
> HAD PROBLEMS. I WAS HEATING MY TEA WHEN IT BEGAN TO
> MAKE A STRANGE NOISE, I OPEN UP THE DRAWER AND I COULD
> SEE WHITE SMOKE AND SMELL SOMETHING BURNING. THE
> SERVICE MAN SAID HE HAS SEEN THIS SAME PROBLEM
> SEVERAL TIMES IN THIS MODEL. HE SAID THE MODEL MOTOR
> QUITS TURNING AND IT STARTS TO BURN A HOLE IN THE
> CAVITY. HE SENT PICTURES TO SHARP AND TOLD ME THAE
> WOULD SEND A REPLACEMENT. I CALLED SHARP AND
> EXPLAINED BECAUSE OF A FIRE HAZARD I DID NOT WANT A
> REPLACEMENT- I WANTED A REFUND. THEY TOLD ME THEY
> COULD NOT REIMBURSE ME BECAUSE OF WARRANTY. I
> PURCHASED THE UNIT ON NOV. 2015 BUT BECAUSE I WAS
> REMODELING MY HOME - I JUST HAD THE UNIT INSTALLED
> AND HAD JUST STARTED USING IT. AT SOME POINT THEY WILL
> HAVE A LAWSUIT ON THERE HANDS. THEY NEED TO RECALL
> THIS MODEL.

141.    Another consumer reported as follows:[16]

> After one week of use we heard buzzing sound and there was lots of smoke.
> Took one week to get repair person here, see photos of burnt area under the
> chassis frame. Product has a defect that causes the painted area to burn.
> Repairman indicated mine was the third unit he had seen with this issue,
> knew right where to look. The unit is under warranty, and so I will be getting
> a replacement. Sharp assures me the new unit is free of any issue, which
> means they know of this. No other manufacturers make a drawer microwave
> (all use Sharp as the base model). I am stuck as the cabinet was built for this
> unit.

---

[15] https://www.amazon.com/Sharp-SMD2470AS-Microwave-24-Inch-Stainless/product-
reviews/B00U6YFOZ6/ref=cm_cr_dp_d_hist_1?ie=UTF8&filterByStar=one_star&reviewerTyp
e=all_reviews#reviews-filter-bar (last accessed June 26, 2019).

[16] https://www.amazon.com/Sharp-SMD2470AS-Microwave-24-Inch-Stainless/product-
reviews/B00U6YFOZ6/ref=cm_cr_getr_d_paging_btm_next_9?sortBy=recent&pageNumber=9
(last accessed Dec. 27, 2018).

142.    In June of 2018, another consumer reported:[17]

> Yesterday morning when heating oatmeal (which I do almost every
> morning) the microwave started making a loud electrical zapping noise
> followed immediately by a huge amount of white smoke coming out of the
> front upper area just below the control panel. I immediately turned it off,
> opened the drawer and removed my food. Have not tried to use it again for
> fear of starting another fire. From my research here with other reviews as
> well as Houzz this appears to be a known issue at Sharp for this microwave
> model manufactured in the 2016 time frame. I purchased this unit in April
> 2016    and    my    Manufactured    Date    is    Jan.    2016.
>
> I have reached out to Sharp via their online customer support center and will
> update this review as my claim progresses.
>
> 26JUN2018 Update: After contacting Sharp as mentioned above, I was
> informed my unit is outside of the 1 year warranty period and there is
> nothing they will do for me ("so you will be held responsible for the cost of
> repairs for the unit"). They could not provide me with an "Authorized"
> service/repair company in my area either. After pushing back saying that
> since this is a "known issue" at Sharp was there any way I can know that if
> I have the unit repaired at my own expense (which I am willing to do), that
> the part(s) used would not have the same defect and cause the same issue. I
> was told to have "the servicer look at the unit and its deemed unrepairable
> you can have the servicer send in photos along with an evaluation for further
> options".
>
> I really don't know what "further options" there might be at this point as
> Sharp does not appear to be interested in helping me here.

143.    Similarly, numerous consumers have reported that the Microwaves are not heating

their food, as it should.  This is a result of the Microwaves failure to operate at the represented 950

watts.[18]

---

[17] https://www.amazon.com/Sharp-SMD2470AS-Microwave-24-Inch-Stainless/product-
reviews/B00U6YFOZ6/ref=cm_cr_dp_d_hist_1?ie=UTF8&filterByStar=one_star&reviewerTyp
e=all_reviews#reviews-filter-bar (last accessed June 26, 2019).
[18] https://www.amazon.com/Sharp-KB-6524PS-24-Inch-Microwave-Stainless/product-
reviews/B001QFYDSI/ref=cm_cr_arp_d_hist_1?filterByStar=one_star&pageNumber=1 (Las
Accessed July 5, 2019).

144.    In conjunction with Sharp's experience designing and selling the Microwaves, these facts and complaints illustrate that Sharp knew or should have known of the Defect.

145.    In fact, Sharp has been publicly responding to these complaints since at least 2016, misrepresenting its response to warranty claims and complaints, as well as the cause of the Microwave failure, evidencing both Sharp's knowledge of the Defect, and its failure to take the Defect seriously.

146.    Further, through sources such as pre-release design and testing information, and regulary quality control testing, Sharp knew or should have known of the defect.

147.    Despite its knowledge, Sharp did not remedy or eliminate the Defect in the Microwaves or remove them from the stream of commerce.

148.    Instead, Sharp improperly denied warranty claims.

149.    Sharp has a duty to disclose the Defect and to not conceal the Defect from Plaintiffs and Class Members.

150.    Upon information and belief, Sharp has not remedied the Defect and is currently still selling the defective Microwaves, concealing the Defect, failing to notify consumers of the Defect, and failing to recall the Microwaves.

151.    Moreover, Sharp continues to falsely represent through written warranties that the Microwaves are free from defect, are of merchantable quality, and will perform dependably for years.

152.    When corresponding with customers, Sharp does not disclose that the Microwaves suffer from the Defect. As a result, reasonable consumers, including Plaintiffs and Class Members, purchased and used, and continue to purchase and use, the Microwaves.

153.    Had Plaintiffs, Class Members, and the consuming public known that the Microwaves were defective, they would not have purchased the Microwaves.

154.    Sharp has wrongfully placed on Plaintiffs and Class Members the burden, expense, and difficulty involved in discovering the Defect, repairing and replacing the Microwaves (potentially multiple times), and paying for the cost of damages caused by the Defect.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

155.    Sharp was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of the Microwaves. Sharp actively concealed—and continues to conceal—the true character, quality and nature of the Microwaves and knowingly made misrepresetations about the quality of the Microwaves. Plaintiffs and Class Members reasonably relied upon Sharp's knowing and affirmative representations and /or active concealment of these facts.

156.    Sharp had actual awareness for years that the Microwaves contain the Defect that causes the magnetron to overheat and the unit to prematurely fail.

157.    Although Sharp was aware of the Defect, it took no steps to warn Plaintiffs or the Class of such Defect. Instead, it actively and fraudulently concealed the Defect from consumers.

158.    At least by 2015, if not earlier, Sharp had received numerous reports from consumers of incidents of loud noises and smoke associated with the Microwaves.

159.    Sharp has purportedly changed its manufacturing process in its attempt to correct the problem for newly manufactured Sharp-branded Microwaves, without notifying consumers of these changes.

160.    Sharp did not, however, issue a recall, warn consumers, or take any other affirmative steps to correct the problem in the Microwaves already in the field with the defective magnetron,

nor did Sharp take steps to alert Class Members about the problem.

161.    Despite its knowledge, Sharp concealed the fact that the Microwaves were defective, even though it had a duty to disclose the Defect.

162.    Sharp made affirmative misrepresentations to consumers during the sale of the Microwaves, including that the Microwaves were free of defects and that the Microwaves would be repaired or replaced within the first five (5) years after purchase if the magnetron tube failed to operate.

163.    Sharp made affirmative misrepresentations to Plaintiffs and consumers during warranty claims and other correspondence with consumers lodging complaints, including that, their Microwave failures were anomalous; the problems with the Microwaves have been resolved in an effort to persuade consumers to accept replacement Microwaves; Microwaves more than one (1) year old were out of warranty; and in other ways to be discovered.

164.    At all times, Sharp concealed that the Microwaves were defective.

165.    Sharp's concealment was material to Plaintiffs and Class Members' decision to purchase the Microwaves.  Sharp's concealment  was knowing, and Sharp intended to mislead Plaintiffs and Class Members into relying upon it. Accordingly, Plaintiffs and Class Members relied upon Sharp's concealment of these material facts and suffered  injury as a proximate result of that justifiable reliance.

166.    The Defect in the design and/or manufacture of the Microwaves was not detectible to Plaintiffs and members of the Class.

167.    Sharp actively and intentionally concealed the existence of the Defect and failed to inform Plaintiffs or Class Members of the existence of the Defect at all times, including when they contacted Sharp about the problems.  Accordingly, Plaintiffs and Class Members' lack of awareness

was not attributable to lack of diligence on their part.

168.    Upon information and belief, Sharp's statements, words, and acts suppressed that the Microwaves, including some of the replacement Microwaves, were defective.

169.    As a result of Sharp's active concealment of the Defect and/or failure to inform Plaintiffs and members of the Class of the Defect, any and all applicable statutes   of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Sharp is estopped from relying on any statutes of limitations in light of its active concealment of the  defective nature of the Microwaves.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Class:

> All persons residing in the United States who purchased a  Sharp Microwave Drawer, model numbers  SMD2470AH, SMD2470AS, SMD3070AS, SMD2480CS, KB6524PS, and KB6525PS.

171.    Plaintiffs reserve the right to modify the class definition if necessary to include additional Sharp Microwave Drawer models with the same defect and/or other Microwave Drawers manufactured by Sharp with the common Defect but bearing different brand names.

172.    Numerosity: The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown, it consists of thousands of people geographically disbursed throughout Florida and the United States. The number of Class members can be determined by sales information and other records. Moreover, joinder of all potential Class members is not practicable given their numbers and geographic diversity. The Class is readily  identifiable from information and records in the possession of Sharp and its third-party distributors.

31

173.    <u>Commonality</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over questions that may affect only individual Class Members because Sharp has acted on grounds generally applicable to the Class.  Such common legal or factual questions include, *inter alia*:

(a)    Whether the Microwaves are defective;

(b)    Whether the Microwaves are defectively designed and/or manufactured;

(c)    Whether Sharp knew or reasonably should have known about the Defect prior to distributing and selling the Microwaves to Plaintiffs and the Class;

(d)    Whether Sharp concealed from and/or failed to disclose to Plaintiffs and the Class the problems with the Microwaves;

(e)    Whether Sharp knew or reasonably should have known about the Defect after distributing the Microwaves to Plaintiffs and the Class;

(f)    Whether Sharp breached express warranties relating to the Microwaves;

(g)    Whether Sharp breached implied warranties relating to the Microwaves;

(h)    Whether Sharp was unjustly enriched by receiving moneys in exchange for Microwaves that were defective;

(i)    Whether Sharp should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the defective Microwaves;

(j)    Whether Plaintiffs and the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

174.    <u>Typicality</u>:  Plaintiffs' claims are typical of the members of the Class as all  members of the Class are similarly affected by the same Defect and Sharp's actionable conduct. Plaintiffs and all members of the Class purchased the Microwaves containing a Defect. In addition, Sharp's conduct that gave rise to the claims  of Plaintiffs and members of the Class  (*i.e.* delivering a defective microwave  drawer, concealing the Defect, and breaching warranties respecting the Microwaves) is the  same for all members of the Class.

175.    <u>Adequacy of Representation</u>: Plaintiffs will fairly and adequately protect the interests of the Class because he has no interests antagonistic to, or in conflict with, the Class that Plaintiffs

seeks to represent. Furthermore, Plaintiffs has retained counsel  experienced and competent in the prosecution of complex class action litigation.

176.    <u>Predominance</u>: The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class Members, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of hundreds or thousands of claimants in one suit would be impractical or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated Plaintiffs.

177.    Plaintiffs know of no difficulty to be encountered in the maintenance of this  action that would preclude its maintenance as a class action.

178.    Sharp has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief  with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Implied Warranties**
**(Plaintiffs Individually and on Behalf of All Others Similarly Situated)**

179.    Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 178 into this cause of action and claim for relief as if fully set forth herein.

180.    Plaintiffs brings this cause of action individually and on behalf of the Class.

181.    Sharp is a merchant and was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Microwaves.  Sharp knew or had reason to know of the specific use for which the Microwaves, as goods, were purchased.

182.    Sharp provided Plaintiffs and Class Members with implied warranties that the Microwaves were merchantable and fit for the ordinary purposes for which they were used and sold, and were not otherwise injurious to consumers.

183.    However, the Microwaves are not fit for their ordinary purpose of providing reasonably reliable and safe heating of food because, *inter alia*, the Microwaves contain a Defect preventing the Microwaves from safely heating food without electrical arcing, as well as preventing the Microwaves from cooking food at the represented wattage.  Therefore, the Microwaves are not fit for their particular purpose of safely heating and/or cooking food.

184.    Because of the Defect, the Microwaves are not safe, reliable cooking appliances, and therefore, there is a  breach of the implied warranty of merchantability..

185.    Plaintiffs and each of the members of the class have had sufficient direct dealings with either Sharp or one of its agents to establish privity of contract between Sharp, on the one hand, and Plaintiffs and each of the  Class Members, on the other hand.  Notwithstanding, privity is not required because Plaintiffs and each of the Class Members are the indended beneficiaries of Sharp's written warranties and its relationships with retailers.  The retailers were not intended to be the ultimate consumers of the Microwaves, and have no rights under the warranty agreements provided by Sharp.  Sharp's warranties were designed for and intended to beneit the consumer only and Plaintiffs and Class Members were the intended consumers of the Microwaves.

186.    Sharp impliedly warranted that the Microwaves were of merchantable quality and fit for such use.  These implied warranties included, among other things: (i) a warranty that the Microwaves manufactured, supplied, distributed, and/or sold by Sharp were safe and reliable for heating food; and (ii) a warranty that the Microwaves would be fit for their intended use while the Microwaves were being operated.

187.    Contrary to the applicable implied warranties, the Microwaves, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable and durable methods of heating food.  Instead, the Microwaves suffer from a defective design and/or manufacture, as alleged herein.

188.    Sharp's failure to adequately repair or replace the defective Microwaves has caused the warranty to fail of its essential purpose.

189.    Sharp breached the implied warranties because the Microwaves were sold with the Defect, which substantially reduced and/or prevented the Microwaves from being used for safe food preparation.

190.    As a direct and proximate result of the foregoing, Plaintiffs and the Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## SECOND CLAIM FOR RELIEF
### Breach of Express Warranty
### (Plaintiffs Individually and on Behalf of All Others Similarly Situated)

191.    Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 178 into this cause of action and claim for relief as if fully set forth herein.

192.    In connection with its sale of the Microwaves, Sharp expressly warranted that they were free from defects at the time of shipping, operated at up to 950-1000 watts, and suitable for heating food.

193.    The defectively designed Microwaves are subject to and otherwise covered by Sharp's Consumer Limited Warranty, which applies to each Microwave.

194.    Each of the Microwave models has an identical or substantially identical warranty.

195.    Sharp was obligated, under the terms of the express warranty to adequately repair or replace the defective Micowaves for Plaintiffs and Class Members.

196.    In the Consumer Limited Warranty, Sharp warrants that "when shipped in its original container, [the Microwaves] will be free from defective workmanship and materials, and agrees that it will, at its option, either repair the defect or replace the defective Product or part thereof with a new or remanufactured equivalent at no charge to the purchaser for parts or labor for the period(s) set forth…" As alleged herein, the Microwaves are not free from defects in workmanship and materials at the time they are "shipped" and thus the warranty is breached at the point of sale.

197.    The Consumer Limited Warranty further states that in accordance with such warranty, Sharp, "agrees that it will, at its option, either repair the defect or replace the defective Product or part thereof with a new or remanufactured equivalent at no charge to the purchaser for parts or labor for the period(s) set forth below."

198.    Further, the Warranty Period for the Microwaves is: "One (1) year parts and labor including in-home service. The warranty period continues for an additional four (4) years, for a total of five (5) years, with respect to the magnetron tube in the Product for parts only; labor and service are not provided free of charge for this additional period."

199.    Sharp further breached the warranty because it improperly and unlawfully denies valid warranty claims, and it has failed or refused to adequately repair or replace the Microwaves with non-defective units.  Plaintiffs and the Class Members have privity of contract with Sharp through their purchase of the Microwaves, and through the express written and implied warranties that Sharp issued to its customers. Sharp's warranties accompanied the Microwaves and were intended to benefit end-users of the Microwaves. To the extent Class Members purchased the

Microwaves from third-party retailers or via the purchase of their homes, privity is not required because the Class Members are intended third-party beneficiaries of the contracts between Sharp and third-party retailers and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailer; in other words, the contracts are intended to benefit the ultimate consumer or user of the Microwaves.

200.    The express written warranties covering the Microwaves were a material part of the bargain between Sharp and consumers. At the time it made these express warranties, Sharp knew of the purpose for which Microwaves were to be used.

201.    Sharp breached its express warranties by selling Microwaves that were, in actuality, not free of defects, not made for years of dependable use, not made from merchantable material and workmanship, were unsafe for use, and could not be used for the ordinary purpose of heating food. Sharp breached its express written warranties to Plaintiffs and Class Members in that the Microwaves are defective at the time they leave the manufacturing plant, and on the first day of purchase.

202.    The Microwaves that Plaintiffs and Class Members purchased contained a Defect that caused each of them damages including loss of the product, loss of the benefit of their bargain, and property damage.

203.    Any limitations on remedies and the exclusions in Sharp's warranties are unconscionable and unenforceable in light of the fact that Sharp knew that the Microwaves suffered from the Defect described herein.

204.    Plaintiffs and Class Members notified Sharp of its breach of the express warranty shortly after their Microwaves failed to perform as warranted due to the Defect.   Nonetheless, Sharp unlawfully denied Plaintiffs' warranty claims.

37

205.    Moreover, Sharp was put on constructive notice about its breach through its review of consumer complaints and media reports described herein, and, upon information and belief, through product testing.

206.    Upon information and belief, Sharp received further notice and has been on notice of the defective nature of the Microwaves and of its breaches of warranties through customer warranty claims reporting problems with Sharp, consumer complaints at various sources, and its own internal and external testing. Sharp also received such notice through Plaintiffs who complained to Sharp about the defective Microwave and resulting damage.

207.    Despite having notice and knowledge of the defective nature of the Microwaves, Sharp failed to provide any relief to Class Members with Microwaves more than one (1) year old, failed to provide a non-defective replacement Microwave to Plaintiffs and Class Members, and otherwise failed to offer any appropriate compensation from the resulting damages.

208.    Sharp breached its express warranty to adequately repair or replace the Microwave despite its knowledge of the Defect, and/or despite its knowledge of alternative designs, materials, and/or options for manufacturing the Microwaves.

209.    To the extent that Sharp offered to replace the defective Microwaves, the warranty of replacement fails in its essential purpose given it is insufficient to make Plaintiffs Hamm and Class Members whole because the warranty covering the Microwaves gives Sharp the option to repair or replace the Microwave, where neither is sufficient.

210.    Accordingly, recovery by Plaintiffs and Class Members is not limited to the limited warranty of replacement, and they seek all remedies allowed by law.

211.    Had Plaintiffs, Class Members, and the consuming public known that the Microwaves were defective, or that Sharp would not properly honor its warranty, they would not have purchased the Microwaves.

212.    To the extent any express warranties do not by their terms cover the defects alleged in this Complaint, and to the extent the contractual remedy is in any other respect insufficient to make Plaintiffs and Class Members whole, the warranty fails of its essential purpose and, accordingly, recovery by Plaintiffs and Class Members are not restricted to the promises in any written warranties, and they seek all remedies that may be allowed.

213.    Any attempt by Sharp to limit or disclaim the express warranty in a manner that weould exclude coverage of the Defect is unconscionable as a mater of law because the relevant purchase transactions were taited by Sharp's concealment of material facts.  Thus, any such effort to disclaim, or otherwise limit, its liability for the Defect is null and void.

214.    Plaintiffs and Class Members have performed all duties required of them under the terms of the express warranty, except as may have been excused or prevented through the conduct of Sharp or by operation of law in light of Sharp's conduct described throughout this Complaint.

215.    Sharp has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Sharp  has failed and refused to offer an effective remedy.

216.    As a direct and proximate result of Sharp's breach of its express written warranties, Plaintiffs and Class Members have suffered damages and did not receive the benefit of the bargain and are entitled to recover compensatory damages, including, but not limited to the cost of inspection, repair and diminution and value.

**THIRD CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**Breach of Contract**
**(Plaintiffs Individually and Behalf of All Others Similarly Situated)**

217.    Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1 through 178 into this cause of action and claim for relief as if fully set forth herein.

218.    To the extent Sharp's commitment is deemed not to be a warranty under Florida's Uniform Commercial Code, Plaintiffs pleads in the alternative under common law warranty and contract law.

219.    Plaintiffs and Class Members purchased the Microwaves from Sharp or through retailers such as Home Depot, Lowe's, Amazon, and other appliance stores.

220.    Sharp expressly warranted that the Microwaves were fit for their intended purpose and that they were free of defects, suitable for safe heating of food, and heat food at 950 watts.

221.    Sharp made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs, Class Members, and Sharp.

222.    Defendant breached the warranties and/or contract obligations by placing the defective Microwaves into the stream of commerce and selling them to consumers, when they knew the Microwaves contained defects, were prone to premature failure, and did not heat food at 950 watts.   These deficiencies substantially and/or completely impair the use and value of the Microwaves.

223.    The defeciencies described existed when the Microwaves left Sharp's possession or control and were sold to Plaintiffs and Class Members.  The deficiencies and impairment of the use and value of the Microwaves was not discoverable by Plaintiffs or Class Members at the time of the purchase of the Microwaves.

224.    As a direct and proximate cause of Sharp's breach of contract, Plaintiffs and Class

Members were harmed because they would not have purchased the Microwaves if they knew the

truth about the defective condition of the Microwaves.

**FOURTH CLAIM FOR RELIEF**
**(IN THE ALTERNATIVE)**
**Unjust Enrichment**
**(Plaintiffs Individually and Behalf of All Others Similarly Situated)**

225.    Plaintiffs hereby re-allege and incorporate all allegations raised in Paragraphs 1

through 178 into this cause of action and claim for relief as if fully set forth herein.

226.    This alternative claim is asserted on behalf of Plaintiffs and Class Members to the

extent there is any determination that any contracts between Class Members and Sharp do not

govern the subject matter of the disputes with Sharp, or that Plaintiffs does not have standing to

assert any contractual claims against Sharp.

227.    Plaintiffs and Class Members conferred a monetary benefit on Sharp, and Sharp had

knowledge of this benefit. The average price paid by Plaintiffs and Class Members for the

Microwaves was more than $900.00.

228.    By its wrongful acts and omissions described herein, including selling the defective

Microwaves, Sharp was unjustly enriched at the expense of Plaintiffs and Class Members.

229.    Plaintiffs and Class Members' detriment and Sharp's enrichment were related to and

flowed from the wrongful conduct alleged in this Complaint.

230.    It would be inequitable for Sharp to retain the profits, benefits, and other

compensation obtained from its wrongful conduct as described herein in connection with selling

the defective Microwaves.

231.    Plaintiffs and Class Members seek restitution from Sharp and an order of this Court

proportionally disgorging all profits, benefits, and other compensation obtained by Sharp from their

wrongful conduct and establishing a constructive trust from which Plaintiffs and Class Members may seek restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

A.  Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.  Name Plaintiffs as Class Representatives and their counsel as Class Counsel;

C.  Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Class in an amount to be determined at trial;

D.  Grant restitution to Plaintiffs and the Class and require Sharp to disgorge its ill-gotten gains;

E.  Award Plaintiffs and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law; and

F.  Award such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  July 15, 2020                    Respectfully submitted,

/s/ Rachel Soffin
Rachel Soffin (FL Bar # 18054)
Gregory F. Coleman*
Lisa A. White*
Adam A. Edwards*
**GREG COLEMAN LAW PC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080 F: 865-522-0049
greg@gregcolemanlaw.com
rachel@gregcolemanlaw.com
lisa@gregcolemanlaw.com

adam@gregcolemanlaw.com

Harper T. Segui*
Daniel K. Bryson*
**WHITFIELD BRYSON & MASON, LLP**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
dan@wbmllp.com
harper@wbmllp.com

Hassan A. Zavareei*
Andrea Gold*
**TYCKO & ZAVAREEI LLP**
1828 L. Street, NW, Suite 1000
Washington, D.C 20036
Telephone: (202) 973-0900
jtycko@tzlegal.com
hzavareei@tzlegal.com
agold@tzlegal.com

*Admitted or to be admitted *pro hac vice*

# EXHIBIT B

## Claim Form

## SHARP MICROWAVE OVEN DRAWER ("MOD")
## CLASS ACTION SETTLEMENT CLAIM FORM

Please see Claim Deadline information in section IV below

*Para una notificación en Español, llamar o visitar nuestro website: [WEBSITE]*

### I.    CLAIMANT INFORMATION

| | |
|---|---|
| Name: | |
| Street Address: | Apt. Number: |
| City: | State / Zip: |
| Daytime Phone: | Alternate Phone: |
| E-mail: | Do you consent to receive official information about the claim via e-mail? **YES  /  NO** |

### II.    DESCRIPTION OF MICROWAVE OVEN DRAWER

| | |
|---|---|
| Model Number: | Date of Purchase or Date of Installation:  *If attaching a photograph of the serial number plate inside the MOD, which provides information regarding the date of manufacture of the Class Microwave, please indicate above. |

### III.    ELECTION OF BENEFITS

Along with the attachment of supporting documents, please select your requested benefit as follows:

**Five Year Warranty Extension**

The Limited Extended Warranty begins from date of purchase or installation and is available to either (1) the first person to purchase or receive a new Class Microwave for his/her own use or (2) the first person to own a residential real property after a new Class Microwave has been installed for the owner's use.

Claim Form Submission is not required if your MOD has never experienced an Arcing Event.  Simply keep this form with your Owner's Manual.

**Benefits Available <u>after</u> a Documented Arcing Event** (please select only <u>one option</u> with its related reimbursements):

☐ A new, replacement MOD, and (if applicable):

_____Amount Requested for Reimbursement of Labor Costs Related to Arcing Event (may not exceed $150.00).

OR     ☐ $250.00 cash payment, and (if applicable):

_____Amount Requested for Reimbursement of Repair Costs Related to Repair or Covering of Cabinetry, if any (may not exceed $200.00); and (if applicable),

_____Amount Requested for Reimbursement of Labor Costs Related to Arcing Event (may not exceed $150.00).

OR     ☐ $500 electronic voucher (2-year expiration date) for the purchase of Sharp-branded merchandise available at shop.sharpusa.com or available for purchase through other sales channels that offer Sharp-branded merchandise, and (if applicable):

_____Amount Requested for Reimbursement of Repair Costs Related to Repair or Covering of Cabinetry, if any (may not exceed $200.00); and (if applicable),

_____Amount Requested for Reimbursement of Labor Costs Related to Arcing Event (may not exceed $150.00).

## IV.     CLAIMS DEADLINE

Class Members whose five-year <u>Limited Extended Warranty expires after the date of the Final Approval Hearing</u> shall have two years after occurrence of a Documented Arcing Event for which relief is being sought to submit a claim.

Class Members whose five-year <u>Limited Extended Warranty expires prior to or on the date of the Final Approval Hearing</u> shall have one hundred and twenty (120) days after the date of the Final Approval Hearing to submit a claim for a Documented Arcing Event.

## V.     SUPPORTING DOCUMENTATION FOR ARCING EVENT CLAIMS

Please enclose documentation supporting your claim as described below. **Failure to provide any of the documents requested below may result in a denial of your Claim.**

☐ **<u>Proof of Purchase or Installation</u>**: Enclose a document showing the date of purchase or installation. In lieu of documented proof of the date of purchase or installation of the MOD, you may submit a photograph of the serial number plate inside the MOD, which provides information regarding the date of manufacture of the MOD.

☐ **<u>Documentation of Arcing Events</u>**: Enclose all documentation related to electrical arcing within the MOD including (i) dated photographic evidence or other similar evidence, or (ii) written information from a licensed appliance service contractor, in either case establishing the existence of the electrical arcing and the date or approximate date such claim arose.

☐ **<u>Documentation of Labor Costs for Reimbursement:</u>** Enclose documentation of the labor and/or service costs, including the date(s) of the charges, the services provided, and the amount paid, in order to receive reimbursement for a Labor Reimbursement Claim.

☐ **<u>Documentation of Reimbursement for Cabinetry Covering:</u>** Enclose documentation of the costs related to the Cabinet Covering Claim, including the date(s) of the charges assessed, the services and/or materials provided, and the amount paid, in order to receive reimbursement for a Cabinet Covering Claim.

_____          _____
Signature or E-Signature of Claimant                                           Date

# EXHIBIT C

## Class Notices

<u>UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION</u>

## If You Purchased or Received a Sharp Microwave Oven Drawer Between 2009 and 2020

### You Could Get Benefits From a Class Action Settlement

**Si usted desea obtener una copia de este documento legal en español, favor de visitar la página web <u>www.[WEBSITE].com [[website].com]</u> o escribir al Administrador de Reclamos: Sharp Microwave Oven Drawers Settlement, [ADDRESS, CITY, STATE, ZIP]**

*A federal court authorized this notice. This is <u>not</u> a solicitation from a lawyer.*

- A Settlement has been reached with Sharp Electronics Corporation ("Sharp") in a class action lawsuit regarding Sharp-branded Microwave Oven Drawers ("Class Microwave(s)"). The lawsuit alleges that some of the Class Microwaves contained an issue that caused "arcing through the waveguide," which could cause the microwave to malfunction (an "Arcing Event"). Sharp denies these allegations.

- <u>This Settlement applies only to Sharp microwave oven drawers</u>, and not to other Sharp microwave ovens (i.e., not countertop or over-the-range models) or other Sharp products.

- <u>You are included in the Settlement</u> if you purchased or received a new Class Microwave, or if you were the first person to own a residential real property with a new Class Microwave (as defined in Question 1, below) installed between January 1, 2009 and the date of Preliminary Approval, [DATE]

- <u>If you are included in the Settlement, you may qualify for one of several benefits</u>, including an extension of the existing warranty from one year to five years ("Limited Extended Warranty") for an Arcing Event, which allows for choice of replacement, cash or voucher, and reimbursement for out-of-pocket expenses for labor costs and/or repairs to kitchen cabinetry due to the removal of a Class Microwave(s).

- Your legal rights may be affected. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM** | Eligible Class Members must submit a Claim Form and documentation. This is the only way to be eligible to receive a replacement, cash payment, or voucher, and reimbursement for out-of-pocket expenses for labor costs and/or cabinetry repairs under this Settlement. If you are a Class Member, you will be bound by the Settlement and you will relinquish any Released Claims that you may have against Sharp. If you have not experienced an Arcing |

**QUESTIONS? CALL 1-[TOLL FREE NUMBER] OR GO TO WWW.[WEBSITE].COM**

1

|  | Event, you do not need to submit a Claim Form to qualify for the Limited Extended Warranty, but you should retain the Claim Form for your records in the event you experience an Arcing Event in the future. |
|---|---|
| **CLAIMS DEADLINES** | The terms of the five-year Limited Extended Warranty apply to Class Microwaves installed between January 1, 2009 and the date of Preliminary Approval, **[DATE]**.<br><br>• Class Members whose five-year Limited Extended Warranty <u>expires after the date of the Final Approval Hearing</u> shall have two years after occurrence of a Documented Arcing Claim for which relief is being sought to submit a claim.<br><br>• Class Members whose five-year Limited Extended Warranty <u>expires prior to or on the date of the Final Approval Hearing</u> shall have one hundred and twenty (120) days after the Final Approval Hearing to submit a claim.<br><br>The Claims Deadlines will be set forth in the Claim Form. |
| **EXCLUDE YOURSELF** | This is the only option that allows you ever to be part of another lawsuit against Sharp about the claims resolved by this Settlement. You may opt-out of the Settlement. If you opt-out, you will not receive any benefits from this Settlement. You must opt-out by **[DATE]**. |
| **OBJECT** | If you wish to object to the proposed Settlement, the request for attorneys' fees and reimbursement of litigation expenses, or Service Payments to the proposed Class Representatives, you should write to the Court and explain why you object. You cannot object to the proposed Settlement unless you are a Class Member. You must object by **[DATE]**. |
| **ATTEND THE HEARING** | You may ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | If you are a Class Member whose Class Microwave experienced an Arcing Event and you do not submit a Claim Form by the applicable Claims Deadline, you will not be eligible to receive a replacement, cash payment, or voucher, and reimbursement for out-of-pocket expenses for labor costs and/or cabinetry repairs under this Settlement, and you will give up your right to ever be part of another lawsuit against Sharp about the legal claims resolved by this Settlement.<br><br>If you have not experienced an Arcing Event, you do not need to submit a Claim Form to qualify for the Limited Extended Warranty, but you should retain the Claim Form for your records in the event you experience an Arcing Event in the future, described below. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case will decide whether to approve the Settlement. If the Court approves the Settlement, and if you meet the requirements of the Settlement, benefits for arcing incidents will be issued if you submit a valid claim form. See Question 12 below for how to access a claim form. If there are any appeals of the Court's decision, the Settlement may be delayed. Please be patient.

**BASIC INFORMATION**

| **1.  Why did I get this notice?** |
|---|

You received this notice because you may own a Sharp microwave oven drawer that was installed between January 1, 2009, and [DATE]. Such microwave oven drawers are referred to as "Class Microwaves."

The Court authorized this notice because you have a right to know about the proposed Settlement of a class action lawsuit before the Court decides whether to approve the Settlement. If the Court approves the Settlement, and after any objections and appeals are resolved, an administrator appointed by the Court and Sharp will oversee certain benefits that the Settlement allows.

This notice explains the class action lawsuit, your legal rights, what benefits are available under the Settlement, who is eligible for them, and how to get them.

The Court in charge of this case is the United States District Court for the Middle District of Florida, and the case is known as *Hamm v. Sharp Electronics Corporation,* No. 5:19-cv-00488. The persons who sued are called the "Plaintiffs" and the company they sued, Sharp, which is called the "Defendant."

| **2.  What is the lawsuit about?** |
|---|

The lawsuit alleges that the Class Microwaves manufactured by Sharp contain a manufacturing or design defect. The lawsuit alleges the defect causes premature failure due to "arcing" (or electrical sparking) within one of the components of the Class Microwaves called the waveguide, which is located at the top of the microwave, and that may extend to the magnetron. The lawsuit also alleges that Sharp breached warranties or other obligations in connection with the manufacture and sale of the Class Microwaves. Sharp denies these allegations, but has agreed to the Settlement to avoid the risks and costs of trial. The Settlement is not an admission of liability by Sharp.

This Settlement is the product of hard-fought litigation and arm's-length negotiations, which included two in-person mediations and subsequent months of arm's-length negotiations between experienced class-action counsel for both Sharp and Plaintiffs, all led by a former federal judge.

**3.    Why is this a class action?**

In a class action, one or more people called "Class Representatives" sue on behalf of all people who have similar claims. Together, these people are called a "Settlement Class" or "Class Members." One court resolves the issues for all Class Members, except for those who exclude themselves from the Settlement Class.

**4.    Why is there a Settlement?**

The Court did not decide which side was right or whether the Class Microwaves are defective. Instead, both sides agreed to a Settlement to avoid the costs and risks of further litigation and provide benefits to Class Members. The Class Representatives and the lawyers representing them (called "Class Counsel") believe that the Settlement is in the best interests of all Class Members.

**5.    Who is included in the Settlement Class?**

The Settlement Class includes all persons residing in the United States who were either (1) the first person to purchase or receive a new Class Microwave for his/her own use or (2) the first person to own a residential real property after a new Class Microwave has been installed for the owner's use, installed between January 1, 2009 and the date of Preliminary Approval of the Settlement, [Date].

**6.    Who is not included in the Settlement Class?**

Excluded from the Settlement are: (a) officers, directors, and employees of Sharp or its parents, affiliates, or subsidiaries; (b) insurers of Class Members; (c) any entity purporting to be a subrogee of a Class Member, who is someone who has assumed the rights of another person, or all entities that claim to be subrogated to the rights of the owner of a Class Microwave; (d) any secondary owner of a Class Microwave including, without limitation, any purchaser of a used Class Microwave, purchaser of real property containing a used Class Microwave, or any other owner of a Class Microwave who was not the first person to purchase or receive a new Class Microwave; (e) all third-party issuers or providers of extended warranties or service contracts; (f) persons who previously released their claims against Sharp; (g) any personnel of the Court overseeing the proposed settlement, and any immediate family member of such personnel; (h) any personnel of the Settlement Administrator, and any immediate family member of such personnel; and (i) those persons who timely and validly exercise their right to be removed from the Settlement Class as described below.

**7.    What benefits does the Settlement provide?**

Several levels of benefit are available for Eligible Class Members:

| Relief Level | Eligibility |
|---|---|
| Limited Extended Warranty | All Class Members will receive an extension of the existing warranty from one year to five years ("Limited Extended Warranty"). The Limited Extended Warranty only covers Arcing Events. Otherwise, all other parts are subject to the original warranties that came with the purchase. |
| **One of the following benefit options:**<br>• Replacement Microwave Oven Drawer<br>• $250 cash payment, **or**<br>• $500 voucher for any Sharp-branded product. | If a Class Member provides documentation of an Arcing Event during the Limited Extended Warranty Period, then they are eligible for one of these benefits subject to the terms and conditions of the Settlement Agreement.<br><br>If a Class Member selects a Replacement Microwave Oven Drawer, the replacement will come with the standard, one-year warranty or the time remaining on the Limited Extended Warranty, whichever is longer. |
| **Labor costs reimbursement of up to $150** – microwave repairs or inspection only. *Class Members can receive this benefit in combination with other benefits.* | Any Class Member who provides documented labor costs for a repair or inspection related to an Arcing Event will be eligible for reimbursement of up to $150.<br><br>Proof example: Receipt from the repair technician. |
| **Labor costs reimbursement of up to $200** – adjacent cabinetry repairs only. *Class Members can receive this benefit in combination with other benefits.* | If a Class Member has documentation of an Arcing Event, but decides not to receive a replacement microwave, they can receive up to $200 of documented costs incurred to repair the cabinetry where their Class Microwave was installed. |

More information is available below and in the Settlement Agreement (available on the website).

## 8.   What is a waveguide and how will I know if I experienced an Arcing Event?

A waveguide is the component in the top of the microwave oven that directs the energy from the magnetron, where waves are formed, into the cooking cavity. If the waveguide is arcing, sparks or flashes may be seen within the microwave oven drawer while it is in use. A buzzing noise may also be heard. If arcing occurs over an extended period, it is possible that smoke could appear from the microwave, and the microwave could stop working.

**9.    When does the five-year limited extended warranty begin?**

The Limited Extended Warranty begins either on the date of installation or 30 days after purchase; whichever date is earlier is the start date.  If Class Members do not have proof of purchase or installation, then the Limited Extended Warranty begins ninety days after the date of manufacture.  The date of manufacture is printed on the serial number plate inside the opening of the Class Microwave.

**10.  If I choose to receive or have received a replacement microwave oven drawer, will that also be covered under the Limited Extended Warranty?**

Any replacement microwave oven drawer delivered to a Class Member, either prior to this Settlement or through this Settlement, shall have a Limited Extended Warranty for Arcing Events, pursuant to the Settlement, for a term of one year from the date of replacement installation for Arcing Events, or the remainder of the five year Limited Extended Warranty period for Arcing Events, whichever is longer.

**11.  What are the terms of the $500 voucher for Sharp-branded products?**

The $500 voucher for Sharp-branded products will be valid for two years from the date of issue. To redeem the voucher, you will need to contact Sharp's Customer Service Center at 1-800-BE-SHARP (1-800-237-4277).

**12.  How do I receive benefits if my Class Microwave exhibited an Arcing Event?**

The Claim Deadline applicable to consumers will be set forth in the Claim Form.

- Class Members whose five-year Limited Extended Warranty expires after the date of the Final Approval Hearing shall have two years after the occurrence of a Documented Arcing Claim for which relief is being sought to submit a claim.

- Class Members whose five-year Limited Extended Warranty expires prior to or on the date of the Final Approval Hearing shall have one hundred and twenty (120) days after the Final Approval Hearing to submit a claim.

To receive benefits if your Class Microwave exhibited an Arcing Event, you must complete and submit a Claim Form prior to the applicable Claim Deadline and provide the documented proof of arcing for any benefits you may be seeking.

The Claim Form is available for download at www.[WEBSITE].com and may also be submitted at this website.  Claim forms may also be obtained by contacting the Settlement Administrator at [toll free number] or [email address] or by writing a letter to the Sharp Microwave Oven Drawers Settlement, [ADDRESS, CITY, ZIP].

## 13.   What type of proof is needed?

To be eligible for benefits under the Settlement Agreement, a Class Member must include all of the following with their Claim Form:

- Proof of purchase or installation of a Class Microwave, or a photograph of the serial number plate inside the Class Microwave.
- Documentation of an Arcing Event that may include repair and/or inspection invoices or receipts, or other writing from a licensed appliance service contractor documenting the arcing and the date, or dated photographs of arcing-related damage.
- If a Class Member is seeking reimbursement of labor costs or costs to repair or cover an opening in kitchen cabinetry, the Class Member must provide documentation of such expenses, including an invoice or receipt.

## 14.   When will I receive any benefits?

Payments and/or a replacement microwave will be made to eligible Class Members after the Court approves the Settlement and after any appeals are resolved.  Everyone who sends in a Claim Form will eventually receive a response.  Please be patient.

## 15.   What am I giving up by getting benefits and staying in the Settlement Class?

Unless you opt-out of the Settlement, you will remain in the Settlement Class.  If the Settlement is approved and becomes final, all of the Court's Orders will apply to you and legally bind you. That means that you will not have a right to sue or be part of any other lawsuit against Sharp for the legal issues and claims resolved by this Settlement.  Personal injury claims are not affected or released by the settlement.  The specific rights you are giving up are called "Released Claims" and the "Released Persons" are described below in Question No. 16.

## 16.   What are the Released Claims and who are the Released Persons?

The Released Claims are any and all claims, whether known or unknown, that relate in any way to any Class Microwaves.  Class Members will have fully, finally and forever settled and released any and all of the Released Claims if the Settlement is approved, even if Class Members later discover facts in addition to or different from those which they now know or believe to be true.  The releases in the Settlement are bargained for and are an essential and material element of the Settlement.

Class members expressly, knowingly, and voluntarily waive the provisions of Section 1542 of the California Civil Code, as well as any statute or legal provision in the relevant states similar to the California Civil Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASE PARTY.

The Released Persons are (a) Sharp, (b) any individual or entity involved in any way in the design, manufacture, advertising, marketing, distribution, sale, and/or service of any of the Class Microwaves purchased by the Class Members, as well as (c) all of these individuals' and entities' past, present, and future employees, officers, directors, shareholders, owners, partners, members, joint venturers, managers, representatives, adjusters, attorneys, agents, consultants, insurers, excess insurers, reinsurers, indemnitors, contractors, employers, affiliates, divisions, partnerships, independent contractors, servants, parents, subsidiaries, related entities, predecessors, successors, assignors, assignees, including but not limited to, successors or predecessors by merger, and any other person or entity who has, had, or could have legal responsibility relating to the Released Claims.

The Settlement is expressly intended to cover and include all such claims, demands, actions and causes of action, regardless of the legal theories involved (and whether based in common law, statute or otherwise), dealing whatsoever with the Class Microwaves. The Released Claims, however, do not include any claims for personal injury. The complete Settlement Agreement, which is available on www.[WEBSITE].com, describes the Released Claims in necessary legal terminology. Please read it carefully. If you have any questions about the Released Claims, you can speak with Class Counsel, described below in Question No. 20 for free, or you can speak with your own lawyer at your own expense.

| **17. How do I opt-out from the Settlement?** |
|---|

If you do not want to receive any benefits from this Settlement and you want to keep the right to sue Sharp on your own related to the Class Microwaves, then you must take steps to exclude yourself, or "opt-out," from the Settlement.

To opt-out of the Settlement, you must complete and send, via mail or tracked delivery service to the Settlement Administrator a letter stating that you wish to opt-out, by [DATE].

  Your Opt-Out request must include all of the following:
- Your full name.
- Current address.
- Your signature and the date you signed it.
- The serial number and date of manufacture for your Class Microwave.
- The date that your Class Microwave was purchased, if known.
- The following statement: "I want to be excluded from the Settlement Class in *Hamm v. Sharp Electronics Corp.*, No. 5:19-cv-00488 (M.D. Fla.)."

To be valid, your Opt-Out request must be actually delivered to the Settlement Administrator no later than [DATE]. Your Opt-Out request must be personally signed by you – and not anyone else. You cannot opt-out by phone, text or email.

| **18. If I opt-out, can I get the benefits from this Settlement?** |
|---|

No. If you opt-out from the Settlement, you are telling the Court you do not want to be part of the Settlement Class in this Settlement. You can only get Settlement benefits if you stay in the Settlement Class and submit a valid Claim Form for benefits.

### 19. If I do not opt-out, can I sue Sharp for claims related to the Class Microwaves?

No.  If you remain in the Settlement Class and do not opt-out of the Settlement, you will be legally bound by the Settlement.  You will give up the right to sue Sharp for the claims that this Settlement resolves and releases.  You must opt-out from the Settlement to start or continue with your own lawsuit or to be part of any other lawsuit.

### 20. Who represents the Settlement Class?

The Court has appointed Gregory F. Coleman, Rachel Soffin and Lisa White of Greg Coleman Law PC, Daniel K. Bryson and Harper T. Segui of Whitfield Bryson LLP, and Andrea Gold and Hassan A. Zavareei of Tycko & Zavareei LLP as Class Counsel to represent Class Members in this case.  You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

### 21. How will Class Counsel be paid?

This Lawsuit has been prosecuted on behalf of the proposed Class Representatives on a wholly contingent basis. That means that Class Counsel have not received any payment of attorneys' fees for their representation of the Class and have advanced expenses necessarily incurred to prosecute this case. Class Counsel have reviewed and analyzed documents obtained through Class Counsel's own investigation; consulted with experts; examined and considered the benefits to be provided to the Class Members under the Settlement; and considered the laws of several States and the claims that could be asserted under those laws regarding the Class Microwaves. Class Counsel will ask the Court to award them up to $3,000,000.00 for attorneys' fees, costs, and expenses.  If approved by the Court, Sharp will separately pay these fees, costs, and expenses.  These payments will not reduce the amount of benefits available to Class Members.  Sharp also has agreed to pay the Settlement Administrator's fees and expenses, including the costs of mailing the Notices and assisting with the administration of the Settlement as part of the Settlement.  The Court's award of any attorneys' fees and expenses to Class Counsel shall be separate from and independent of the Court's determination of whether to approve the Settlement. If the Court declines to approve the Settlement, no award of attorneys' fees and expenses shall be awarded or paid to Class Counsel. The Parties have negotiated and reached agreement on the Attorneys' Fees and Expenses only after reaching agreement on all other material terms of Settlement in this matter.

### 22. What if I want to object to the Settlement?

If you are a Class Member and do not opt-out, you may object to the Settlement if you dislike any part of it and may give reasons why you think the Court should not approve the settlement for all Class Members.  To object, you or your attorney must file and serve a written objection. All objections must be filed with the Clerk of the Court and served on counsel for the Parties and received in writing or postmarked no later than [DATE].  Your objection must include:

- The name of this lawsuit: *Hamm v. Sharp Electronics Corp.*, No. 5:19-cv-00488 (M.D. Fla.);
- Your full name, current address, telephone number, and e-mail address;

**QUESTIONS?  CALL 1-[TOLL FREE NUMBER] OR GO TO WWW.[WEBSITE].COM**

- Documents showing the serial number, date of manufacture, and date of purchase for your Class Microwave;
- The specific reasons for your objection and any evidence and supporting papers (including, but not limited to, all briefs, written evidence, and declarations) that you want the Court to consider in support of your objection;
- A list of all persons who will be called to testify in support of your objection; and
- Your signature and the date of your signature.
- You must mail your written objection to the Court and counsel for the parties at the following addresses:

**The Court:**

Clerk of Court
U.S. District Court, M.D. Fla., Tampa Division
Sam M. Gibbons U.S. Courthouse
801 North Florida Avenue
Tampa, FL 33602

**Defense Counsel:**

Brian E. O'Donnell, Esq.
Jeffrey Beyer, Esq.
Riker Danzig Scherer Hyland & Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981

**Class Counsel:**

Gregory F. Coleman, Esq.
Rachel Soffin, Esq.
Lisa White, Esq.
Greg Coleman Law
800 S. Gay Street, Suite 1100
Knoxville TN 37929

Daniel K. Bryson, Esq.
Harper T. Segui, Esq.
Whitfield Bryson LLP
900 W. Morgan St.
Raleigh, NC 27603

Andrea R. Gold, Esq.
Hassan A. Zavareei, Esq.
Tycko & Zavareei LLP
1828 L Street, NW - Suite 1000
Washington, DC 20036

Again, your written objection must be mailed with a postmark no later than [DATE].

| **24.   What is the difference between objecting and opting out?** |

Objecting is telling the Court that you do not think the Settlement should be approved for the entire Settlement Class.  Opting-out is removing yourself from the Settlement Class in order to preserve your individual legal rights.  If you opt-out/exclude yourself, you cannot object to the Settlement, because the Settlement no longer affects you.

| **25.   When and where will the Court decide whether to approve the Settlement?** |

The Court will hold a hearing on [DATE], at [TIME], in Courtroom 17 of the Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, FL 33602.  At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate, and whether it should be finally approved.  The Court may also decide the amount of fees, costs and expenses to award to Class Counsel and the service awards for class representatives.  This hearing may be continued or rescheduled by the Court without further notice to the Settlement Class.  Please check www.[WEBSITE].com for updates.  After the hearing, the Court will decide whether to approve the Settlement.  It is unknown how long this decision will take.

**QUESTIONS?  CALL 1-[TOLL FREE NUMBER] OR GO TO WWW.[WEBSITE].COM**

| **26.  Do I have to come to the hearing?** |
| --- |

No.  Class Counsel is working on behalf of the Settlement Class and will answer any questions the Court may have about the Settlement.  The hearing is public, and you are welcome to come at your own expense.  You may also pay your own lawyer to attend, but that is not necessary.

| **27.  May I speak at the hearing?** |
| --- |

Yes.  You may ask the Court for permission to speak at the hearing.  To do so, you must mail a written request to the Court, postmarked by [DATE], that includes:

- The following language: it is your "Notice of Intention to Appear at the Fairness Hearing in *Hamm v. Sharp Electronics Corp.*, No. 5:19-cv-00488 (M.D. Fla.)."
- Your name, address, telephone number, email address (if any), signature, and
- Copies of any papers, exhibits, or other evidence that you or your counsel intend to present to the Court.

Your Notice of Intention to Appear must be postmarked no later than [DATE], and be sent to the Clerk of the Court, Class Counsel, and Defense Counsel, at the addresses in Question No. 22.  If you plan to have your own attorney speak for you at the hearing, you must also include the name, address and telephone number of the attorney who will appear.

| **28.  What if I feel that I need more information about what I should or should not do?** |
| --- |

This Notice summarizes the Settlement.  More details are in the Settlement Agreement, available at www.[WEBSITE].com.  If you have questions, you may contact the Settlement Administrator at Sharp Microwave Oven Drawers Settlement, [ADDRESS, CITY, STATE, ZIP], [Email] or [Toll Free Number], or by visiting www.[WEBSITE].com.  If you wish to communicate directly with Class Counsel, you  may contact them at the address or phone number listed on their website.

**DO NOT WRITE OR CALL THE COURT, SHARP OR ANY APPLIANCE RETAILER, DEALER, OR AGENT FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LAWSUIT**

## Postcard Notice

**Front of Postcard "tag line"**

If You Owned A Sharp Microwave Oven Drawer Between 2009 and 2020,

You Could Get Benefits From a Class Action Settlement

*Para una notificación en Español, llamar o visitar nuestro website:* <mark>*[WEBSITE]*</mark>

**Back of Postcard/Notice**

A Settlement has been reached with Sharp Electronics Corporation ("Sharp") in a class action lawsuit regarding Sharp-branded Microwave Oven Drawers ("Class Microwave(s)"). The lawsuit alleges that some of the Class Microwaves contained an issue that caused "arcing through the waveguide," which could cause the microwave to malfunction (an "Arcing Event"). Sharp denies these allegations.

**Am I included?** You are included in the Settlement if you purchased or received a new Class Microwave, or you were the first person to own a residential real property with a new Class Microwave, installed between January 1, 2009 and <mark>[DATE]</mark>.

**What does the Settlement provide?** The Settlement includes potential benefits for eligible Settlement Class Members, including: Limited Extended Warranty; full Replacement; up to $250 cash payment or $500 voucher; and/or reimbursements for certain out-of-pocket payments.

**How can I file a claim?** Eligible Settlement Class Members must file a claim, including the required documentation. Claim Forms are available on the Settlement website: <mark>[WEBSITE]</mark>. You may file a claim online or download the Claim Form and send it in via e-mail or regular mail. Claim Forms for any Settlement Class Member whose Limited Extended Warranty has expired on or prior to <mark>[DATE OF FINAL APPROVAL HEARING]</mark> must be received by <mark>[DATE]</mark>. Claim Forms for any Settlement Class Member whose Limited Extended Warranty will expire after <mark>[DATE OF FINAL APPROVAL HEARING]</mark> must be received within two years of the date of any Arcing Event.

**What are my other rights?** If you don't want benefits and don't want to be legally bound by the Court's orders, you must exclude yourself from the Settlement by [DATE]. If you do not exclude yourself, you will be bound by this Settlement and you will not be able to sue Sharp for any claims related to the Settlement. If you stay in the Settlement, you may object to the Settlement by [DATE]. You or your own lawyer may appear at the hearing at your own expense. The Court will hold a hearing on [DATE] to consider whether to approve the Settlement, a request for $ 3 million for attorneys' costs and fees, and a service payment of $1,500 to each Class Representative ($10,500 total). The attorneys' fees and service payments to the Class Representatives will not reduce the amount of benefits available to Class Members.

**[WEBSITE]**                              **[TFN]**

### Email Notice

*From*: Sharp Microwave Oven Drawer Class Action Settlement Administrator

*Subject Line*: Sharp Microwave Oven Drawer Settlement

*Content:*

*Para una notificación en Español, llamar o visitar nuestro website:* [WEBSITE]

A federal court authorized this notice. This is not a solicitation from a lawyer, **and you are not being sued**.

**You are receiving this notice because you could be affected by a class action lawsuit against Sharp involving microwave oven drawers.**

A Settlement has been reached with Sharp Electronics Corporation ("Sharp") in a class action lawsuit regarding Sharp-branded Microwave Oven Drawers ("Class Microwave(s)"). The lawsuit alleges that some of the Class Microwaves contained an issue that caused "arcing through the waveguide," which could cause the microwave to malfunction (an "Arcing Event"). Sharp denies these allegations.

**Am I included?** You are included in the Settlement if you purchased or received a new Class Microwave, or you were the first person to own a residential real property with a new Class Microwave, installed between January 1, 2009 and [DATE].

**What does the Settlement provide?** The Settlement includes potential benefits for eligible Settlement Class Members, including: Limited Extended Warranty; full Replacement; up to $250 cash payment or $500 voucher; and/or reimbursements for certain out-of-pocket payments.

**How can I file a claim?** Eligible Settlement Class Members must file a claim, including the required documentation. Claim Forms are available on the Settlement Website: **[WEBSITE]**. Click **HERE** to file your Claim. You may file a claim online or download the Claim Form and send it in via e-mail or regular mail. Claim Forms for any Settlement Class Member whose Limited Extended Warranty has expired on or prior to [DATE OF FINAL APPROVAL HEARING] must be received by [DATE]. Claim Forms for any Settlement Class Member whose Limited Extended Warranty will expire after [DATE OF FINAL APPROVAL HEARING] must be received within two years of the date of any Arcing Event.

**What are my other rights?** If you don't want benefits and don't want to be legally bound by the Court's orders, you must exclude yourself from the Settlement by [DATE]. If you do not exclude yourself, you will be bound by this Settlement and you will not be able to sue Sharp for any claims related to the Settlement. If you stay in the Settlement, you may object to the Settlement by [DATE]. You or your own lawyer may appear at the hearing at your own expense. The Court will hold a hearing on [DATE] to consider whether to approve the Settlement, a request for $3 million for attorneys' costs and fees, and a service payment of $1,500 to each Class Representative ($10,500 total).  The attorneys' fees and service payments to the Class Representatives will not reduce the amount of benefits available to Class Members.

**For more information, visit [WEBSITE] or call [TFN]**

## **Banner Ad**

Did You Purchase or Receive a Sharp Microwave Oven Drawer?
You Could Get Benefits From a Class Action Settlement

**For more information, visit [WEBSITE] or call [TFN]**

# If You Owned A Sharp Microwave Oven Drawer Between 2009 and 2020,

## You Could Get Benefits From a Class Action Settlement

*Para una notificación en Español, llamar o visitar nuestro website: [WEBSITE]*

A Settlement has been reached with Sharp Electronics Corporation ("Sharp") in a class action lawsuit regarding Sharp-branded Microwave Oven Drawers ("Class Microwave(s)"). The lawsuit alleges that some of the Class Microwaves contained an issue that caused "arcing through the waveguide," which could cause the microwave to malfunction (an "Arcing Event"). Sharp denies these allegations.

### Am I included?

You are included in the Settlement if you purchased or received a new Class Microwave, or you were the first person to own a residential real property with a new Class Microwave, installed between January 1, 2009 and [DATE].

### What does the Settlement provide?

The Settlement includes potential benefits for eligible Settlement Class Members, including: Limited Extended Warranty; full Replacement; up to $250 cash payment or $500 voucher; and/or reimbursements for certain out-of-pocket payments.

### How can I file a claim?

Eligible Settlement Class Members must file a claim, including the required documentation. Claim Forms are available on the Settlement website: [WEBSITE]. You may file a claim online or download the Claim Form and send it in via e-mail or regular mail. Claim Forms for any Settlement Class Member whose Limited Extended Warranty has expired on or prior to [DATE OF FINAL APPROVAL HEARING] must be received by [DATE]. Claim Forms for any Settlement Class Member whose Limited Extended Warranty will expire after [DATE OF FINAL APPROVAL HEARING] must be received within two years of the date of any Arcing Event.

### What are my other rights?

If you don't want benefits and don't want to be legally bound by the Court's orders, you must exclude yourself from the Settlement by [DATE]. If you do not exclude yourself, you will be bound by this Settlement and you will not be able to sue Sharp for any claims related to the Settlement. If you stay in the Settlement, you may object to the Settlement by [DATE]. You or your own lawyer may appear at the hearing at your own expense. The Court will hold a hearing on [DATE] to consider whether to approve the Settlement, a request for $3 million for attorneys' costs and fees, and a service payment of $1,500 to each Class Representative ($10,500 total). The attorneys' fees and service payments to the Class Representatives will not reduce the amount of benefits available to Class Members.

---

**[WEBSITE]**
**[TFN]**

FOR RELEASE
Date: MONTH 00, 2020

**Media Contacts**
First Name Last Name
Phone: 000-000-0000
Email: XXXX.com

## Consumers Who Owned a Sharp Microwave Oven Drawer Could Get Benefits From a Settlement

(Washington, D.C.) — The following is being released by Greg Coleman Law, Whitfield Bryson LLP, and Tycko & Zavareei LLP about the lawsuit *Hamm v. Sharp Electronics Corporation*, Case No. 5:19-cv-00488-JSM-PRL, in the United States District Court for the Middle District of Florida.

Sharp Electronics Corporation ("Sharp") has reached a Settlement to resolve a class action lawsuit that claims certain Sharp-branded Microwave Oven Drawers ("Class Microwaves") contained an issue that caused electrical arcing through the waveguide, which could cause the Class Microwave to malfunction (an "Arcing Event"). Sharp denies that the Class Microwaves had any issues.

Consumers may be included in the class if they purchased or received a new Class Microwave, or they were the first person to own a residential real property with a new Class Microwave, installed between January 1, 2009 and [**DATE**].

Eligible class members may be able to get benefits such as a Limited Extended 5-year Warranty; full Replacement; up to $250 cash payment or $500 voucher; and/or reimbursements for certain out-of-pocket payments if their Class Microwave experienced an Arcing Event or if their Class Microwave experiences an Arcing Event in the future.

To get benefits, eligible class members must file a claim and include any required documentation. Claim Forms are available at the website, [**WEBSITE**] or by calling 1-800-000-0000. Individuals may file a claim online or download or obtain a copy of the Claim Form and send it in via e-mail or regular mail. Individuals whose Limited Extended Warranty expires before the [**Final Approval Hearing Date**] and who have experienced an Arcing Event must submit a Claim Form by [**120 days after the Final Approval Hearing Date**]. Individuals whose Limited Extended Warranty has not expired as of [**Final Approval Hearing Date**] and who have experienced an Arcing Event or experience an Arcing Event in the future must submit a Claim Form within two years of the date of the Arcing Event.

Those affected should visit the website [**WEBSITE**] or call [**TFN**] to learn more about this Settlement and how it could affect their rights.

**Important Information and Dates:**

- Eligible class members must object to the Settlement by **[DATE].**

- Eligible class members must exclude themselves from the Settlement by **[DATE].**

- Eligible class members whose Class Microwave already experienced an Arcing Event or whose Class Microwave experiences an Arcing Event in the future, must submit a Claim Form in accordance with the dates set forth above.

- The Court will hold a hearing on [**Final Approval Hearing Date**] to consider whether to approve the Settlement, a request for $3 million for attorneys' costs and fees, and a service payment of $1,500 to each Class Representative ($10,500 total). The attorneys' fees and service payments to the Class Representatives will not reduce the amount of benefits available to Class Members. You and your own lawyer can appear and speak at the hearing, but you do not have to.

**For more information:**

- Visit: [**WEBSITE**]

- Call: [**TFN**]

### 

2

# EXHIBIT D

# Declaration of Settlement Administrator

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **MICHAEL HAMM, JILL BROWN, AUSTIN RUSSELL, CHRISTIAN LAMMEY, NANCY JAMES, JILL WITTMAN, THOMAS MACONE,** individually and on behalf of themselves and all others similarly situated, | **Civil Action: 5:19-cv-488** Judge James S. Moody, Jr. Magistrate Judge Philip R. Lammens |
| Plaintiffs, | |
| v. | |
| **SHARP ELECTRONICS CORPORATION**, | |
| Defendant. | |

### DECLARATION OF TIFFANEY JANOWICZ
### REGARDING SETTLEMENT NOTICE AND ADMINISTRATION

## I.    INTRODUCTION

I, Tiffaney A. Janowicz, declare as follows:

1.    I am a Senior Vice President for Rust Consulting, Inc. ("Rust") and authorized to make this declaration on behalf of Rust Consulting and myself. Attached as Exhibit A is my C.V., which outlines my experience and qualifications, and a C.V. outlining Rust's services and experience.

2.    Rust Consulting specializes in class action notification and claims administration, including telephone and web-based support, direct mail services, claims processing, and settlement fund distribution. Founded in 1976, Rust Consulting began its claims administration business in 1989 and has extensive experience in class action matters, having provided services in class actions ranging

from 100 to 100 million class members and has provided notification and/or claims administration services in more than 6,500 class action cases and remediation projects.

## II.    NOTICE AND SETTLEMENT ADMINISTRATION

3.      Subject to the approval of the Court, the parties have retained Rust Consulting to fulfill the role of Settlement Administrator in the above-captioned case to design the Notice Plan and help implement the terms and conditions of the Settlement Agreement.

4.      I understand that the Settlement Class includes all persons residing in the United States who, at any time during the Class Period, January 1, 2009, through the Preliminary Approval Date, became the First Consumer Purchaser of a microwave oven drawer unit manufactured or sold by Sharp or any of its related entities and affiliates under the Sharp brand name.

5.      The Notice Plan is designed to reach the greatest practicable number of Settlement Class Members, providing them opportunities to learn about the Settlement and act on their rights. The Notice Plan has three components, **Direct Notice** to individuals included in Sharp's list of potential class members, **Paid Media** (*digital and print ads, keywords*) and **Earned Media** (*nationwide press release*) to reach unidentified Settlement Class Members.

6.      The Notice Plan also includes Direct Notice via mail to Settlement Class Members who call or write to request a hardcopy of the Long Form Notice and/or Claim Form.  The Long Form Notice and Claim Form will also be available for download on the Settlement Website.

7.      The Notice Plan includes plain-language Notices that I believe comply with Fed. R. Civ. Proc. Rule 23(c)(2) and easy-to-use **Class Member Response Mechanisms** for Settlement Class Members to act on their rights.

### *Direct Notice*

**A.    Email Class Notice**

8.    Using data records provided to Rust by Sharp, Rust will send a short form Notice via email ("Email Class Notice") about the Settlement to Settlement Class Members for whom an email address was located within Sharp's records.  The Email Class Notice will include a link to the Settlement Website where Class Members will find the Settlement details including the Settlement Agreement, Long Form Notice, and Claim Form, as well as a direct link to the online Claim Form.  For any emails that bounce back as undeliverable, Rust will attempt to locate the related mailing address in Sharp's data and send Mailed Class Notice if a physical address is found.

**B.    Mailed Class Notice**

9.    Rust will mail Class Notice via First Class U.S. Mail in the form of a postcard to any Settlement Class Member for whom an email address is not located or the emailed notice bounces back as undeliverable, and a mailing address is available ("Mailed Postcard Class Notice").  Prior to mailing, Rust will update Settlement Class Member address information using the National Change of Address (NCOA) system maintained by the United States Postal Service (USPS).  The NCOA system contains new addresses of people and businesses that have moved over the past 48 months and notified USPS of their new addresses.  Standardizing and updating addresses prior to mailing using NCOA is industry standard and improves delivery rates.  Rust Consulting will follow these procedures in mailing the Mailed Postcard Class Notice to Settlement Class Members.

10.    Direct Mailed Postcard Class Notices that are returned as non-deliverable will be reviewed and re-mailed as appropriate.  In the case of Mailed Postcard Class Notices returned as

non-deliverable with a forwarding address, the Mailed Postcard Class Notices will be re-mailed to any address indicated by the USPS. Mailed Postcard Class Notices returned as non-deliverable, but for which a new address is not indicated by the USPS, will be further traced through TransUnion or a similar vendor to obtain a more current address. TransUnion uses a variety of third-party sources to compare latest addresses for individuals and returns updated addresses for them. If any such address is found, the Mailed Postcard Class Notice will be re-mailed.

11.    Rust will also mail Class Notice via First Class U.S. Mail in the form of a Long Form Notice (with included Claim Form) to any Settlement Class Member who requests it ("Mailed Long Form Class Notice"). The Long Form Notice includes detailed information about the Settlement, including, but not limited to, answers to frequently asked questions.

### *Paid Media*

12.    <u>Target Audience Development</u>. The first step in determining what media is appropriate to reach potential Settlement Class Members is to establish an equivalent demographic profile, otherwise known as a target audience, of potential Settlement Class Members and then analyze available data (demographics, media habits) about that target audience. This information is used to select the most appropriate media to reach potential Settlement Class Members.

13.    In order to establish a target audience, we use data from a variety of sources, including MRI-Simmons 2019 *Doublebase Study*.[1] Purchasers of Sharp branded microwave oven drawers are not measured within the MRI-Simmons media survey data. Therefore, we looked to a broader, measured target of homeowners who own microwave ovens. However, this measured target would include many non-class members and would be over-inclusive for the Settlement. To further refine the target, we used best practices by reviewing the relevant demographic information

---

[1] MRI-Simmons produces an annual survey, called a *Doublebase Study*. The study includes survey responses from over 50,000 people and covers thousands of brands and hundreds of product categories.

of potential Settlement Class Members. We determined that total household income was an appropriate way to narrow the target because the Settlement involves higher-end microwaves. Based on the cost of ownership of the product, the target audience that we selected for purposes of measuring the reach of the Notice Plan is homeowners with a total household incomes of $75,000 and over ("Microwave Oven Owners $75k+").

14. To determine the best methods for reaching our target audience, we compared the target audience's media usage to that of the average adult 18 years of age and older ("Adults 18+") in usage quintiles[2] reported by MRI-Simmons. The study ranks respondents based on their amount of exposure to a medium and divides them into five equal-sized groups (called "quintiles") from heaviest usage (1) to lightest usage (5).



15. Media consumption data indicate that our target audience consumes higher than average amounts of magazines, internet, radio, television, and newspapers. When we look more

---

[2] The media usage of the target audience in each quintile is expressed as an index. An index of 100 is the average adult's usage of a particular medium. Therefore, an index above 100 indicates a heavier usage of the medium than the average adult, and an index below 100 indicates a lighter usage of the medium than the average adult.

closely at consumption rates, we find that approximately 95% of the target audience consumes Internet and 76% read magazines. These mediums provide the most cost-efficient means to effectively reach the target audience.

16.     Print Ads: The Publication Notice will appear one time in the national edition of *Good Housekeeping* with a circulation of 4,200,000 and one time in *People* with a circulation of 3,400,000. Both ads will appear as one-third-page size.

17.     Digital Ads and Banner Notices: A total of 64,000,000 gross impressions[3] will be delivered on Google Display Network, Facebook and Instagram across mobile and desktop platforms. Banner notices will be implemented using multiple targeting layers, programmatically targeting the audience effectively using third-party data (Kantar Shopcom IRI), to deliver messages to specific audiences. Ads will target people who have been identified to have purchased microwaves. Also, ads will be targeted based on demographics, interest and behaviors (Adults 35+, Homeowners, Home Improvement, Home Appliances, Home Remodeling).

18.     Keywords: To help Class Members locate the Settlement Website, Rust will purchase sponsored links on Google AdWords and their search partners to appear when searchers enter certain terms (e.g., "Sharp microwave lawsuit").

### *Earned Media*

19.     National Press Release: Rust will also disseminate a press release approved by the parties over PR Newswire's US1 news circuit reaching 5,400 traditional media outlets (television, radio, newspapers, and magazines) and relevant trade publications and 4,000 national websites. The release will highlight the toll-free telephone number and case website address, so that Settlement Class Members can obtain complete information.

---

[3] Gross impressions are the total number of times a digital ad will be shown. This figure does not represent the total number of unique viewers of the ad, as some viewers will see the ad on more than one website.

### *Class Member Response Mechanisms*

20.     The Class Member response mechanisms provided by Rust include a dedicated Settlement Website, toll-free number, and Post Office Box.

21.     Rust Consulting will establish a website to enable Settlement Class Members to get information about the Settlement, including the Long Form Notice in English and Spanish, the Claim Form, answers to frequently asked questions, the Settlement Agreement and other court documents from this action.  Settlement Class Members will be able to download the Long Form Notice and Claim Form materials and also file a claim online.  The online claim filing system will allow Settlement Class Members to upload documentation to support their claims. The Settlement Website will be operational prior to starting the Notice Plan.

22.     Rust Consulting will establish a Toll-Free Informational Number allowing Settlement Class Members to call and listen to answers to frequently asked questions 24 hours a day, 7 days a week.  Through this system, Settlement Class Members may request the Long Form Notice and Claim Form.  The Toll-Free Informational Number will be operational prior to starting the Notice Plan.

23.     Rust Consulting will establish a U.S. Mail Post Office Box to allow Settlement Class Members to submit Opt-Out requests and correspondence by mail with any specific requests or questions.  Claim Forms and claim filing instructions will provide Sharp's email and mailing addresses, which Sharp will be establishing to receive Claim Forms, in addition to any Claim Forms that may be filed online through the Settlement Website.

### III.    CONCLUSION

24.    The Notice Plan will deliver an approximate reach[4] of 75% against the target audience with an average frequency[5] of 2.1.

25.    The reach is within the guidelines established by the Federal Judicial Center [6], which established that sufficient reach is within 70-95%.  In my experience, the projected reach of the Notice Plan is consistent with other court-approved notice programs, and the notices have been designed to meet due process requirements.

26.    The process Rust intends to use to provide Notice to the Settlement Class and assist in administering this matter—including Direct Mail Class Notice, Email Class Notice, Publication Notice and maintaining the Settlement Website and Toll-Free Informational Number—are consistent with our standard approach for providing Class Notice and assisting in administering these types of class action settlements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed in Boulder, CO this 17th day of July 2020.

*Tiffaney A Janowicz*

Tiffaney A. Janowicz

---

[4] Reach is the estimated number of different people exposed to a specific vehicle or combination of vehicles.
[5] Frequency is the estimated average number of opportunities an audience member has to see the notice.
[6] Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, available at www.fjc.gov/content/judges-class-action-notice-and-claims-process-checklist-and-plain-language-guide-0 (last visited July 7, 2020).



# Exhibit A





Senior Vice President

## Tiffaney A. Janowicz, Esq.

**625 Marquette Avenue, Suite 900**
**Minneapolis, MN 55402**

**M:** 612.770.8805
**E:** tjanowicz@rustconsulting.com

# Education & Certifications

- **J.D.** William Mitchell College of Law, 1995 (St. Paul, MN)
- **B.S. Marketing Education** University of Minnesota, 1990 (Minneapolis, MN)

Tiffaney Janowicz leads Rust's consumer, product liability, and insurance and healthcare practice areas, with a depth of experience in antitrust matters. She also provides guidance to a team of project management professionals who handle projects in the same practice areas.

Janowicz began her career as a consultant at Rust in 1996 and was promoted to senior vice president in 2003. In her current role, Janowicz specializes in customer relations and strategic consultation on claims administration programs. Rust's clients benefit from her expertise in developing and executing strategies designed to achieve their settlement administration goals.

Janowicz has overseen all aspects of hundreds of settlements, including many of the firm's largest claims-processing matters. Examples include Microsoft's antitrust settlements for the states of California, Iowa, Minnesota, New York and Wisconsin, as well as the multi-district litigation claiming that companies fixed the price of Dynamic Random Access Memory (DRAM) in the United States. Janowicz has also lead many of Rust's insurance-related settlements and a number of credit life settlements.

Following are some additional details of cases that Rust has administered under the leadership of Janowicz.

- ***Parko v. Shell Oil Company***, **No. 3:12-cv-00336 (S.D. Ill.).** Janowicz was personally appointed as the neutral arbitrator in this $4.83 million class action settlement resolving claims against Shell and ConocoPhillips over groundwater contamination in Roxana, Illinois.
- ***Stinson v. The City of New York***, **No. 10 Civ. 4228 (S.D.N.Y.).** In a major civil rights class action settlement valued at up to $75 million, the City of New York agreed to provide compensation to class members who received summonses from New York police officers that had been issued without probable cause, allegedly in response to a summons quota within the NYPD. Rust mailed 922,000 notices and managed a website that received 131,000 unique visitors.

- ***Chaudhri v. Osram Sylvania**, No. 11-CV-05504 (D. N.J.).* A lawsuit claimed that Sylvania made misrepresentations regarding the performance of certain premium automotive lighting. The notice program used a mix of direct and media notice that included 1.6 million mailed postcards along with television, radio, and Internet advertising. Rust mailed 1.4 million checks totaling $16 million; Sylvania also changed the packaging for the covered products to address the issues in the lawsuit.

- ***In re: Target Corporation Customer Data Security Breach Litigation**, MDL No. 14-2522 (D. Minn.).* Plaintiffs claimed that Target did not adequately protect their payment card data and personal information and that Target delayed in providing notice of a widespread data breach. Rust's direct notice program consisted of 12 million mailed notices and 71 million email notices.

- ***In re Dynamic Random Memory (DRAM) Antitrust Litigation**, MDL No. 1486 (N.D. Cal.).* The lawsuits combined into this multi-district litigation claimed that the Defendant companies fixed the price of DRAM in the United States, causing individuals and businesses to pay more for DRAM and DRAM-containing devices. The combined direct and indirect settlements totaled $310 million.

- ***Maksimovic v. Sony of Canada Ltd**., Ontario Superior Court of Justice, No. CV-11 425487-00CP.* This Canadian settlement resolved allegations that Sony failed to adequately safeguard the computer systems used to provide the Sony PlayStation Network, the Qriocity service, and the Sony Online Entertainment services, which were attacked by criminal intruders in April 2011. Rust managed the translation of all materials into French and provided all documentation and communication in both English and French. Rust also established a Canadian P.O. box for the matter and drop-shipped the mail to our processing center in Minnesota.

- ***In re Nutella Marketing and Sales Practices Litigation**, No. 3:11-cv-01086-FLW-DEA (D.N.J.).* Plaintiffs claimed that Defendant Ferrero U.S.A., Inc. made representations through its marketing and advertising of Nutella® brand hazelnut spread, improperly suggesting that Nutella is healthier than it actually is. Rust placed notice of the settlement in magazines and banner ads on popular websites; the settlement website received over 1 million visits and over a quarter million consumers filed claims.

- ***In re Online DVD Rental Antitrust Litig**., MDL No. 2029 (N.D. Cal.).* Rust sent over 34 million email notices to potential class members in this project. Rust has processed more than 1.1 million claims for gift cards or cash benefit in this ongoing project. Rust also created a settlement website which has to-date received over 2.2 million site visits.

- ***Microsoft I-V Cases**, J.C.C.P. No. 4106, (Cal. Super. Ct. S.F. County).* Janowicz was responsible for the design and management of the direct mail notice program that involved the mailing of 18 million notice-and-claim form packages and deployment of 7 million email notices to a class consisting of consumers who purchased at retail selected Microsoft software for use in California. During the first years of the multi-year program, Janowicz was actively involved in the daily project activities and second in project responsibility only to the company president. Janowicz was and continues to be responsible for overseeing project management, claims and voucher processing, benefits and cy pres distribution, and call center activities.

- ***The Authors Guild, Inc. v. Google, Inc**., No. 05-cv-8135 (S.D.N.Y.).* Janowicz led and continues to lead her team in the administration services provided this settlement involving rights-holders around the world. Janowicz oversaw the translations of the claim forms and supporting materials and well as the provision of telephone support in more than 30 languages. For this ongoing project, Rust's CSRs assist rights-



holders in claiming their books and inserts, responding to questions related to the complex settlement and providing technical support throughout the online claims process.

- *Thompson v. Metropolitan Life*, **No. 00-CIV-5071 (W.D. Pa.).** Janowicz was second in project responsibility only to the company president in overseeing Rust's provision of services for this settlement, which included an estimated 25 million policies. Rust mailed more than 550,000 customized and 104,000 generic notices to potential class members. In this race-based underwriting insurance settlement, Rust received 220,000 claim forms, forwarded them on a rolling basis to the company for their research into class membership, and followed up on the company's direction by mailing 80,000 "cure" letters and more than 270,000 response letters to claimants. Rust's call centers answered calls generated by both the mailed notice and an extensive media campaign. During the national TV noticing campaign, there were 500 call center operators in two sites.

- *McNeil v. American General Life & Accident*, **No. 3:99-1157 (D. Tenn.).** Janowicz was second in project responsibility only to the company president in the management of Rust's claims administration services for a settlement covering 9 million class members. Rust mailed over 3 million notices within approximately two weeks. Rust also arranged for an ad campaign to help reach class members for whom the company did not have current addresses. Rust received 600,000 calls on this project, and printed and mailed more than 440,000 payments.

- *Naef v. Masonite Corp.*, **No. CV 944033 (Ala. Cir. Ct. Mobile County).** Project involved receiving and processing according to pre-determined criteria (including proof of property ownership, proof of product ownership, and proof of damage) more than 400,000 claims, eventually distributing more than $800 million to more than 260,000 claimants whose claims were validated. Janowicz co-directed the initial design of the claims intake process of this 10-year claims program, and managed claims review and contact center operations.

## Thought Leadership

- Co-Author, **"Estimating Claims – What Every Attorney Should Know,"** What We've Noticed, Feb. 2015
- Co-Author, **"Increasing Judicial Attention to Claims-Filing Rates,"** What We've Noticed, Oct. 2014
- Co-Author, **"The Case for Simplified Notice and Claims,"** What We've Noticed, July 2014
- Co-Author, **"Tracking Ted…,"** What We've Noticed, April 2014
- Panelist, **"Crafting Class Settlement Notice Programs: Due Process, Reach, Claims Rates, and More – Minimizing Court Scrutiny and Overcoming Objector Challenges,"** Strafford CLE Webinar, Feb. 2014
- Co-Author, **"Efficient, Cost-Effective Notification and Administration in Antitrust Class Actions,"** Class Action Perspectives, 2013
- Co-Author, **"Recent Court Decisions Indicate Greater Scrutiny of Class Notice Programs,"** What We've Noticed, Dec. 2013
- Panelist, **"Mechanics, Logistics & Statistics: How to Settle a Class Action Lawsuit,"** FDCC Section Presentations for CLE 2013 Winter Program, March 2013
- Panelist, **"Emerging Trends in Class Action Notice,"** CLE International 6th Annual Conference Class Actions: Hot Topics, Winning Strategies and More, June 2010



- Speaker, **"Class Action Notice and Claims Administration: Trends and Innovation,"** Women Antitrust Plaintiffs' Attorneys Networking Event, Aug. 2009
- Author, **"Anticipating Claims Filing Rates in Class Action Settlements,"** Class Action Perspectives, Nov. 2008

## Bar Admissions

- Licensed to practice law in Minnesota





# Qualifications Summary

This document outlines Rust Consulting's qualifications to serve as the administrator for class action, mass tort, and regulatory settlements, as well as to perform other similar, complex and time-sensitive matters such as remediation programs, data breach responses, and product recalls. It includes summary information categorized as follows:

- Firm Overview
- Practice Area Organization
- Personnel
- Services
- Representative Case Experience
- Data and System Security

## Firm Overview

Rust, an Exela Technologies brand, is an industry-leading consulting and administration firm that provides public and private sector clients a full complement of services required to administer legal settlements and similar programs. These services include consulting; project management; data management; notification; contact center and websites; claims processing; and fund management, distribution, and tax reporting.

Rust grew out of the litigation support firm the Rust Consulting Group, which was founded in 1976. In 1988, the Group administered its first class action settlement, eventually leading in 1995 to the formation of Rust Consulting, Inc. as a separate entity focused on legal settlement administration. Since then, Rust has administered more than 7,000 settlements and projects.

Headquartered in Minneapolis, Rust also has an office in Faribault, Minnesota. Our subsidiary Kinsella Media maintains a Washington, D.C., location. Rust and Kinsella are wholly owned subsidiaries of Exela Technologies, Inc. (NASDAQ: XELA, XELAW and XELAU), one of the largest global providers of transaction processing solutions and enterprise information management.

## Practice Area Organization

Rust administers programs spanning diverse subject matter. The depth and breadth of our legal settlement administration experience spans all prominent practice areas, such as antitrust, consumer, finance, insurance and healthcare, labor and employment, product liability, and securities matters on behalf of private sector clients and governmental agencies at all levels. Our services also lend themselves to our clients' non-settlement needs, including data breach responses, recalls, and remediation programs.

Our leadership and certain operations and client services personnel focus on specific practice areas relevant to our clients, deepening their subject matter expertise and directly relevant experience.

*Rust Consulting Qualifications Summary, 2*

## Personnel

Our permanent staff of approximately 200 includes professionals with backgrounds and disciplines including project management, information technology, finance, law, and operations. This cross-functional, innovative team includes experts in their respective disciplines, such as CPAs, Ph.D.s, attorneys, and PMPs.

Rust's team includes some of the most experienced practitioners in the industry, with much of that experience Rust-specific. Our executive leadership team averages 21 years of Rust experience, our senior vice presidents average 16 years, and our functional directors average nearly 20 years.

## Services

The Rust team provides high quality administrative services for matters of any size and scope. Specific approaches may vary depending upon the requirements of each individual matter; however, the below services are typical of our engagements.

### Preliminary Consulting

Rust consults with clients prior to settlement to help set expectations based on our experience with similar matters and to anticipate otherwise identified issues that may arise in administration based on a settlement or program's characteristics.

### Project Management

Our project management personnel prepare plans of notice and administration, create or customize project tracking tools and reports, and oversee the creation of project-specific databases designed to house and capture appropriate information for use in claims administration. Throughout the administration process, project management personnel coordinate all activities between the parties, vendors, and internal Rust departments to ensure work is completed accurately and according to any service level agreements, internal standards, settlement documents, etc. We provide regular and on-demand reports and statistics to the appropriate parties and raise potential issues requiring their attention, as necessary. Upon completion of each major phase of administration, or as required, we prepare declarations or affidavits attesting to the scope and results of our work.

### Data Management

The secure and efficient handling of data underlies all aspects of claims administration; Rust creates and customizes data management processes, databases, applications to meet the unique needs of each settlement or project. Tasks associated with data management throughout administration may include:

- Intaking original client data.
- Normalizing data for cross-platform usability, such as meeting mailing or other outreach requirements.
- Consolidating and deduplicating data from multiple sources.
- Extracting data for standard or customized trace services.
- Extracting data for mailing or other outreach.
- Calculating awards.



*Rust Consulting Qualifications Summary,* 3

## Notification

Rust disseminates hundreds of millions of notices annually by mail and email. We also work with our subsidiary Kinsella Media, the leading provider of notice to unidentified audiences and the only firm in the nation with qualified, court-recognized notice expertise, to develop and implement notice plans.

With respect to legal settlements, these notice programs notify class members or other affected individuals of their legal rights and options. With respect to data breach responses, recalls, or remediation, these programs inform affected individuals about the situations and any options those affected individuals may have.

Among our notification-related services are:
- Designing notice programs (through Kinsella Media).
- Drafting plain language materials (through Kinsella Media).
- Designing and proofreading notice materials.
- Locating unidentified individuals and updated addresses.
- Printing and mailing.
- Processing and forwarding undeliverable mail.
- Opining about notice program adequacy (through Kinsella Media).

## Contact Center

Rust supports the programs we administer through an assortment of contact center services including call center, websites, and email support up to 24/7 and for class members and other affected individuals worldwide.

Our call center services include inbound and outbound calls in our own domestic, in-house call center. The call center is located in our Minneapolis headquarters and is readily expandable to meet the needs of specific programs of any size.

All customer service representatives (CSRs)—permanent or temporary—undergo background checks and training on Rust's policies and technology, customer service fundamentals, and project-specific information. Typical engagements include English- and Spanish-speaking CSRs, while we provide support in additional languages, as required. In one case, Rust CSRs took live inbound calls in 10 languages.

In lieu of or in conjunction with live customer service, Rust builds and maintains automated Interactive Voice Response (IVR) systems that provide 24/7 service to toll-free numbers and include menus of prerecorded options such as program overviews, frequently asked questions and answers, and options for requesting forms or filing claims. Rust's IVR systems regularly support English- and Spanish-language speakers and can be programmed to support other languages, as required. In one case, Rust managed IVR support including translations of information pre-recorded by native speakers in 67 languages.



## Claims Processing

Rust develops or executes claims processing or adjudication programs as required by the diverse terms of our engagements. We use several proprietary software applications and tested, streamlined processes to provide the most appropriate solutions for each engagement's needs, whether for paper or online claims. Our systems automate the claims administration process:

- Receipt.
- Link to class member database record.
- Data capture.
- Review of supporting documentation.
- Initial adjudication.
- Deficiency processing.
- Final adjudication.
- Rejection letters.
- Reporting/affidavits.

To meet the needs of each engagement, our systems can be configured to give clients or authorized parties secure online access to claimant data and reporting, or to class members to facilitate online claims filing.

## Fund Management, Distribution, and Tax Reporting

Rust annually distributes billions of dollars associated with settlements and similar programs. Our Bank and Tax group is responsible for day-to-day banking and tax reporting functions for all settlement funds.

| Banking Services | Tax Reporting Services |
|---|---|
| <ul><li>Account setup.</li><li>Online bank reporting.</li><li>Escrow, investment and distribution accounts.</li><li>Escrow agent services.</li><li>Positive Pay – all claimant checks are issued with Positive Pay verification.</li><li>Check images.</li><li>Wire transfers.</li><li>Account reconciliation (daily, weekly or monthly).</li><li>Balance inquiry and reporting.</li></ul> | <ul><li>Tax identification numbers (federal and state).</li><li>Qualified Settlement Fund (QSF) determination.</li><li>Claimant award taxability and reporting.</li><li>W-9 review.</li><li>Annual 1120 SF tax returns and quarterly tax deposits.</li><li>IRS and state 1099 and 1042S reporting and transmission.</li><li>Backup withholding deposits and 945 annual reporting.</li><li>Employment payroll taxes: 941, 940, SUTA, SIT, and local income taxes.</li></ul> |



# Representative Case Experience

Having administered more than 7,000 projects, a complete listing of our experience is voluminous. However, the below tables demonstrate the scope of our experience and capacity.

*Note: All numbers are rounded*

| Notices | Case |
|---|---|
| 183 million | *In re Domestic Airline Travel Antitrust Litigation,* MDL 2656 (D.D.C.). |
| 83 million | *In re Target Corporation Customer Data Security Breach Litigation,* MDL 2522 (D. Minn.). |
| 31 million | *In re Lawnmower Engine Horsepower Marketing and Sales Practices Litigation,* No. 2:08-md-01999 (E.D. Wis.). |
| 24 million | *Microsoft I-V Cases,* J.C.C.P. No. 4106 (Cal. Super. Ct. San Francisco County). |
| 15.7 million | *Blessing v. Sirius XM Radio,* No. 09-cv-10035 (S.D.N.Y.). |

| Distributed | Case |
|---|---|
| $3.6 billion | Independent Foreclosure Review |
| $1.5 billion | National Mortgage Settlement |
| $800 million | *Naef v. Masonite Corp.,* No. CV 944033 (Ala. Cir. Ct. Mobile County). |
| $800 million | *Microsoft I-V Cases,* J.C.C.P. No. 4106 (Cal. Super. Ct. San Francisco County). |
| $762 million | *In re American International Group, Inc. Securities Litigation,* No. 04 Civ. 8141 (S.D.N.Y.). (PwC, Company, Starr, and Gen Re Settlements) |

| Claims | Case |
|---|---|
| 3.5 million | *In re Compact Disc Minimum Advertised Price Antitrust Litigation,* MDL No. 1361 (D. Me.). |
| 3.2 million | *In re American International Group, Inc. Securities Litigation,* No. 04-cv-8141 (S.D.N.Y.) (Company, PwC, Starr, and Gen Re settlements). |
| 3 million | Abbott Infant Formula Settlements |
| 2.8 million | *Fogel v. Farmers Group, Inc.,* No. BC300142 (Cal. Super. Ct. Los Angeles County). |
| 1.2 million | National Mortgage Settlement |

| Calls | Case |
|---|---|
| 3.6 million | Independent Foreclosure Review |
| 1.5 million | *Dyson v. Flagstar Corp.,* No. DKC93-1503 (D. Md.). |
| 1.4 million | National Mortgage Settlement |
| 1.3 million | Abbott Infant Formula Settlements |
| 1 million | *Naef v. Masonite Corp.,* No. CV 94-4033 (Ala. Cir. Ct. Mobile County). |



# Data and System Security

The security of systems and applications and confidentiality of data are of utmost importance to Rust, our clients, the parties to engagements we administer, and members of the public impacted by our operations. Thus Rust actively protects its systems and mitigates potential threats by adhering to a comprehensive assortment of security best practices, certifications, and audits that we refer to collectively as our "unified compliance posture."

As part of our unified compliance posture, Rust:

- Has received from three federal agencies (CFPB, FTC, and SEC) an Authority to Utilize Controlled Unclassified Information under the guidelines of FISMA and NIST 800-171.
- Complies with and adheres to Privacy Shield Principles.
- Undergoes an annual SSAE18 SOC 2 Type II Report audit of our data and system security controls and protocols.
- Complies with applicable laws, such as the Sarbanes-Oxley Act (SOX), Gramm-Leach-Bliley Act (GLBA) and the Health Insurance Portability and Accountability Act (HIPAA).
- Adheres to documented and audited processes.
- Maintains a business continuity plan to ensure uninterrupted, secure service.
- Has implemented controls to prevent unauthorized access or disclosure, maintain data accuracy, and ensure the appropriate use and confidentiality of information, either for its own purposes or on behalf of our clients.
- Has put in place appropriate physical, electronic, and managerial procedures to safeguard and secure the information we process.
- Processes personal information only in ways compatible with the purpose for which it was collected or subsequently authorized to do.

